# UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

| | |
|---|---|
| DONNA J. HILL and YOLANDA CHACON-VALLE, On Behalf of the EDUCATIONAL RETIREMENT FUND and its Members and Beneficiaries, or, Alternatively, On Behalf of Themselves and All Others Similarly Situated, )<br><br>Plaintiffs, )<br><br>vs. )<br><br>VANDERBILT CAPITAL ADVISORS, LLC, PATRICK A. LIVNEY, ALDUS EQUITY, LLC, MARC CORRERA, NEPC, LLC, BRUCE MALOTT, GARY BLAND, VERONICA GARCIA, and DOUGLAS M. BROWN, )<br><br>Defendants, and )<br><br>The EDUCATIONAL RETIREMENT FUND, )<br><br>Nominal Defendant. | No: 6:10-cv-00133 JB-KBM |

## AMENDED COMPLAINT

<u>**THE NATURE OF THE CASE**</u>

1.      Plaintiffs are members of the Educational Retirement Fund (the "Fund"), a public pension plan established for education professionals employed by the State of New Mexico and other government entities within the state.  Plaintiffs seek to recover damages for the Fund from Defendants, who have caused the Fund to suffer losses from improper investment actions. Plaintiff brings this action directly against Defendants as a Trust beneficiary to recover for the Fund, or, in the alternative, she brings this action derivatively on the Fund's behalf under Fed.R.Civ.P. 23.1.

2.      New Mexico pension funds, such as the Fund, have been victimized by "pay to play" schemes involving so-called "placement agents" – individuals and firms who allegedly help money managers solicit investment funds, but whose real purpose is to steer funds to politically favored recipients.  On information and belief, there is an ongoing grand jury investigation conducted by the United States Department of Justice, an ongoing investigation by the United States Securities and Exchange Commission, as well as other lawsuits concerning improprieties in New Mexico's investment policies.[1]

3.      Members of the Fund[2] have suffered identifiable individual damages as they face contribution increases, diminished services and have faced tax increases to cover the financial shortcomings of the Fund.  In recent years, the Fund has been underfunded – its current Fund

---

[1] New Mexico's State Investment Council ("SIC") reports that, as of January 25, 2010, it had expended $4.5 million in legal fees responding to the foregoing civil and criminal investigations, a substantial portion of which expenses were caused to be paid through the conduct of certain of the Defendants herein.

[2] The Educational Retirement Act defines "Members" as active participants in the Fund, "Retired Members" as members receiving retirement benefits from the Fund, and "Beneficiaries" as persons entitled to received member benefits.  In this Amended Complaint, for clarity all such participants in the Fund are referred to as "Beneficiaries."

balance plus its projected returns have been insufficient to meet its anticipated obligations. These problems are exacerbated by the fraudulent conduct alleged herein.

4.      This Complaint charges multiple breaches of fiduciary duties, occasioned by massive and insuperable conflicts of interest; breaches of federal and state antifraud laws; aiding and abetting these violations; and other violations of law.  Plaintiffs, through the claims asserted in this Complaint, seek to recover damages on behalf of the Fund arising from three related circumstances:

    a.      the retention of Defendant Aldus  Equity, LLC ("Aldus") as an investment advisor, as well as the payments made to and through Aldus;

    b.      the investment of $40 million with Defendant Vanderbilt Capital Advisors, LLC ("Vanderbilt Capital") and related entities; and

    c.      the payment of millions of dollars in kickbacks styled as "placement fees" to Defendant Marc Correra ("Correra"), the son of an advisor to Governor Bill Richardson (the "Governor").

5.      This Complaint also challenges the unique circumstance in New Mexico under which members of the Educational Retirement Board ("ERB") are indemnified from public sources for fiduciary abuses, thereby undercutting their essential responsibility for their actions.

## JURISDICTION OF THE COURT

6.      This Court has jurisdiction of this removed action (1) pursuant to Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78aa, and (2) 28 U.S.C. §1331 because it asserts claims under the United States Constitution on behalf of the Class and the Fund.  This Court has supplemental jurisdiction over pendent state law claims in this action

pursuant to 28 U.S.C. § 1367 as they are so closely related to the claims on which there is original jurisdiction that the state law claims are part of the same case or controversy.

7.     Venue is proper in this District because the Plaintiffs, most of the members of the Class herein and many of the Defendants reside in this District, and a substantial part of the events giving rise to the claims occurred in this District.  All of the Defendants have transacted substantial business, and committed unlawful acts, in this District.

## THE PARTIES AND RELEVANT NON-PARTIES

8.     Donna J. Hill ("Plaintiff" or "Ms. Hill") was, and is employed as a Records Tech II at New Mexico State University.  Ms. Hill is a citizen of New Mexico and a Beneficiary of the Fund.

9.     Yolanda Chacon-Valle ("Plaintiff" or "Ms. Chacon-Valle") was, and is employed at New Mexico State University, working in the library.  Ms. Chacon-Valle is a citizen of New Mexico and a Beneficiary of the Fund.

10.     As alleged herein, individual Fund Beneficiaries, such as Plaintiffs, have been injured by shortfalls in the state's pension fund system in the form of higher employee contributions, reduced services and tax increases.  Plaintiffs and all of the other Beneficiaries are also at substantial risk that, due to such shortfalls, the Fund will have insufficient assets to satisfy its obligations to its Beneficiaries.

11.     The Fund, a nominal Defendant, provides retirement benefits to teachers, professors, and employees in New Mexico's public primary schools, colleges, and universities.  The ERB is charged with overseeing the Fund, which has approximately 63,700 active members and 31,200 retired members.  Plaintiffs do not seek any damages from the Fund, but rather, seeks a recovery on the Fund's behalf as well as indirectly for themselves and the Class.  The ERB, as

the Trustee of the Fund, should have taken the action asserted herein on behalf of the Fund and its Beneficiaries, but it has failed to, and will not, do so.

**Vanderbilt Defendants**

12.     Defendant Vanderbilt Capital is a Delaware limited liability company with its principal place of business in Chicago, Illinois.  It managed substantially all of the common ownership interests of the now defunct Vanderbilt Financial, LLC ("Vanderbilt Financial"), also a Delaware limited liability company, and Vanderbilt Financial Trust ("Vanderbilt Trust"), a Delaware statutory trust.  Vanderbilt Capital controlled all of these entities, and is responsible and liable for their actions.  Vanderbilt Capital, in turn, is controlled by Pioneer Investment Management U.S.A., Inc. ("Pioneer").  Pioneer is not named as a defendant herein.

13.     Defendant Patrick A. Livney ("Livney") was the Chief Executive Officer and a director of Vanderbilt Financial.  He also is the Senior Managing Partner of the Structured Finance Group of Vanderbilt Capital.  Livney, at all times, was acting within the scope of his employment at Vanderbilt Capital.  Defendants Vanderbilt Capital and Livney are collectively referred to herein as the "Vanderbilt Defendants."

**Aldus and Meyer**

14.     Defendant Aldus, a Texas limited liability company with its principal place of business in Dallas, Texas, is a private equity services firm that served as a private equity consultant or advisor to the ERB from approximately 2006 until the ERB terminated the relationship in early 2009 amid allegations of "pay to play" scandals involving New Mexico public funds.  As a private equity consultant or advisor to the ERB, Aldus owed fiduciary, contractual, and other duties to the ERB and the Fund.

15.     Saul Meyer ("Meyer"), not a defendant herein, is a founding partner of Aldus. During the period that Aldus served as a private equity consultant or advisor to the ERB, Meyer owed fiduciary, contractual, and other duties to the ERB and the Fund.

**The Placement Agent: Marc Correra**

16.     Defendant Correra is a Santa Fe stockbroker who has been a major political contributor to the Governor and his causes.  Correra is the son of Anthony Correra, a long-time close friend of and major political contributor to the Governor.  Anthony Correra is a close friend of Defendant Bland and served on a committee that recommended him for the State Investment Officer position.   Anthony Correra also served as a director of a non-profit foundation that the Governor formed to conduct voter registration in preparation for the 2004 presidential election. Correra received at least $22 million in undisclosed fees from investment management clients to secure private equity and other investments from various New Mexico public entities, including over $2 million in connection with investments associated with Vanderbilt Capital and related entities.  On information and belief, he has fled the State of New Mexico in order to escape the legal consequences of his actions.

**Trustee Defendants**

17.     Defendant Bruce Malott ("Malott") has been the Chairman of the ERB since August 2004, and has served on the ERB since 1999.  He also is the Chair of the ERB's Investment Committee.  Malott is a close political ally of the Governor and he or others associated with his accounting firm have served as the Governor's campaign treasurer in 2006 and as accountant for the Governor's political action committee and charitable foundation.  In his position with the ERB, Malott owes fiduciary duties to the ERB, the Fund, and the Fund's Beneficiaries.  In his ERB role, Malott had irreconcilable conflicts of interest as, among other

things, his accounting firm garnered millions of dollars of additional state contracts at the time he served on the ERB.

18.     Defendant Gary Bland ("Bland") was an ERB member, appointed by the Governor, from 2006 to 2009.  He also was New Mexico's State Investment Officer and a member of the State Investment Council ("SIC") until he resigned under pressure in October 2009.  He also served on the ERB's Investment Committee.  Bland owed fiduciary duties to the ERB, the Fund, and the Fund's Beneficiaries.

19.     Defendant Veronica Garcia ("Garcia") was an ERB member from 2006 to present, a position she held as a result of her appointment as New Mexico's Secretary of Education by the Governor.  Garcia owed fiduciary duties to the ERB, the Fund, and the Fund's Beneficiaries.

20.     Defendant Douglas M. Brown ("Brown") was a Trustee from 2005 to 2006.  He also was a member of the ERB's Investment Committee.  Brown was the Treasurer of the State of New Mexico at the time the investment by the Fund in the Vanderbilt Trust (the "Vanderbilt Investment") was approved by the ERB, and by virtue of his position as Treasurer, he served as Custodian of the Fund.  Brown owed fiduciary duties to the ERB, the Fund, and the Fund's Beneficiaries.  Brown is a financial professional who, along with his firm, receives substantial fees from governmental entities within the state.  Like Malott, his business depended in substantial part upon of the goodwill of the political forces in the state.

21.     Malott, Bland, Garcia and Brown were all allies of, and indebted to, the Governor. They formed a voting block through which they were able to commit to Fund investments hastily and without sufficient deliberation, all of which indirectly, and intentionally, benefited the Governor and the Governor's interests.

**NEPC**

22.      Defendant NEPC, LLC, a Delaware limited liability company, is the legal successor, by merger effected on December 31, 2007, to New England Pension Consultants, Inc., a Massachusetts corporation.  The two entities are collectively referred to herein as "NEPC." NEPC is a Cambridge, Massachusetts-based investment consulting firm that served as an investment advisor to the ERB, in which capacity it served with respect to the Vanderbilt Investment.  As an investment advisor to the ERB, NEPC owed fiduciary, contractual, and other duties to the ERB, the Fund, and its Beneficiaries.

## GENERAL ALLEGATIONS

**A.      The ERB Was a Desirable Source of Investment Funds**

23.      Beginning in approximately 2005, the ERB was permitted to invest in alternative investments such as private equity and hedge funds, and it became a large and very desirable source of investment funds.  Gaining access to and investments from the ERB was a competitive process, and many of those who sought investment funds retained third parties known as "placement agents" to introduce and market them to the ERB.  In some instances, placement agents performed minimal duties, but were retained because their political connections could obtain substantial public investments.

24.      Placement agents and other third parties who are engaged in the business of effecting securities transactions and who receive a commission or compensation in connection with that transaction are required to be licensed and affiliated with broker-dealers regulated by an entity now known as the Financial Industry Regulatory Authority ("FINRA").

25.      Correra was a placement agent.  Correra was politically connected and essentially sold access to public money, including, as set forth below, the Fund.

**B**.    **The Trustees' Fiduciary and Contractual Duties to the Fund, its Members and Beneficiaries**

    **1.    Trustee Obligations Under New Mexico's Constitution and the Educational Retirement Act**

26.    The Fund is a trust fund established by the Educational Retirement Act, and the ERB is designated by statute as the Trustee of the Fund.  The members of the ERB are charged with fiduciary duties and responsibilities for managing and investing the Fund – a portfolio currently worth approximately $8.5 billion – "for the sole and exclusive benefit of the members, retirees and other beneficiaries."

27.    All Board expenditures must be made solely for the benefit of the Fund's Beneficiaries and for expenses of administering the pension system and may not be used, diverted, loaned, assigned, pledged, invested, encumbered or appropriated for any other purpose. All investment costs must be appropriate and reasonable in relation to the purposes of the Fund.

28.    The ERB members must comply with strict investment restrictions in managing the Beneficiaries' retirement funds.  For example, they must invest or reinvest the retirement funds in compliance with the Uniform Prudent Investor Act and the Prudent Investor Rule. Under the Prudent Investor Rule, the ERB must invest and manage the retirement funds as a prudent investor would.  In satisfying this standard, the ERB must exercise reasonable care, skill and caution.  The ERB also must manage and invest the Fund's assets with loyalty and impartiality.

29.    The ERB's investment and management decisions with respect to the Fund's assets must be evaluated as part of an overall investment strategy, having risk and return objectives reasonably suited to the Fund.  In investing and managing the Beneficiaries' trust assets, the ERB must consider, among other things, general economic conditions, the role that

each investment plays within the overall trust portfolio, the expected total return from income and the appreciation of capital, and the needs for liquidity, regularity of income and preservation or appreciation of capital.  Funds are to be used for investment, not for speculation.

30.     The ERB members were and are required to make reasonable efforts to verify facts relevant to the investment and management of the Fund's assets.

31.     In delegating investment and management responsibilities, the ERB must exercise reasonable care, skill and caution in selecting agents, establishing the scope and terms of the delegation consistent with the purposes of the Fund, and monitoring the agent's performance and compliance with the terms of the delegation of responsibility.

32.     The ERB also must comply with strict restrictions on gifts, campaign contributions, and conflicts of interest.  Except for small gifts of food or beverage, the ERB members may not receive or accept anything of value, directly or indirectly, from a person who has a current contract with the ERB, is a potential contractor, or is authorized to invest Fund monies.  The ERB members also may not have any interest, directly or indirectly, in the gains or profits of any Fund investments.

### 2.     Trustees' Obligations Under the ERB's Policies

33.     In February 2006, the ERB adopted a set of investment policies entitled "New Mexico Educational Retirement Board Investment Goals, Objectives and Policies" (the "Investment Policy").

34.     The Investment Policy includes a "Mission Statement" that states: "The [ERB] is a statutory entity that provides secure retirement benefits for our active and retired members from school districts, higher education and educational agencies.  We strive to make our members' retirement experience optimal by: Prudently managing the financial assets of the fund

. . . ." The document also states that one of its purposes is to "ensure prudence and care are maintained in the execution of the investment program."

35.     The Investment Policy states that the ERB is required to manage and invest the Fund's assets in compliance with the Prudent Investor Rule:

> Under this standard, the Board shall discharge their duties with respect to the system:
>
> (a) Solely in the interest of, and for the exclusive purposes of providing benefits to, participants and their beneficiaries and defraying reasonable expenses of administering the system.
>
> (b) Investment of the fund shall be made with the exercise of that degree of judgment and care, under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs, not for speculation but for investment, considering the probable safety of their capital as well as the probable income to be derived.
>
> (c) Shall diversify the investments of the system so as to minimize the risk of loss and to maximize the rate of return, unless under the circumstances it is clearly prudent not to do so.

36.     The Investment Policy states that the ERB's investment goals are:

> 1.     To invest the assets so they provide sufficient benefits to plan participants.
>
> 2.     To develop an investment structure that minimizes risk and maximizes investment return, recognizing the theory of capital market pricing that maintains that over the long-term investment risk should be proportional to the investment return achieved.
>
> 3.     To comply with existing and future state and federal statutes.

37.     The Investment Policy states that the ERB's investment philosophy is, among other things, to "incorporate effective risk control."

38.     Under the ERB's specific "Private Equity Policy," the ERB may only invest in a private equity investment if it is an "appropriate investment opportunity" that generally falls within the categories of buyout or corporate restructuring capital, venture capital, mezzanine

financing, or "special situations" such as distressed securities, secondary funds, or "[o]ther investments as deemed appropriate."  In addition, the private equity investment must "[h]old[] out the prospects for capital appreciation . . . comparable to similar investments made by other professionally managed private equity funds" and "[h]a[ve] a minimum committed capital of fifty million dollars ($50,000,000) exclusive of the investment with ERB."  Additionally, the ERB may "[a]ccept[] investments only from accredited investors, as that term is defined in Section 2 of the Federal Securities Act of 1933 . . ." and must "[h]a[ve] full-time management with at least five years of direct private equity experience."

39.     The Private Equity Policy also requires that all private equity investments must first be approved by the ERB's Private Equity Investment Committee.

### 3.     The Trustees Received Legal Advice Explicitly Confirming Their Broad-Ranging Fiduciary Responsibilities

40.     The ERB and its members well understood their respective fiduciary duties to the Fund and its Beneficiaries.  Before joining the ERB, each member received both literature and training concerning his or her fiduciary responsibilities.

41.     In 2006, and again in 2010, ERB members received a report from attorney Ian Lanoff of the Groom Law Group, described as "ERB fiduciary counsel."  The Groom Law Group is a prominent Washington, D.C.-based law firm that specializes in advising pension fund boards about their fiduciary duties.

42.     The presentation minutes recite that:

> Mr. Lanoff pointed out that this Board is the trustee of the Educational Retirement Fund, and this isn't seen in every state law – although people on boards realize they are fiduciaries because they have the responsibility, sometimes it is unclear whether they are also trustees.  He said that that is important because fiduciaries who are trustees are subject to the highest standard of conduct known to the law: for example, the ERB has a much higher

responsibility under its law than a corporate trustee or member of a board of directors would have.

In addressing the duties of the Board, Mr. Lanoff said there is very specific language both in the New Mexico Constitution, as well as in State Statute regarding the duty of loyalty; specifically

"Assets shall be held for the sole and exclusive benefit of the members, retirees and beneficiaries.  Expenses shall only be made for the benefit of trust beneficiaries and for expenses of administering the system.  Costs must be appropriate and reasonable.  Assets shall never be used, diverted, loaned, etc. for any other purpose."

Mr. Lanoff commented that was as specific and broad ranging as he has seen in any state statute or constitution. . . .

Mr. Lanoff also noted that, under the New Mexico State Constitution, members have a vested property right with due process protections.

Mr. Lanoff stated Board members have no duty of loyalty to the Legislature, to the taxpayers, to the union who appointed them, to the governor who appointed them, or to contributing employers.

\*   \*   \*

Mr. Lanoff said Board members and employees may not accept anything of value from a person who: 1) has a current contract with a Board or association; 2) is a potential bidder for the provision of services or  property; 3) is authorized to invest  public funds; 4) is an organization having a membership that includes these persons.

\*   \*   \*

. . . Mr. Lanoff advised the Board to buy fiduciary insurance in the interest of paying any attorney fees that might come up.

43.    Contrary to Mr. Lanoff's advice, the ERB did not purchase insurance.  Rather, Board members look to the State for indemnification of their liability for fiduciary abuse.  This policy is itself a breach of fiduciary duty.

## C.    The Vanderbilt Investment

### 1.    The Offering

44.     Pursuant to the Prudent Investor Act of 2005, N.M.S.A. §45-7-601, the Legislature has permitted the ERB to make investments for its retirees in alternative or non-traditional investments as long as it does so "prudently."  This modest statutory change has facilitated opportunities for questionable operators on the periphery of the securities industry to solicit the investment of public funds for exotic and imprudent investments.  In particular, it has created opportunities for placement agents to use their local political connections to cause state and other governmental entities to direct their respective pension fund investments to their lucrative clients in the securities industry.

45.     Shortly after the foregoing legislation was passed, the Vanderbilt Defendants began to aggressively market alternative investments to the ERB and the SIC.  In early 2006, the Vanderbilt Defendants designed the Vanderbilt Trust Offering, an alternative investment offering that was designed specifically to be targeted to the ERB and SIC.  The Vanderbilt Trust Offering was a private placement of the shares of the Vanderbilt Trust, a statutory trust designed to own the membership interests in Vanderbilt Financial.  Vanderbilt Financial, in turn, was a holding company that would acquire certain Collateralized Debt Obligations ("CDOs") and other alternative and questionable investments.

46.     The Vanderbilt Trust Offering was a highly speculative, risky, and leveraged investment that was inappropriate for the Fund.  The portfolio of Vanderbilt Financial consisted principally of CDOs, which are complicated derivative instruments that are only as valuable as their position, or tranche, and the quality of the underlying assets represented by the instruments. The portfolio of Vanderbilt Financial consisted of heavily leveraged positions in CDOs in which Vanderbilt Financial took the first loss position, or equity tranche (the riskiest position in a CDO, sometimes referred to in the industry as "toxic waste") or in which a substantial portion of the

underlying assets were subprime, Alt-A, or A-minus mortgages that had been provided to borrowers who provided little or no verification of their assets or ability to repay the loans and who did not meet minimal lending standards (certain of these loans are known in the industry as "liar's loans" or "exceptional loans").  Many of the holders of the underlying mortgages lacked the means to repay these loans, many of which were adjustable rate mortgages with looming upward interest rate adjustments.  All of these assets comprising the CDOs were of an extremely high-risk nature, required extensive analysis to understand, and were inappropriate investments for pension funds.

47.     Incredibly, the portfolio of Vanderbilt Financial also included "synthetic" CDOs, which were not backed by any underlying assets at all, but were merely highly speculative bets on whether other CDOs (called "reference CDOs") would succeed or fail.  Livney denied that the portfolio contained synthetic CDOs at a May 12, 2006 Investment Committee meeting.

48.     The Vanderbilt Defendants knew that a high default rate on the underlying loans was likely and that even a modest percentage of defaults among mortgagors would make the investment worthless.  They also knew that their interests conflicted with the interests of the ERB, the Fund and the Fund Beneficiaries; while they would profit from securitizing and selling defective mortgages that were difficult to sell anywhere else, the Fund was highly likely to suffer heavy losses.

### 2.  Pay to Play

49.     The Vanderbilt Defendants retained Correra to act as a placement agent to secure investments from the ERB and SIC, and they paid him over $2 million for producing the ERB's and SIC's Vanderbilt investments.  This money was paid purely because of the Correra family's close relationship with the Governor and ability to influence the investment decisions of various

state entities.  These inflated payments were not for legitimate services, but were to "grease the way" for approval of SIC and ERB investments in securities offered by the Vanderbilt Defendants.

50.     Correra used his influence and close political ties with the Governor and his allies to facilitate the participation of the ERB and SIC in the Vanderbilt Trust Offering.

51.     By steering the ERB to invest Fund assets in the Vanderbilt Trust Offering, Correra delivered on his part in the "pay to play" scheme, and the Vanderbilt Defendants held up their end of the bargain as well.  Vanderbilt, its employees, and their families contributed, directly and indirectly, to the Governor's presidential campaign, including the maximum contribution allowed by law from both Livney and his wife.

52.     Malott was also highly incentivized to pressure Board members and staff, including the ERB's Chief Investment Officer, Frank Foy ("Foy"), to approve the Vanderbilt Investment.  Malott's accounting firm received huge state contracts for accounting services, so he had every financial reason to be sensitive to the concerns of the Governor and the Correras.  Since the Governor assumed office in 2003, Malott's accounting firm has been awarded $7.8 million in public auditing contracts; in the prior five years, that firm was awarded only $275,000 in contracts.  Malott received his guidance from senior staff members of the Governor.

### 3.     The Marketing of the Vanderbilt Trust Offering and the Board's Approval of the Vanderbilt Investment

53.     Starting with their initial efforts to market the Vanderbilt Trust Offering, the Vanderbilt Defendants made repeated misrepresentations and omissions of material fact concerning the financial prospects for the Vanderbilt Trust.  On March 7, 2006, Kurt W. Florian, Jr., Chief Operating Officer and Counsel of Vanderbilt Financial, represented in an e-mail to Malott (which Malott forwarded to Bland and Foy) that "we are targeting an annual dividend

yield of approximately 10%" for the Vanderbilt Trust."  This projection was knowingly or recklessly false and misleading, as there was no basis in fact for such a projection.

54.     Malott arranged to obtain approval of the Vanderbilt Investment as quickly as possible and under highly irregular circumstances.  A special meeting was scheduled in order to meet a contrived deadline that did not exist and was misrepresented.  Written materials were not distributed to the ERB in advance (although an offering memorandum was later prepared, it was not provided to the ERB during the course of its deliberations).  ERB minutes make clear that the ERB did not understand the investment that was being proposed.  ERB members acknowledged that the ERB did not understand the investment and a number of the ERB members complained that they had not received written materials about the investment in advance of the meeting.

55.     The ERB Investment Committee met to consider the Vanderbilt Trust Offering at 11:25 a.m. on May 12, 2006, to be followed immediately thereafter by a Special Meeting of the ERB at 12:30 p.m. to approve the Investment Committee's expected recommendation of the investment.  By 1:00 p.m., the decision to make the investment – a $40 million purchase of Vanderbilt Trust Shares (the "Vanderbilt Investment") – had been made.

56.     On May 12, 2006, Livney came to the ERB's offices in Albuquerque to pitch the Vanderbilt Trust Offering to the ERB Investment Committee.  According to the Investment Committee's minutes, Livney falsely represented the Vanderbilt Trust "as a state of the art, 'top of the food chain' investment vehicle."  Such statement was knowingly or recklessly false and misleading and intended to induce the Board to approve the proposal.  In fact, Livney knew that the portfolio of Vanderbilt Financial consisted of toxic waste, liar's loans, and exceptional loans, and was highly speculative, risky, and leveraged, and virtually worthless from the outset.

Contrary to "top of the food chain," this purported investment was thoroughly exposed to defaults on the underlying mortgages.

57.     At the Investment Committee meeting, Livney stated that Citigroup was the lead underwriter for the Vanderbilt Trust Offering and that Bear Stearns was a co-lead underwriter.

58.     In making his presentation, Livney concealed the material fact that the politically connected Correra would receive inflated and unjustifiable fees as placement agent in connection with the transaction.

59.     Livney also misrepresented that the Vanderbilt Trust Offering would be in the nature of a "fixed income" investment.  When ERB member Dr. Pauline Turner ("Turner") asked if the investment was "fixed income or private equity," Livney responded "that it would be referencing all fixed income underlying assets" and that "Vanderbilt Financial Trust is a private company that ERB will own shares of, and the company itself will generate revenue from fixed income."  Livney also touted falsely and with no justification the "underlying investment grade bonds," stating that the CDOs were "a pool of assets/bonds that is financed by AAA, AA, and BBB rated bonds and they re-engineer cash flow."

60.     Livney also provided to the ERB a document that referred to the CDOs investment in "investment grade, high quality fixed income securities" and repeated the term "fixed income securities" two additional times.

61.     These representations also were false and misleading.  While the assets underlying a CDO ostensibly may be fixed income securities, it was false and misleading to represent that the CDOs themselves, or a portfolio of such CDOs, in the context of the Vanderbilt Trust Investment constituted a "fixed income" investment, as returns would be highly variable depending on the performance of a range of underlying assets.  There was no fixed

income aspect to the Vanderbilt Trust and the Fund never received, nor could have received, any "fixed income" from it.  Rather, the investment consisted of shares in a trust that owned a limited liability company that owned derivative instruments ultimately backed by subprime loans that would not "re-engineer cash flow" like bonds.  They were not "high quality," but, rather, were virtually worthless.  Livney's representation that the Fund would own shares of Vanderbilt Financial, which itself would generate revenue from fixed income, was deceptive in that it gave the impression that the Fund would profit from the Vanderbilt Defendants' other ventures.  This was false and misleading because the Fund's profit (or loss) would be derived solely from Vanderbilt Financial's portfolio of CDOs and analogous instruments, not from any of the Vanderbilt Defendants' other ventures.

62.    Bland tried to reinforce the false impression that the CDOs were a fixed income investment.  After Turner raised the question whether the investment was fixed income or private equity, Bland stated that the SIC held the CDOs "under a separate asset class in fixed income."  The ERB's Chief Investment Officer, Foy, responded by noting that, although the SIC held its Vanderbilt investment in its fixed income portfolio, the Vanderbilt investment would be categorized, as a private equity investment for the Fund.  This exchange spurred by Turner's question should have raised a "red flag" to the ERB, warranting further investigation of the true nature of the Vanderbilt Investment.  But it did not, or the red flag was simply ignored.

63.    At this meeting, Livney also stated that "we re-underwrite everything to our specs."  This was false and misleading, as the CDOs and other instruments held in the portfolio of Vanderbilt Financial were not "re-underwritten" by any person, nor is it clear that the Vanderbilt Defendants had any such "specs."  Livney also stated that none of the investment was in synthetic CDOs, which was untrue and material.

64.     Also at the May 12, 2006, meeting, Livney provided the Investment Committee with a false and misleading "primer" on CDOs.  The figures in the presentation made no mathematical sense.  According to this primer on how the Fund's CDO investment would work, a $15 million investment would be leveraged by a ratio of 20 to 1 by being combined with an additional $285 million in loans with a 10-year term and investing the total of $300 million in "investment grade, high quality fixed income securities" also with a 10-year term.  After collecting interest on the $300 million CDO and paying the interest on the $285 million in debt and fees, the "Expected Annual Return" was represented to be "10%-12%."  In addition, the Vanderbilt primer stated that, by the end of the 10-year term, "it is expected" that the "$300 million fixed income securities will have matured," that the "$285 million debt [would be] repaid from proceeds," and that the investor "will have received back the initial $15 million invested."

65.     Aside from the prospect of receiving any income or principal being little more than a gross fabrication given the virtually worthless value of the underlying mortgage loans, the presentation was internally flawed and mathematically incorrect.  The interest on the $285 million debt was represented to be .32% over LIBOR and the interest on the $300 investment was represented to be .65% over LIBOR, resulting in a purported spread of 33 basis points.  A spread of 33 basis points on $285 million, or even $300 million, would have resulted in approximately $1 million before deducting fees.  A gain of $1 million on an initial $15 million investment is far short of the "Expected Annual Return" of 10%-12%.  Moreover, after deducting fees, which Livney represented falsely to be "1 3/4 of a point plus 25% over 9 1/2 dividend yield," the actual return would be even further below the expected return.  By Vanderbilt's own analysis, the investment would not and could not perform as represented.  This should have raised another red flag to the ERB, but they either failed to recognize the red flag or

simply were indifferent to it, given the influence over it wielded by the Governor's political team, headed, by Correra, Bland and Malott.

66.     Livney also represented to the Investment Committee that "[t]here are four classes of holders, with the equity holder receiving the most return."  In fact, the equity position the Fund was to take was the highest risk position in the CDO, the "toxic waste."  ERB member Turner again spoke up, catching Livney's misrepresentation on this point and questioning him on whether the Fund's equity tranche actually would place the Fund in the lowest level position. Livney was forced to concede that this was true, raising yet another red flag calling for caution and further investigation.

67.     Malott and Bland, however, quickly came to Livney's aid in an attempt to prevent the approval process from getting off track, with Malott boasting that "ERB is getting a 'manager' of CDOs by investing with Vanderbilt Capital Advisors" and Bland chiming in that the SIC also was investing in the Vanderbilt CDOs (an investment that also resulted in a total loss).  Despite the concern raised by Turner and Livney's response (that conflicted with his own written and oral presentation), the ERB approved the investment shortly afterward, with no further examination of the Fund's position in the CDO.  This position ultimately resulted in no return for the Fund due to the unsound nature of the underlying loans.

68.     Malott and Bland duplicitously cited reliance on the SIC's purported vetting process as a basis for their vote for the proposed investment.  This abdication of fiduciary duty was particularly egregious as the SIC now admits that its processes were corrupted.  Stunningly, ERB members Turner and Dr. Delman Shirley ("Shirley") warned their fellow members that the ERB could not rely on the SIC, but their warnings were not heeded.

69.     In another attempt to smooth over any concerns with the investment, Bland asked Livney a "softball" question about the fee structure.  Livney responded that the fee would be "1 3/4 of a point plus 25% over 9 1/2 dividend yield," but that "Citi[group] and Bear Stearns agreed not to charge a fee to 'friends and family' of Vanderbilt, which ERB would be considered under that umbrella."  Even without the 25% bonus, a 1 3/4 point fee for Vanderbilt would be $700,000, regardless of the performance of the investment.  Yet the high fee was made to appear to be cushioned by fostering the impression that the Fund would be getting an especially good deal as "friends and family" of Vanderbilt.  Livney's response was false and misleading, as Citigroup and Bear Stearns had not agreed to forego charging a fee to the Board to reward Vanderbilt's "friends and family."   In fact, Citigroup and Bear Stearns were most eager to rid their own portfolios of CDOs, as they had accumulated untenably large inventories of CDOs that they were unable to sell to investors.

70.     In tag team fashion, Malott immediately followed up Bland's softball question with a couple of his own, asking "how long the term of the deal will be" and what the annualized return would be.  Livney was ready with his responses.  To the first question, he answered: "1.3 years," stating "you could own this for 1.3 years if you want and be out 100 percent if you want." To the second question, he answered: "12-15%."  Both of these responses were different, and more favorable, than the corresponding information in the Vanderbilt "primer" document Livney had provided to the ERB.  The document indicated a 10-year term by which the investor could expect to receive back its entire initial investment, during which time it could expect an annual return of 10-12%.  This exchange among Livney, Malott, and Bland, and the differences between the written document and Livney's oral responses, were concocted to foster the false impression that the Fund would receive an exceptional deal, far better than the CDO deal as reflected in the

primer.  The representations were designed to impress the Investment Committee members that, within a very short time, a little over a year, the Fund would, if it chose, receive back its full $40 million investment, plus an annualized return of 12-15%."

71.     When Turner asked another pointed question as to how Vanderbilt came to the ERB for this investment, Livney responded that it was through prior investments with the SIC. This response served only to beg the additional, but unasked, question as to how it was that Vanderbilt came to the SIC for an investment, but, more importantly, concealed the truth regarding the "pay to play" arrangements with the Governor's political aides and the fact that the Vanderbilt Trust Offering had been specifically created and designed to obtain investments from the ERB and SIC.  The Trustee Defendants failed to probe further on this issue because they knew the true answer.

72.     In response to a question about "what could make [this investment] blow up," Livney responded that a "default on the underlying bonds" could do so, but added that "historically the default rate of Vanderbilt since 1999 is zero."  Livney knew that such a response was misleading (if not an outright lie), since the underlying investments in the particular deal being offered to the ERB were exceptionally bad and a high default rate was inevitable and, further, that the purported historical performance of the Vanderbilt Defendants' other pools of CDOs were entirely irrelevant in the context of this specific proposal.  Livney also knew that his response would obfuscate the distinction between a default on the underlying bonds and defaults on the underlying mortgages or other loans underlying the bonds.  No ERB member asked Livney to explain his response or whether any of the past investments to which he was referring were anything like the current investment being offered to the Board.

73.     Livney added that "[t]here is an assumption of recovery and default in every deal, [which] is priced in up front."  Again, none of the ERB members asked Livney to explain what was "priced in up front" or how it was "priced in up front" or otherwise what he meant by his statement.  The statement was misleading in that it implied that the risk of default or of the investment "blowing up" was somehow accounted for, mitigated, or offset up front when, in fact, that was not true.  Allan Martin of NEPC, investment advisor to the ERB, asked: "If the defaults in [the] portfolio exceed [the] assumption, then [would there] be a negative return?"  Livney was compelled to respond "Yes," but hastened to add that Vanderbilt "will try to sell out of deals before they hit bottom."

74.     None of the ERB members asked any further questions or made any further comments.  Malott moved to invest the maximum amount within the range recommended by the investment division – $40 million – which was seconded by Bland and passed.

75.     The Special Meeting of the ERB was called for May 12, necessitating the quickly arranged Investment Committee meeting immediately prior to the Special Meeting, purportedly because of a "deadline" of May 15 set by the Vanderbilt Defendants for the ERB's decision to invest.  In fact, there was no such deadline.  When asked about the May 15 deadline at the May 12 Investment Committee meeting, Livney responded "that the actual deadline was June 15, but I wanted to give the ERB the opportunity to invest and give priority to 'friends and family'."  Livney also stated: "what I wanted . . . is to give priority to our friends and family before Wall Street, Citi, and Bear over subscribe this thing, which you'll be shut out of."  Livney's false altruistic and familial pretensions aside, Vanderbilt stood to profit handsomely from dumping $40 million of worthless securities on a willing but unwitting buyer, for which the only urgency was to do so before the truth was discovered or the securities "tanked."  In addition, the

purported deadline, the purported desire to give "priority" to the ERB, and false threat of over

subscription was a sham in light of the fact that the Vanderbilt Investment was created solely for

the ERB and SIC and was not sold to any other outside investors.

76.     At the same Investment Committee meeting, Brown, then an ERB member, a

member of the ERB's Investment Committee, and New Mexico's State Treasurer, asked what a

CDO is.  Yet approximately forty-five minutes later, without having received any real

explanation, he voted to approve a $40 million CDO investment for the ERB.

77.     Handwritten notes on the Investment Committee's minutes of the May 12 meeting

indicate that someone on or connected with the ERB was not familiar with the basic financial

acronym "ABS," which refers to asset-backed security.

78.     Garcia arrived late to the Investment Committee meeting and missed

approximately half of the presentation and discussion of the Vanderbilt Trust Offering.

79.     At an earlier Investment Committee meeting on April 21st, Malott had told the

committee that the SIC had already approved an investment with Vanderbilt Capital and that the

ERB should consider relying on the purported due diligence investigation that Mallott said was

previously conducted (but, in fact, had not been conducted) by the SIC.  Bland very quickly

agreed, adding that the SIC was going to invest $100 million (it actually invested $50 million).

Malott suggested having the individuals at the SIC responsible for the investment and due

diligence appear before the ERB to explain the investment to the ERB.  Malott made a motion

for representatives of the SIC to make a presentation to a special Investment Committee meeting,

followed by a special Board meeting.  Malott, Brown and Bland all voted in support of the

motion, while ERB staff and Investment committee member Dr. Evalynne Hunemuller voted

against it.  This SIC presentation never happened.

80. Within approximately one-half hour of the false and misleading "dog and pony show" orchestrated by Livney, Malott, and Bland on May 12, to favorably present the proposed Vanderbilt Investment to the Investment Committee, Malott and Bland, along with Brown (who did not know what a CDO was) and Garcia (who had missed half the Investment Committee meeting), caused both the Investment Committee and the ERB to approve the investment.

81. Turner stated her significant concerns with the investment in explanation of her vote in opposition.  According to the ERB minutes:

> Dr. Turner cited three reasons for voting against the Investment Committee's recommendation: 1) she felt this investment instrument to be very complicated, and was concerned about what appeared to be a hasty decision; 2) the Board has not yet been educated on this investment instrument, and no written materials were provided for Board members to study in advance; and 3) the Board has not yet discussed policies and procedures with respect to alternative investment strategies.

> Dr. Turner said she had no idea whether this was a good investment or not, and was concerned about what appeared to be unrealistic promises made by the Vanderbilt representative, Mr. Livney.

82. Shirley also explained his opposition to the investment.  He stated that "Dr. Turner had spoken to most of his concerns" and added that "he did not have enough information to make an informed decision, objected to the hastiness of this decision, and was not sure the Board was following its own policies and procedures."  He also stated that he was "not comfortable in using the SIC's evaluations on any of these alternative investments because the SIC is not the fiduciary agent for the ERB."

83. Turner and Shirley correctly identified some of the breaches of fiduciary duty committed by the Trustee Defendants in ramming the Vanderbilt deal through for political purposes.  The ERB did not understand what it was doing and knew it.  The investment was complicated, and was not transparent, particularly with respect to the quality of the mortgages

underlying the CDOs.  The decision was made too hastily, the ERB was not educated on that type of investment instrument or prepared to evaluate the particular investment being offered, and the ERB had not yet discussed and did not follow its own policies and procedures for this type of investment.  The ERB also circumvented its own rules for private equity investments (which the Vanderbilt Investment was not, despite its categorization as such by Defendants Bland and Malott), as they relied on the corrupted SIC review process.  Yet even after these concerns were expressed by their fellow ERB members, none of the ERB members asked for a reconsideration of the vote or any further discussion, deliberation, investigation, verification, evaluation, education, explanation, or clarification with respect to the "investment."

84.     The vote of the ERB approving the Vanderbilt investment was four to two, with the four members with political ties to the Governor in favor (Malott, Bland, Brown, and Garcia), and the two members of the ERB chosen by public school teachers (Turner and Shirley) opposed.  There was no discussion of the Vanderbilt Investment before the vote at this Special ERB meeting called to evaluate it; the ERB simply rubber-stamped the recommendation of the Investment Committee.  The minutes of this meeting state: "Noting the detailed presentation made to the Investment Committee just prior to this meeting, Mr. Malott asked the ERB to take action on an equity investment in Vanderbilt Financial Trust."  Bland then made the motion, Brown seconded it, and the vote was taken within a matter of a couple of minutes.

85.     After voting in favor of the Vanderbilt Investment, Brown indicated that he was concerned about the deliberative process employed by the ERB.  Brown stated that in the future, if time permitted, he would like to "have a better grounding on some of this."  Turner voiced her support of Brown's statement, noting that Brown had "asked for this before, and on other issues," but that the ERB "ha[d]n't gotten it," and that the failure to provide the ERB with the

requested information was "totally inappropriate." In order to quell dissent on the ERB that

could lead to further investigation of the Vanderbilt investment, Malott ended the discussion

claiming that the vote had already taken place, and  that "[g]iven the time, I'm going to cut off

the discussion" because the ERB already "had the vote."

86.     After the ERB approved the Vanderbilt Investment, but before it was

consummated, the Vanderbilt Defendants continued to misrepresent the investment's

performance and prospects.  These misrepresentations were designed to continue the deception

and dissuade the ERB from discovering the truth concerning the nature of the Vanderbilt

Investment and pulling out of it.

87.     For example, on June 2, 2006, Livney told Foy that Vanderbilt wanted to register

the securities in four months for purposes of an initial public offering.  Livney also stated, falsely

and without any justification, that within 14 days of closing, the securities would be listed on

Euronext and thereafter on the New York Stock Exchange.  According to Livney, this meant that

the ERB's investment would have liquidity three to four months earlier than previously

anticipated.  On July 28, 2006, Livney repeated his false representation that the securities would

be listed on a European stock exchange prior to being listed in the United States, which would

allow the securities to be publicly traded sooner rather than later and to earn a greater profit if the

ERB decided to liquidate its shares.  All of these statements were false and misleading.  As the

Vanderbilt Defendants knew, there was never any prospect of an initial public offering,

registration, listing on a securities exchange, or liquidity with respect to the ERB's shares in the

Vanderbilt Trust.

### 4.     The Trustees' Abdication of Their Fiduciary and Contractual Responsibilities

88.     The ERB's consideration of the Vanderbilt Investment was knowingly inadequate and intentionally rushed.  The $40 million investment was approved by both the Investment Committee and the ERB in a little over one hour, with no advance background or explanatory materials, no briefing on the nature and risks of highly leveraged investments in CDOs or alternative investment vehicles, and almost no discussion.

89.     In voting in favor of the Vanderbilt Investment, the four Trustee Defendants acted to further political goals, repay political favors, and/or accede to political pressures, but, in any event, abdicated their constitutional, statutory, and fiduciary responsibilities, and failed to follow the Board's own procedures.  NEPC's recommendation, approval, or failure to oppose, the Vanderbilt Investment also constituted a breach of its fiduciary and contractual responsibilities since it was charged with the investigation and analysis of this investment and, upon information and belief, did not do so.

90.     The ERB also improperly relied on due diligence purportedly previously conducted by the SIC, as the ERB had the fiduciary obligation to conduct its own investigation. What makes matters worse is that the decision making processes of the SIC were themselves corrupted.  The State Investment Officer (the "SIO") recently acknowledged the political manipulation of the processes of the SIO and SIC, noting that it had:

> uncovered wide use of placement agents in connection with investments made by the SIO and SIC.  Some of the placement agent fees paid by investment managers with respect to those investments may have been either inappropriate or sham payments. These payments may have altered, influenced or corrupted the investment process.  Many of these payments were not fully and properly disclosed.  As a result, the SIO and SIC may have suffered significant damage and losses.

New Mexico State Investment Office, *Request for Proposal for Legal Services*, RFP #10-0004, June 7, 2010.

91.     In the meetings on May 12, 2006 to consider the Vanderbilt Investment, not one of the Trustees, nor NEPC, asked questions regarding:

a)  the nature or quality of the mortgage loans underlying the CDOs;

b)  the past performance of similar investments;

c)  any objections from managers or ERB members;

d)  whether the investment complied with the ERB's own Investment Policy and Private Equity Policy;

e)  whether there were other outside investors;

f)  how it was that Citigroup and Bear Stearns were brought into the deal or why they were, purportedly, not charging the ERB for their underwriting or other services;

g)  the red flags raised by Turner's questions about the fixed income or equity nature of the investment and the Fund's position in the CDOs;

h)  the issues raised by Allan Martin's question about whether loan defaults could cause negative returns;

i)  the red flag raised by the conflicts and other flaws in Vanderbilt's presentation to the Investment Committee;

j)  the amount Vanderbilt Defendants stood to gain from the investment;

k)  the amount of the fees involved from any "pay to play" arrangements, including how much Correra was to receive if the Vanderbilt Investment was made;

l)  the influence of persons with close political ties to the Governor  on the

presentation of investment offerings, such as the Vanderbilt Investment to the

ERB and, more specifically, on the vote in favor of the Vanderbilt Investment;

m)  political contributions by the Vanderbilt Defendants or Correra;

n)  the use and role of placement agents; or

o)  any conflicts of interest.

92.     Not one of the Trustee Defendants in these meetings, nor NEPC, questioned the

amount of the Fund's investment in Vanderbilt, challenged the Vanderbilt Defendants' purported

analysis of the investment, sought more time to consider the investment, asked for additional

documentation or information from or about Vanderbilt, or requested that the ERB obtain an

objective expert opinion or assistance regarding the Vanderbilt investment.  In a little over an

hour, the four ERB members who voted in favor of it caused the Board to invest (and ultimately

lose) $40 million in a worthless investment.  In doing so, these four Trustee Defendants and the

ERB's investment advisor, NEPC, chose to ignore obvious issues and problems rather than

protect the Fund and its Beneficiaries.

93.     The Trustee Defendants who voted for the Vanderbilt Investment did so for

political and personal reasons - to curry political favor with the Governor and the Democratic

party and to avoid adverse political repercussions if they did not go along.  Malott's cooperation

also was intended to help his accounting firm continue to obtain lucrative public contracts.

94.     Even if the Vanderbilt Investment had not been made for political purposes, it was

a wholly reckless and inappropriate investment of the fiduciary assets of the Fund.  The Trustee

Defendants and NEPC ignored or failed to  comprehend that the investment consisted primarily

of defective mortgages, that the Fund was likely to suffer a heavy, if not complete, loss of its

investment, and that the interests of the Vanderbilt Defendants and Correra were contrary to the interests of the ERB and the Fund.

### 5.    Damages Sustained by the Fund

95.    The Defendants' profit was the loss of the Fund and its Beneficiaries, as the Vanderbilt Investment was virtually worthless.  In December 2006 and May 2007, the ERB received small dividends.  Other than those modest dividends, the Vanderbilt Trust generated no other income, and the Fund's entire $40 million principal investment eventually was lost.  In addition to losing its entire investment, the Fund lost the income it could have earned if the Vanderbilt Investment had performed as represented or if the funds had been invested appropriately.

### D.    The Aldus "Pay to Play" Schemes

96.    From approximately 2006 until early 2009, Aldus served as a private equity consultant or advisor to the ERB.  In this capacity, Aldus and Meyer owed fiduciary and other duties to the ERB, the Fund and its Beneficiaries, obligating them to provide objective investment advice, free from conflicts of interest and political and other improper pressures.

97.    In October 2009, Meyer pleaded guilty to securities fraud in New York arising from his conduct involving a public pension fund kickback scheme there.  As he admitted in his allocution in the New York investigation led by New York Attorney General Andrew Cuomo, "[o]n numerous occasions, however, contrary to my fiduciary duty, I ensured that Aldus recommended certain proposed investments that were pushed on me by politically-connected individuals in New Mexico."  Meyer's allocution continues as follows: "I did this knowing that these politically-connected individuals or their associates stood to benefit financially or

politically from the investments and that the investments were not necessarily in the best economic interest of New Mexico."

98.     Correra exerted the political influence on Aldus and Meyer to recommend inappropriate investments for the ERB for the political and financial gain of Correra, Aldus, Meyer, and others (the "Aldus Investments").  Upon information and belief, Bland acted in concert with Aldus and Meyer to cause the ERB to make the Aldus Investments.

99.     Meyer admitted the following in his allocution:

> From in or about January 2003 through in or about February 2009, acting in concert with others, I made false representations of material facts and concealed material information while engaged in inducing and promoting the exchange, sale, negotiation and purchase . . . [of] investment transactions involving . . . the New Mexico Educational Retirement Board in the State of New Mexico. As a result of this, I … wrongfully obtained agreements and fees relating to these transactions

100.    The Aldus Investments were inappropriate for the ERB due to their highly speculative and risky nature, were inconsistent with the fiduciary and other duties of Aldus and Meyer to protect the Fund and its Beneficiaries' money by safeguarding the integrity of the public pension fund investment process, were tainted by conflicts of interest and political pressures, and caused losses to the Fund and its Beneficiaries.  Aldus both accepted fees for advising the ERB about hedge fund investments, and sought and obtained approval for co-investments by the ERB.  Through these fees and investments, the Fund was damaged.

**E.     The Indemnification Procedure Violates Fiduciary Duties**

101.    In late 2009, the ERB belatedly hired the consulting firm of Ennis, Knupp & Associates, Inc. ("EnnisKnupp") to perform an analysis of the ERB's fiduciary policies. EnnisKnupp was, of course, retained after the alleged improprieties of the Fund surfaced.

102.    The EnnisKnupp report, delivered to the Board, directly states:

> The Prudent Investor Act gives wide latitude to the fiduciaries it
> covers, but it does not grant immunity for those who are negligent
> and breach their fiduciary duties of prudence or loyalty.[3]
>
> In the private sector, ERISA's section 410(a) imposes strong
> personal liability on any person considered a "fiduciary" in
> violation of their duties, including negligent behavior.  ERISA
> does not apply to public pension funds, but the governing laws of
> many public funds are modeled after ERISA.  The Uniform
> Management of Public Employee Retirement Systems Act . . .  also
> imposes personal liability on trustees or other fiduciaries for a
> breach of fiduciary responsibility.  It is our understanding that in
> New Mexico the legal interpretations of the statutes covering ERB
> provides that the Board members are covered by the Tort Claims
> Act or have indemnification or even immunity.  In our opinion,
> such coverage, indemnification, or immunity lessens the
> seriousness of a violation and diminishes the high fiduciary
> responsibility and liability standards intended by the drafters of the
> Uniform Prudent Investor Act.  In other states, where the potential
> for personal liability exists, the members of the governing bodies
> of public funds have accepted the potential for personal liability as
> a reasonable trade-off for having the ability to operate under
> Modern Portfolio Theory and act as a prudent investor

103.    The ERB considered its policies for indemnifying ERB members who were

alleged to have committed fiduciary abuse at three meetings on December 11, 2009, February

26, 2010 and on March 16, 2010.  In contrast to the summary decision making over the $40

million Vanderbilt Investment – which consumed a little over an hour – the discussion of ERB

reimbursement took place over three sessions that lasted over nine hours.

104.    The ERB directly negotiated its policy with the personal attorney of ERB

Chairman Malott, who presented drafts and argued his client's case as if he were a staff member.

105.    EnnisKnupp recommended that the ERB be prohibited from indemnifying the

ERB member found by a court to have breached fiduciary duties to the Fund.  It also

recommended that amounts previously paid be "subject to recovery by the Fund."

---

[3]  Generally a fund is allowed to purchase fiduciary insurance.

106.     At the March 2010 meeting, the ERB again brought in Mr. Lanoff.  Mr. Lanoff again advised the ERB that he had advised it four years ago to purchase fiduciary insurance.  At least one ERB member was shocked to find that the ERB did not have fiduciary insurance.

107.     There were many contentious issues between counsel for Mr. Malott and the ERB's outside Counsel, Mr. Lanoff.  The most contentious issue was whether it was consistent with the New Mexico Constitution to indemnify the ERB members for their expenses of suit.  Mr. Lanoff expressed that this was a contentious and open proposition under the New Mexico Constitution.

108.     Without any doubt, the most contentious issue was what would happen if an ERB member was found liable for fiduciary abuse.  Mr. Lanoff recommended, consistent with the EnnisKnupp recommendations, that the ERB cease indemnification and "claw back" amounts that had been advanced to the ERB members who had been found in breach of fiduciary duty.  In violation of public policy and the New Mexico Constitution, article XX § 22, the ERB rejected this view and adopted a policy in which it would be discretionary for public funds to be used to reimburse ERB members for fiduciary abuses.

## CLASS ACTION ALLEGATIONS

109.     Plaintiffs bring this case as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of herself and the other current Beneficiaries of the Fund.  Following discovery with respect thereto, Plaintiffs reserve the right to modify such definition if appropriate.

110.     The members of the Class are so numerous that joinder of all members is impracticable.  There are approximately 95,000 Class members.

111.     Common questions of law and fact affect the claims of all Class members and common relief by way of damages and injunctive relief is sought for all Class members.  The

harm Defendants have caused, are causing, and will cause is substantially uniform with respect to all Class members since there is one fund, the Fund, from which all Class members' retirement payments are being and/or will be made.

112.   Common questions of law and fact that affect the Class members include, but are not limited to, the following:

   a)   Whether any of the Defendants engaged or otherwise participated indirectly in a wrongful "pay to play" scheme involving the Vanderbilt Investment, designed to use the Fund for political purposes at the expense of the Fund and the members of the Class;

   b)   Whether the Trustee Defendants and NEPC breached their fiduciary duties owed to the Fund and the members of the Class in approving the Vanderbilt Investment;

   c)   Whether the Trustee Defendants and NEPC breached their contractual duties owed to the Fund and the members of the Class by approving the Vanderbilt Investment;

   d)   Whether the Trustee Defendants and NEPC impaired the vested property rights of members of the Class;

   e)   Whether the Vanderbilt Defendants and Correra aided and abetted the Trustee Defendants' breaches of fiduciary duties;

   f)   Whether the Vanderbilt Defendants and Correra aided and abetted the Trustee Defendants' breaches of contract;

   g)   Whether the Vanderbilt Defendants and Correra aided and abetted the Trustee Defendants' impairment of vested property rights;

h)      Whether the Vanderbilt Defendants defrauded the Board and, indirectly, the members of the Class;

i)      Whether NEPC breached its fiduciary duties owed to the Fund and its Beneficiaries in recommending, approving, and/or failing to oppose the Vanderbilt Investment;

j)      Whether Aldus breached its fiduciary duties by engaging in "pay to play" schemes;

k)      Whether Aldus committed fraud in connection with recommending the Aldus Investments to the ERB;

l)      Whether Correra aided and abetted Aldus' and Meyer's breaches of fiduciary duties;

m)      Whether any of the Defendants violated the New Mexico Uniform Securities Act;

n)      Whether Correra aided and abetted Aldus' and  Meyer's fraud in connection with the Aldus Investments;

o)      Whether the Fund and the members of the Class have suffered damages as a result of Defendants' wrongful conduct and, if so, the proper measure of such damages; and

p)      Whether Defendants' wrongful conduct, including "pay to play" practices, should be enjoined.

113.    These common questions of law and fact predominate over any individual questions that may exist or arise.

114.    Plaintiffs' claims are typical of absent Class members' claims.  All claims arise from the same factual background and legal theories.  Plaintiffs and all members of the Class have suffered the same harm arising out of Defendants' wrongful course of conduct.  The harms suffered by Plaintiffs are typical of the harms suffered by the members of the Class, and Plaintiffs and the other members of the Class have a common interest in seeking redress for Defendants' wrongful conduct and in preventing Defendants from engaging in such activity in the future.

115.    Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs have retained counsel competent and experienced in class actions and other complex litigation and have no conflict of interest with other Class members in the maintenance of this class action.  Plaintiffs have no relationship with Defendants that would pose a conflict of interest with other Class members.  Plaintiffs will vigorously pursue the Class claims in the best interests of the Class.

116.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.  Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members to individually seek redress for the wrongs done to them.  Class members, to the extent they are aware of their rights against Defendants herein, likely would be unable to secure counsel to litigate their claims on an individual basis because of the high cost of doing so and the relatively small nature of the individual damages.  A class action is the only feasible means of recovery for the Class members.  Individual actions also would present a substantial risk of inconsistent decisions, even though each Class member has an identical claim of right against Defendants.

117.    Plaintiffs envision no difficulty in the management of this action as a class action. The advantages of maintaining the action as a class action far outweigh the expense and waste of judicial effort that would result in hundreds or thousands of separate adjudications of these issues for each member of the Class or the injustice that would result if individual actions could not be brought due to lack of notice or resources.  Class treatment further ensures uniformity and consistency in results and will provide optimum relief for members of the Class.

## **DEMAND EXCUSAL**

118.    As trust beneficiaries, Plaintiffs and the other members of the Class have standing to assert claims directly against Defendants and to recover damages on the Fund's behalf and for the benefit of the Fund.  Alternatively, Plaintiffs assert these claims derivatively on behalf of the Fund under Fed.R.Civ.P. 23.1.

119.    To the extent that a demand on the Board may be required by Rule 23.1, it is excused.  A demand under the circumstances alleged herein would be futile because, among other things, this action alleges political corruption and other wrongful conduct committed by ERB members who constituted a majority of, and controlled, the ERB and the Fund.  Some of the conduct alleged against certain ERB members could lead to possible criminal charges being investigated or filed.  Malott continues to serve on the Board today as Chairman.  Even after numerous news articles exposing the corrupt "pay to play" schemes and disastrous Vanderbilt Investment alleged herein and a "whistleblower" suit has been commenced, and Meyer has pleaded guilty to defrauding the ERB in New York State court, the ERB thus far has declined to take any action against any of the Defendants herein, and it is unlikely to pursue the claims set out in this Amended Complaint.  Rather, if the ERB pursues any claims at all, it will do so only under circumstances that leave the ERB members and their political allies protected from any

action against them.  The ERB intentionally failed to commence legal action against their friends, colleagues, and political confederates, and would prefer to allow applicable statutes of limitation to expire by operation of time, and absent this action will do so.  The ERB's failure to do so demonstrates its utter disregard of its obligations as a fiduciary.  Further, none of the ERB's members are disinterested or independent of the "pay to play" schemes alleged herein and at least four owe their positions to the Governor and his close associates.  None of the ERB members have admitted any wrongdoing.  Not only has the ERB failed to enforce rights that may properly be asserted by it on behalf of the Fund, it has, in fact, publicly defended the actions of the Trustee Defendants.  None of the Trustee Defendants has been removed or resigned from the ERB because of his or her role in approving the Vanderbilt or Aldus Investments.

## COUNT I

### BREACH OF FIDUCIARY DUTY
### (Against the Trustee Defendants and NEPC)

120.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

121.   In approving the Vanderbilt Investment, the Trustee Defendants failed to manage and invest the Fund and its assets solely in the best interests of the Fund and its members.

122.   In recommending, approving, or failing to oppose the Vanderbilt Investment, NEPC failed to advise the ERB solely in the best interests of the Fund and its members.

123.   The Vanderbilt Investment was a highly speculative, risky, and leveraged investment that was inappropriate for the Fund, all of which was known or should have been known by each of the Trustee Defendants and NEPC.

124.   The Trustee Defendants caused the Board to invest and pay fees, investment costs, and other expenditures that were not solely for the benefit of the Fund's members and that

were not appropriate or reasonable in relation to the purposes of the Fund.  Instead, the Trustee Defendants acted with other interests and purposes – political and personal – and diverted, misappropriated and otherwise wasted Fund assets for those interests and purposes.

125.    The Trustee Defendants failed to comply with the Uniform Prudent Investor Act and the Prudent Investor Rule.  Considering the purposes of the Fund to safeguard the retirement funds of public school teachers and college professors and other education employees and the circumstances of the highly speculative, risky, and leveraged Vanderbilt Investment, the Trustee Defendants did not manage and invest the Fund as would a prudent investor.

126.    The Trustee Defendants and NEPC failed to appreciate, or ignored, the conflicts of interest presented by the placement agent and "pay to play" arrangements and kickbacks in connection with the Vanderbilt Investment and how such conflicts of interest prevented an honest, objective, fully informed, and diligent evaluation of the "investment" in the best interests of the Fund and its members.

127.    The Trustee Defendants and NEPC acceded to political influence and pressure in approving the Vanderbilt Investment and allowed Fund assets to be misappropriated for political purposes, contrary to the best interests of the Fund and its Beneficiaries.  Malott and Bland went even further, in taking affirmative actions designed to further the "pay to play" scheme by influencing the other Trustee Defendants and otherwise ensuring the approval of the Vanderbilt Investment.

128.    The Trustee Defendants and NEPC failed to exercise reasonable care, skill and caution in the performance of their respective responsibilities to the Fund and its members.

129.    The Trustee Defendants and NEPC failed to properly investigate, discover, and consider the circumstances regarding the Vanderbilt Investment that would have revealed that it was highly speculative, risky, leveraged, virtually worthless, and not at all suitable for the Fund.

130.    The Trustee Defendants and NEPC failed to properly verify facts relevant to the Vanderbilt Investment, including the reliability of the representations made by the Vanderbilt Defendants.

131.    The Trustee Defendants and NEPC ignored a number of "red flags" in connection with the Vanderbilt Investment which, in the exercise of reasonable care, warranted further investigation.  These red flags included unrealistic claims and inconsistencies concerning: the nature of the investment as being fixed income; the underlying assets as being of "high quality" and able to "re-engineer cash flow"; an internally incorrect "primer" on how the CDO investment would work; the length of the term of the deal; the expected return of principal; the expected annual return; how Vanderbilt was "introduced" to the ERB; how Citigroup and Bear Stearns were brought into the deal and why they were purportedly not charging the ERB a fee in connection with the Vanderbilt Investment; the reasonableness of assumptions; the effect of defaults and how they purportedly would be mitigated and factored into the deal up front; the supposed "deadline" for the ERB's decision; and the points raised by ERB members Turner and Shirley in opposing the investment.

132.    The Trustee Defendants failed to obtain the financial knowledge necessary to evaluate the Vanderbilt Investment in CDOs.

133.    NEPC failed to properly inform itself of material facts, conduct a reasonable inquiry, and give the ERB informed, objective, and reasonable investment advice with respect to the Vanderbilt Investment and the Vanderbilt Defendants consistent with its fiduciary duties.

134.    All ERB members were so unfamiliar with the Vanderbilt Investment that the Investment Committee had to receive a "primer" on CDOs in the same meeting held purportedly to evaluate the Vanderbilt Investment.  Brown, a member of the Investment Committee, indicated that he did not even know what a CDO is.  Garcia, another ERB member, missed half of the meeting.  Yet within a little over an hour, the Investment Committee, including Malott, Bland, and Brown, voted to approve the Vanderbilt Investment, and all four Trustee Defendants voted to approve it at the Special ERB meeting immediately following the Investment Committee meeting despite being warned of its inappropriateness by the two remaining ERB members.

135.    The Trustee Defendants and NEPC failed to manage and invest the Fund's assets with loyalty and impartiality, placing their own political and personal interests above the Fund and its members' interests.

136.    The Trustee Defendants and NEPC wasted the Fund's assets.

137.    The Trustee Defendants and NEPC failed to follow the ERB's own policies. Among other things:

a)  The Vanderbilt Investment, and the Trustee Defendants' and NEPC's consideration of it, conflicted with the Trustee Defendants' obligation to provide "secure" and "sufficient" retirement benefits.  In fact, the losses suffered by the "investment" contributed to the subsequent decisions to increase employee/member contributions and propose an increase in the number of work years necessary to receive full retirement benefits;

b)  The Trustee Defendants and NEPC also failed to "[p]rudently manag[e]" the Fund's assets with "care" and consistent with the Prudent Investor Rule;

c)  The Trustee Defendants and NEPC did not act "[s]olely in the interest of, and for the exclusive purposes of providing benefits to, participants and their beneficiaries" or to defray reasonable expenses; instead, they acted with political and personal interests and purposes;

d)  The Trustee Defendants and NEPC impermissibly used the Fund for speculation with insufficient consideration of the probable safety of capital and income to be derived;

e)  The Trustee Defendants and NEPC failed to minimize the risk of loss, utilize "effective risk controls," or exercise "prudence;"

f)  The Trustee Defendant and NEPC failed to comply with state statutes, such as the Educational Retirement Act and the Prudent Investor Act;

g)  The Vanderbilt Investment was not an "appropriate investment opportunity" for the Fund and did not fall within the permitted types of private equity investments set forth in the ERB's Private Equity Policy, nor was it appropriate as a special exception to those permitted types;

h)  The Vanderbilt Investment also violated the Private Equity Policy because it did not "[h]old[] out the prospects for capital appreciation . . . comparable to similar investments made by other professionally managed private equity funds.";

i)  The Trustee Defendants and NEPC failed to ascertain whether the investment had "a minimum committed capital of fifty million dollars ($50,000,000)

exclusive of the investment with ERB" or whether Vanderbilt had "full-time

management with at least five years of direct private equity experience."[4]

j)  The Trustee Defendants and NEPC also failed to determine whether the

amount of the Fund's Vanderbilt Investment exceeded the maximum allowable

amount as set forth in the Private Equity Policy; and

k)  The Vanderbilt Investment was not first approved by the Private Equity

Investment Committee, as required by the Private Equity Policy.

138.    The Trustee Defendants and NEPC knew or should have known by the exercise of

reasonable diligence that the Vanderbilt Investment was part of an illegal scheme involving

political contributions, a placement agent, and conflicts of interest that would prevent an honest

and objective evaluation of the investment and the firms and principals who promoted it.

139.    Malott additionally breached his fiduciary duties by accepting huge state contracts

for his accounting firm while considering, as a member of the ERB, investment decisions on

behalf of the Fund.

140.    By the wrongful conduct alleged herein, the Trustee Defendants and NEPC

breached their fiduciary duties to the Fund and its members, which has caused and is causing

substantial damages to them, including lost principal, lost income, fees and expenses, increased

payroll contributions, and a looming increase in the number of years new employees must work

to be entitled to full retirement benefits.

---

[4] Despite the representations of the Vanderbilt Defendants to the effect that the $50 million being invested
was committed capital, in fact after fees and expenses applicable to the investment are deducted, the
amount was far less.

## COUNT II

## BREACH OF CONTRACT
### (Against the Trustee Defendants)

141.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein

142.    The constitutional and statutory obligations imposed upon the Trustee Defendants to act in a fiduciary capacity and solely in the best interests of the Fund and its Beneficiaries constitute an implied-in-fact contract between the Trustees and the Fund and its Beneficiaries, which was breached by the Trustee Defendants as alleged herein.

143.    The Board's written investment policies also constitute an implied-in-fact contract between the Trustees and the Fund and its Beneficiaries, which was breached by the Trustees as alleged herein.

144.    The Trustee Defendants' breaches of contract have caused and are causing substantial damages to the Fund and its Beneficiaries, including lost principal, lost income, fees and expenses, increased payroll contributions, and a looming increase in the number of years new employees must work to be entitled to full retirement benefits.

## COUNT III

## IMPAIRMENT OF VESTED PROPERTY RIGHTS
### (Against the Trustee Defendants and NEPC)

145.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

146.    Under the New Mexico Educational Retirement Act, employees who have worked five years of qualified state employment have vested property rights in their retirement plan benefits.

147.     Qualified employees' vested property rights are protected against impairment by the New Mexico Educational Retirement Act, the New Mexico Constitution, Article II, Sections 18 and 20, and Article XX, Section 22(D), and the United States Constitution, Amendment XIV, incorporating Amendment V.

148.     By engaging in the conduct alleged herein, the Trustee Defendants and NEPC have impaired the vested property rights of members of the Class, in violation of state statutes and the state and federal constitutions.

## COUNT IV

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against the Vanderbilt Defendants, NEPC and Correra)

149.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

150.     The Vanderbilt Defendants, NEPC and Correra knowingly and substantially assisted and otherwise aided and abetted the Trustees in their breaches of fiduciary duties, as alleged herein.

151.     The Vanderbilt Defendants', NEPC, and  Correra's wrongful conduct aiding and abetting the Trustee Defendants' in their breaches of fiduciary duties has caused and is causing substantial damages to the Fund and its Beneficiaries, including lost principal, lost income, fees and expenses, increased payroll contributions, and a looming increase in the number of years new employees must work to be entitled to full retirement benefits.

## COUNT V

### AIDING AND ABETTING BREACH OF CONTRACT
### (Against the Vanderbilt Defendants, NEPC and Correra)

152.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

153.    The Vanderbilt Defendants, NEPC and Correra knowingly and substantially assisted the Trustee Defendants in their breaches of contract, as alleged herein.

154.    The Vanderbilt Defendants', NEPC's and Correra's wrongful conduct aiding and abetting the Trustee Defendants' in their breaches of contract has caused and is causing substantial damages to the Fund and its Beneficiaries, including lost principal, lost income, fees and expenses, increased payroll contributions, and a looming increase in the number of years new employees must work to be entitled to full retirement benefits.

**COUNT VI**

**AIDING AND ABETTING IMPAIRMENT OF VESTED PROPERTY RIGHTS**
**(Against the Vanderbilt Defendants, NEPC and Correra)**

155.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

156.    The Vanderbilt Defendants, NEPC and Correra knowingly substantially assisted the Trustee Defendants in their impairment of the vested property rights of Plaintiffs and members of the Class, as alleged herein.

157.    The Vanderbilt Defendants,  NEPC's, and Correra's wrongful conduct aiding and abetting the Trustee Defendants' in their impairment of vested property rights has caused and is causing substantial damages to the Fund and members of the Class.

**COUNT VII**

**BREACH OF CONTRACT**
**(Against NEPC)**

158.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

159.    The ERB entered into an express or implied contract with NEPC, pursuant to which NEPC agreed to provide financial advisory services to the ERB.

160.    NEPC breached that contract by failing to adequately perform the services it agreed to provide.

161.    NEPC's breaches of contracts have caused and are causing substantial damages to the Fund and its Beneficiaries, including lost principal, lost income, fees and expenses, increased payroll contributions, and a looming increase in the number of years new employees must work to be entitled to full retirement benefits.

<u>**COUNT VIII**</u>

<u>**PROFESSIONAL NEGLIGENCE**</u>
<u>**(Against NEPC)**</u>

162.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

163.    NEPC agreed to provide financial advisory services to the ERB.

164.    NEPC negligently performed the financial advisory services it agreed to provide to the ERB.

165.    NEPC's professional negligence has caused and is causing substantial damages to the Fund and its Beneficiaries, including lost principal, lost income, fees and expenses, increased payroll contributions, and a looming increase in the number of years new employees must work to be entitled to full retirement benefits.

<u>**COUNT IX**</u>

<u>**BREACH OF CONTRACT**</u>
<u>**(Against Aldus)**</u>

166.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

167.    The ERB entered into an express or implied contract with Aldus, pursuant to which Aldus agreed to provide financial advisory services to the ERB.

168.     Aldus breached that contract by failing to adequately perform the services it agreed to provide.

169.     Aldus' breaches of contract have caused and are causing substantial damages to the Fund and its Beneficiaries, including lost principal, lost income, fees and expenses, increased payroll contributions, and a looming increase in the number of years new employees must work to be entitled to full retirement benefits.

### COUNT X

### PROFESSIONAL NEGLIGENCE
#### (Against Aldus)

170.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

171.     Aldus agreed to provide financial advisory services to the ERB.

172.     Aldus negligently performed the financial advisory services it provided to the ERB.

173.     Aldus' professional negligence has caused and is causing substantial damages to the Fund and its Beneficiaries, including lost principal, lost income, fees and expenses, increased payroll contributions, and a looming increase in the number of years new employees must work to be entitled to full retirement benefits.

### COUNT XI

### COMMON LAW FRAUD
#### (Against Aldus)

174.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

175.     Aldus agreed to provide honest advice and professional services to the ERB, in the best interest of the Fund.

176.     Aldus did not intend to provide honest advice and professional services to the ERB, but rather intended to use its position to further its interests and the interests of its political allies and sponsors.

177.     The ERB relied on Aldus providing honest advice and professional services. Under the circumstances alleged herein, such reliance was reasonable.

178.     Aldus did not provide honest advice and professional services, but rather used its position to recommend investments that were in its best interests, rather than the best interests of the Fund.

179.     The Fund was damaged by Aldus' fraud.

### COUNT XII

### COMMON LAW FRAUD
### (Against the Vanderbilt Defendants)

180.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

181.     The Vanderbilt Defendants knowingly or recklessly materially misrepresented the nature of the Vanderbilt Investment to the Board, which relied on such misrepresentations, causing the Fund and its members to suffer damages as a result.  The Vanderbilt Defendants knew the Board would rely on their material misrepresentations and omissions and intended such reliance.

182.     The Vanderbilt Defendants' statement on March 7, 2006, that "we are targeting an annual dividend yield of approximately 10%" was false and misleading.

183.     The Vanderbilt Defendants' false and misleading statements at the May 12, 2006 Investment Committee meeting included the following:

a)      That the Vanderbilt investment is "a state of the art, 'top of the food chain' investment vehicle;"

b)      That Citigroup was the "lead placement agent" for the deal;

c)      That the Vanderbilt investment was based on "fixed income" investments and that the investment "would be referencing all fixed income underlying assets;"

d)      That "Vanderbilt Financial Trust is a private company that ERB will own shares of, and the company itself will generate revenue from fixed income;"

e)      That the Vanderbilt Investment was based on and had as collateral "underlying investment grade bonds;"

f)      That the CDOs were "a pool of assets/bonds that is financed by AAA, AA, and BBB rated bonds and they re-engineer cash flow;"

g)      That the CDOs were backed by "investment grade, high quality fixed income securities;"

h)      That "we re-underwrite everything to our specs;"

i)      That "[t]here are 4 classes of holders, with the equity holder receiving the most return;"

j)      That the Fund was receiving an especially good deal because "Citibank and Bear Stearns agreed not to charge a fee to 'friends and family' of Vanderbilt, which ERB would be considered under that umbrella;"

k)      That the term of the investment was 1.3 years;

l)      That the Fund could expect to receive back its entire principal investment by the end of the 1.3-year term;

m)      That the Fund could expect an annualized return of 12-15% on its

investment;

n)      That the Vanderbilt Defendants had come to the Board for an investment

in connection with its other investments with the SIC;

o)      That "historically the default rate of Vanderbilt since 1999 is zero;"

p)      That "[t]here is an assumption of recovery and default in every deal,

[which] is priced in up front;"

q)      That a negative return as a result of defaults in the portfolio could be

avoided because Vanderbilt "will try to sell out of deals before they hit bottom;"

r)      That there was a May 15, 2006, or June 15, 2006, "deadline" for the

Board's decision to invest or that Vanderbilt was extending any deadline in order

to "give ERB the opportunity to invest and give priority to 'friends and family;'"

s)      That Vanderbilt wanted to give priority to the Board "before Wall Street,

Citi, and Bear oversubscribe this thing, which you'll be shut out;"

t)      That the securities involved in the Vanderbilt investment would be listed

on the New York Stock Exchange through an initial public offering and would be

liquid soon after closing; and

u)      That there were no synthetic CDOs underlying the Vanderbilt Trust

Offering.

184.    These statements were knowingly false and misleading.  In fact, the Vanderbilt

Investment was highly speculative, risky, leveraged, virtually worthless, and targeted solely at

the ERB and SIC.  It was the vehicle of a "pay to play" scheme, orchestrated through the

political influence of Defendant Correra and his father.  It was not a "fixed income" investment.

The Vanderbilt Defendants knew the CDOs' underlying assets consisted mainly of subprime

loans, including adjustable rate residential mortgages, toxic waste, liar's loans, and exceptional

loans that were likely to suffer a substantially high default rate, including the real possibility that

they would become worthless.  The investment touted by the Vanderbilt Defendants was not

backed by fixed income bonds that would "re-engineer cash flow."  They were not "high

quality," but, rather, virtually worthless.  The Fund's investment would not be protected by

Vanderbilt Financial's other business.  The Fund's equity tranche in the CDOs was "toxic waste"

– the lowest position with the highest level of risk and least return.  Citigroup and Bear Stearns

had not agreed to forego a fee as a reward for being Vanderbilt's "friend or family."  The Fund

was not being offered an especially good deal due to the purported absence of fee to Citigroup or

Bear Stearns or the purported short term and high return of the investment.  The Vanderbilt

Defendants knew the Board could not reasonably expect to receive back its entire principal

investment plus an annualized return of 12-15% by the end of the 1.3-year term of the deal.  The

risk of default on the underlying loans was not mitigated, offset, or accounted for "up front."

The Vanderbilt Defendants knew they would not realistically be able to sell out of the investment

in the event of defaults in the portfolio in order to avoid a negative return.  There was never any

prospect of an initial public offering, listing on the New York Stock Exchange, or liquidity with

respect to the Vanderbilt Investment.   The Vanderbilt Trust Offering included Synthetic CDOs.

     185.    The Vanderbilt Defendants also omitted to state material facts it was obligated to

disclose and that, under the circumstances, made its conduct false and misleading.  These

material omissions included:

          a)     That the Vanderbilt Investment was highly speculative and risky,

              excessively leveraged, and virtually worthless;

b)      That the underlying assets purportedly collateralizing the CDOs consisted mainly of subprime loans, including adjustable rate residential mortgages, toxic waste, liar's loans, and exceptional loans;

c)      That, due to the high-risk nature of the underlying assets, a high default rate was probable;

d)      That Vanderbilt had been introduced to the ERB for an investment through the intervention of Correra and his father;

e)      That the Vanderbilt Defendants had agreed to generate political contributions to the Richardson presidential campaign and otherwise in exchange for a Fund investment;

f)      That Vanderbilt had paid Correra as a placement agent to exert his influence to obtain the Fund's investment;

g)      That Correra also was exerting his influence to obtain the Fund's investment;

h)      That Correra's father had brought Citigroup and Bear Stearns into the deal;

i)      That the purported zero-default rate experienced by Vanderbilt was entirely irrelevant to the Vanderbilt Investment being promoted to the ERB;

j)      That the investment was created and targeted for the ERB and SIC and not sold to any other outside investors;

186.   The Vanderbilt Defendants' fraud has caused and is causing substantial damages to the Fund and its Beneficiaries.

187.    The ERB relied on the fraudulent statements and omissions of the Vanderbilt

Defendants in approving the Vanderbilt Investment.  Under the circumstances described above,

such reliance was reasonable.

## COUNT XIII

## VIOLATION OF NEW MEXICO UNIFORM SECURITIES ACT N.M.S.A. § 58-13C-509
### (Against the Vanderbilt Defendants)

188.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing

paragraphs as if fully set forth herein.

189.    The Vanderbilt Defendants and Aldus, and each of them, are "persons," and the

Vanderbilt Investment is a "security," as those terms are defined in the New Mexico Uniform

Securities Act, N.M.S.A. § 58-13C-102.

190.    The New Mexico Uniform Securities Act, N.M.S.A. § 58-13C-501, prohibits any

person, in connection with the sale of a security, directly or indirectly, to employ a device,

scheme or artifice to defraud; to make an untrue statement of a material fact or to omit to state a

material fact necessary in order to make the statement made, in the light of the circumstances

pursuant to which it is made, not misleading; or to engage in an act, practice or course of

business that operates or would operate as a fraud or deceit upon another person.

191.    The Vanderbilt Defendants and Aldus, and each of them, directly or indirectly,

violated the New Mexico Uniform Securities Act, N.M.S.A. § 58-13C-509, by selling the

Vanderbilt Investment to the Fund (and, indirectly, to its beneficiaries) by means of untrue

statements of material facts, including, but not limited to, the statements contained in the

Vanderbilt Trust Offering and those made during the May 12, 2006 presentation to the ERB

concerning, *inter alia*, the nature, risk and prospects of the Vanderbilt Investment, or by omitting

to state material facts necessary in order to make those statements, in light of the surrounding

circumstances in which they were made, not misleading, including, but not limited to, the improper role and actions of placement agents, such as Defendant Correra, in presenting the Vanderbilt Investment to the ERB and the illiquidity of the Vanderbilt Investment and its underlying investments.

192.    Under the circumstances alleged herein, the ERB did not know, and could not have known, in the exercise of reasonable care, the untruth or omissions of the statements made by the Vanderbilt Defendants and Aldus.

193.    As a result of the foregoing acts and omissions of the Vanderbilt Defendants and Aldus, they are liable to the Fund (and indirectly to its Beneficiaries) for the actual damages it sustained as a result of its purchase of the Vanderbilt Investment, together with interest at the legal rate of interest from the date of the Fund's purchase of the Vanderbilt Investment, and costs and reasonable attorneys' fees in an amount to be determined by the Court.

## COUNT XIV

### VIOLATION OF NEW MEXICO UNIFORM SECURITIES ACT
### N.M.S.A. § 58-13C-509
### (Aiding and Abetting Against Livney, Malott, Bland,
### Garcia, Brown, Aldus and Correra)

194.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

195.    Defendants Livney, Malott, Bland, Garcia, Brown, Aldus and Correra, and each of them, are "persons," and the Vanderbilt Investment is a "security," as those terms are defined in the New Mexico Uniform Securities Act, N.M.S.A. § 58-13C-102.

196.    The New Mexico Uniform Securities Act, N.M.S.A. § 58-13C-509, imposes joint and several liability on (1) persons who directly or indirectly control a primary violator of the New Mexico Uniform Securities Act, (2) managing partners, executive officers or directors of

such a primary violator, or (3) an individual employed by or associated with such a primary violator and who materially aids the conduct giving rise to the primary violator's liability.

197. Livney, on behalf of the Vanderbilt Defendants, materially aided the conduct giving rise to the damages sustained by the Fund and its Beneficiaries, and is liable to them for the actual damages sustained as a result of the Fund's purchase of the Vanderbilt Investment, together with interest at the legal rate of interest from the date of the Fund's purchase of the Vanderbilt Investment, and costs and reasonable attorneys' fees in an amount to be determined by the Court.

198. Malott, Bland, Garcia and Brown, and each of them, as alleged herein, materially aided the conduct described of herein, and are jointly and severally liable to the Fund and its Beneficiaries for the actual damages they sustained as a result of the Fund's purchase of the Vanderbilt Investment, together with interest at the legal rate of interest from the date of the Fund's purchase of the Vanderbilt Investment, and costs and reasonable attorneys' fees in an amount to be determined by the Court.

199. Aldus and Correra, as alleged herein, materially aided the conduct of the other Defendants described herein and are jointly and severally liable to the Fund and its Beneficiaries for the actual damages they sustained as a result of the Fund's purchase of the Vanderbilt Investment, together with interest at the legal rate of interest from the date of the Fund's purchase of the Vanderbilt Investment, and costs and reasonable attorneys' fees in an amount to be determined by the Court.

## COUNT XV

## NEGLIGENT MISREPRESENTATION
### (Against the Vanderbilt Defendants)

200.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing

paragraphs as if fully set forth herein.

201.     The Vanderbilt Defendants negligently misrepresented the nature of the

Vanderbilt Investment to the ERB, which relied on such misrepresentations, causing the Fund

and its Beneficiaries to suffer damages as a result.  The Vanderbilt Defendants knew the ERB

would rely on their material misrepresentations and omissions and intended such reliance.

202.     The Vanderbilt Defendants' negligent misrepresentations have caused and are

causing substantial damages to the Fund and its Beneficiaries.

## COUNT XVI

## VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND
## SEC RULE 10B-5 PROMULGATED THEREUNDER
## 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5

### (Against the Vanderbilt Defendants and Aldus)

203.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing

paragraphs as if fully set forth herein. The claims herein are asserted derivatively on behalf of the

Fund and not on behalf of the Class.

204.     As alleged herein, the Vanderbilt Defendants and Aldus, and each of them,

disseminated or approved the materially false and misleading statements specified herein,

including, but not limited to, the statements contained in the Vanderbilt Trust Offering, those

made during the May 12, 2006 presentation to the ERB concerning, *inter alia*, the nature, risk

and prospects of the Vanderbilt Investment, the role and actions of placement agents, such as

Defendant Correra, in presenting the Vanderbilt Investment to the ERB and the illiquidity of the Vanderbilt Investment and its underlying investments.

205.    As alleged herein, the Vanderbilt Defendants and Aldus, and each of them, knew or deliberately or recklessly disregarded that the material statements specified herein were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make those statements, in light of the circumstances under which they were made, not misleading.

206.    As alleged herein, the Vanderbilt Defendants and Aldus employed devices, schemes and artifices to defraud; made untrue statements of a material fact and omitted to state material facts necessary to make the statements, under the circumstances, not misleading; and engaged in acts, practices and a course of business which operated as a fraud and deceit upon the ERB.

207.    The Fund has suffered damages in that, in reliance on the material statements specified herein, the Fund purchased the Vanderbilt Investment.  The Fund would not have purchased the Vanderbilt Investment if the ERB had been aware of the true facts and/or the omitted information, including, but not limited to, the nature, risk and prospects of the Vanderbilt Investment, the role and actions of placement agents, such as Defendant Correra, in presenting the Vanderbilt Investment to the ERB and the illiquidity of the Vanderbilt Investment and its underlying investments.

## COUNT XVII

## UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST
### (Against all Defendants)

208.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

209.     As a result of the conduct described above, each of the Defendants has been unjustly enriched at the expense of the Fund and its Beneficiaries, and/or has aided and abetted such unjust enrichment.

210.     Each of the Defendants should be required to account for and disgorge all realized monies, profits, commissions, bonuses and gains (including fees and related compensation for attending meetings and rendering other services) which they have obtained and will unjustly obtain at the expense of the Fund and a constructive trust should be imposed thereon for the benefit of the Fund and its Beneficiaries.

## COUNT XVIII

### UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST TO REMEDY BREACH OF FIDUCIARY DUTIES AND VIOLATION OF NEW MEXICO CONSTITUTION
#### (Against the Trustee Defendants)

211.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

212.     As a result of the conduct described above, each of the Trustee Defendants has breached his or her fiduciary duty, and violated the New Mexico Constitution, and has been unjustly enriched as a result of the unqualified acceptance of reimbursement from the state for legal expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief, including:

A.     An award of actual damages to the Fund, consisting of lost principal, lost income, and fees and expenses in an amount to be determined at trial;

B.     Pre- and post-judgment interest;

C.     An award of reasonable attorneys' fees and costs;

D.      Injunctive and other appropriate equitable relief prohibiting the wrongful conduct alleged herein, including "pay to play" practices and political contributions by persons doing business with the ERB and the Fund, and removing the Trustee Defendants from the ERB;

E.      Injunctive and other appropriate equitable relief requiring the ERB to adopt and adhere to investment practices and procedures which put the interests of the Fund and its Beneficiaries first and foremost, and which are consistent with the ERB's fiduciary obligations to the Fund and its Beneficiaries;

F.      Injunctive and other appropriate equitable relief pursuant to which the Court appoints a monitor to oversee the rehabilitation of the ERB and its investment practices and procedures; and

G.      Such other relief as may be necessary or appropriate.

                                    Respectfully submitted,

                                    THE ROWE LAW FIRM

Dated: June 30, 2010                _____/s/_____
                                    Gordon H. Rowe III
                                    1200 Pennsylvania NE, Suite 2B
                                    Albuquerque, NM 87110
                                    Phone: 505-232-2800
                                    Fax: 505-266-1031

                                    Jonathan W. Cuneo
                                    Matthew E. Miller
                                    Brendan S. Thompson
                                    CUNEO GILBERT & LaDUCA, LLP
                                    507 C Street, N.E.
                                    Washington, D.C. 20002
                                    Phone: 202-789-3960
                                    Fax: 202-789-1813

                                    Richard D. Greenfield
                                    Marguerite R. Goodman
                                    GREENFIELD & GOODMAN, LLC
                                    250 Hudson Street, 8th Floor

New York, N.Y.  10013
Phone: 917-495-4446

*Attorneys for Plaintiffs*

I hereby certify that a true and correct
Copy of the foregoing pleading was served
Via electronic notification through the
CM/ECF system on all parties of record
This 30th day of June, 2010.


_____/s/_____

Gordon H. Rowe III