IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DONNA J. HILL, *et al.*,

Plaintiffs,

vs.                                                    No. CV-10-133 JB/KBM

VANDERBILT CAPITAL ADVISORS, LLC, *et al.*,

Defendants.

## VANDERBILT DEFENDANTS' MOTION
## TO DISMISS COMPLAINT AND MEMORANDUM OF LAW IN SUPPORT

### INTRODUCTION

The New Mexico Educational Retirement Board ("ERB") is a multi-billion dollar pension fund that invests in a wide array of assets. Like countless other institutional investors, it lost money on collateralized debt obligation ("CDO") investments when the national economy and financial markets entered a period of virtually unprecedented crisis in 2007 and 2008. Plaintiffs are New Mexico State University employees and beneficiaries of the Educational Retirement Fund (the "Fund") who, with the financial clarity that only 20/20 hindsight can provide, now claim that the ERB's trustees breached their fiduciary duties by making a poor decision relating to a particular CDO investment the ERB made in 2006. The entity in which the ERB invested, Vanderbilt Financial Trust ("VFT"), was an investment vehicle that owned equity interests in a diversified portfolio of CDO assets. Plaintiffs have also sued Vanderbilt Capital Advisors, LLC ("Vanderbilt"), the manager of the challenged investment, and its former CEO Patrick A. Livney (together, the "Vanderbilt defendants") for alleged misrepresentations and other claimed torts in connection with the sale to the ERB of a stake in VFT.

Plaintiffs' claims are riddled with problems and cannot proceed.

**No Statutory Authority for Derivative Claim.** There is no statutory or other basis for Plaintiffs to sue derivatively on behalf of the ERB. The ERB is a New Mexico state agency, not

a corporation, and Plaintiffs are its beneficiaries, not its shareholders.  The statute permitting derivative claims for corporations and other *private* entities simply does not cover them.

**Demand Not Excused.**  Even if the ERB were to be treated like a corporation for purposes of analyzing purported derivative claims, Plaintiffs failed to make the required prior demand for the ERB board to assess and, if appropriate, pursue these claims.  Four of the seven ERB trustees now in office – the ones who would make the decision as to whether to pursue this claim – were not even on the board at the time of the challenged investment in VFT, and the complaint contains no allegations establishing a disqualifying self-interest by those individuals.

**No Class Claim.**  This suit also fails as a direct or class action.  Plaintiffs do not allege that they or any class member had any interactions with the Vanderbilt defendants, heard or read any misrepresentations from the Vanderbilt defendants, or relied on anything the Vanderbilt defendants said or omitted.  What is more, they acknowledge that (at most) they were harmed only "indirectly" (Am. Compl. ¶¶ 11, 112(h)) and disavow any claim for class damages.

**No Reliance.**  Regardless of whether the claim is direct or derivative, Plaintiffs fail to allege facts indicating that the ERB relied on any of the alleged misrepresentations.  Indeed, in a number of instances, they fail even to plead facts suggesting the representations were false.

**Belied by Undisputed Record.**  The audio recording of the meeting where the misrepresentations were allegedly made demonstrates that there was express discussion of the very risks Plaintiffs claim were hidden.  Similarly, the claimed misstatements or omissions are inconsistent with the detailed risk disclosures made in the VFT offering memorandum.  Fraud claims that do not plead falsity or that fly in the face of express disclosures must be dismissed.

**Non-Existent Claims.**  Plaintiffs' causes of action for "aiding and abetting breach of contract" and "aiding and abetting impairment of vested property rights" simply do not exist under New Mexico law.  And the unjust enrichment claim, which is just piggybacking on Plaintiffs' other claims, fails for the same reasons those do.

**Suit Barred by Statute.**  Plaintiffs' allegations are based on the same facts underlying former ERB Chief Investment Officer Frank Foy's pending state court lawsuit under the New

Mexico Fraud Against Taxpayers Act ("FATA").  NMSA 1978, §§ 44-9-1 to -14.  Section 5(E) of FATA bars anyone from bringing "a related action based on the facts underlying the pending [FATA] action."  Plaintiffs cannot circumvent the statutory bar of FATA by applying different labels to their claims.

ARGUMENT

## I.   THE COMPLAINT DOES NOT SATISFY THE REQUIREMENTS FOR A DERIVATIVE ACTION

### A.   Private Plaintiffs Cannot Bring a Derivative Suit on Behalf of a State Board

There is no freestanding right to bring a derivative action on behalf of another person or entity; it is a creature of statute.  No provision of the Educational Retirement Act (NMSA 1978, §§ 22-11-1 to -55) gives beneficiaries of the Fund standing to bring suit derivatively on behalf of the ERB.  The New Mexico statute authorizing derivative actions clearly states that a plaintiff in such an action must be "a shareholder of record or the beneficial owner of shares" in a "domestic or foreign corporation."  NMSA 1978, § 53-11-47(A); *see also Saylor v. Valles*, 2003-NMCA-037, ¶ 8, 133 N.M. 432, 63 P.3d 1152 ("By statute, several states allow derivative actions by members of nonprofit corporations; however, New Mexico is not one of them.").  Fed. R. Civ. P. 23.1, on which Plaintiffs rely (Am. Compl. ¶ 118) is similarly limited to "shareholders or members of a corporation of unincorporated association."  Neither Plaintiffs nor any other beneficiary of the Fund owns shares in the ERB, nor is the ERB a corporation of any kind.  Rather, four of the ERB's seven trustees are state officials or political appointees, NMSA 1978, § 22-11-3(B), and, as such, the ERB is "considered to be an 'arm of the state.'"  *See Wirtz v. State Educ. Ret. Bd.*, 1996-NMCA-085, ¶ 10, 122 N.M. 292, 923 P.2d 1177.

Consequently, if beneficiaries of the Fund wish to bring suit on the ERB's behalf, they must comply with the requirements of FATA, which is the sole avenue for private citizens to bring civil claims on behalf of a state agency.  *See* NMSA 1978, § 44-9-5(A) ("A person may bring a civil action for a violation of Section 3 of the Fraud Against Taxpayers Act on behalf of

3

the person and the state.").  Plaintiffs' attempt to avoid the narrow prescriptions for a FATA suit by styling their claim as a derivative action must fail.

      **B.**      **Plaintiffs Fail To Establish that the Demand Requirement Is Excused**

Even if a derivative claim were allowed (which it is not), under New Mexico law, a shareholder may not bring an action on behalf of a corporation unless "the complaint alleges with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors and the reasons for his failure to obtain the action or for not making the effort."  NMSA 1978, § 53-11-47(A)(3); *accord* Fed. R. Civ. P. 23.1(b)(3).  Because a derivative action is properly commenced only once the corporation "has refused a properly made demand to enforce the corporation's rights," the New Mexico Supreme Court has explained that "the demand requirement is crucial to the derivative action."  *White ex rel. Banes Co. Derivative Action v. Banes Co.*, 116 N.M. 611, 614, 616, 866 P.2d 339, 342, 344 (1993).  Only if the plaintiff can "demonstrate[] the futility of such demand" will this crucial requirement be excused.  *Id.* at 616, 866 P.2d at 344.  Demand is futile only where "the circumstances are such as to *clearly show* that it would be *a mere useless form*."  *Porter v. Mesilla Valley Cotton Prods. Co.*, 42 N.M. 217, 220, 76 P.2d 937, 939 (1937) (emphases added); *accord Saylor*, 2003-NMCA-037, ¶ 8 (dismissing purported derivative claim on behalf of nonprofit organization because there were no allegations that plaintiffs made the requisite demand to the organization's directors or officers or adequately explained why such demand would be futile).

Here, Plaintiffs admit that they have made no such demand, but offer no support for excusing demand beyond the fact that the trustees have not caused the ERB to bring suit yet and the bald assertion that a majority of the ERB board was allegedly corrupt.  (Am. Compl. ¶ 119.) However, "[c]onclusory allegations that directors participated in, approved of, or acquiesced to the conduct in question, unsupported by *specific facts*" are not sufficient, and to survive a motion to dismiss Plaintiffs must "make a *particularized showing* that demand on the board would have been futile, *i.e.*, that the board could not have impartially considered and acted on the demand." *Rist v. Stephenson*, 2007 U.S. Dist. LEXIS 73263, at *9, *19 (D. Colo. Oct. 1, 2007) (emphasis

added).  Plaintiffs have failed to make such a particularized showing with respect to the ERB board.

In determining whether a board is so hopelessly conflicted that a plaintiff does not even need to *try* to convince it to take action, courts sensibly look to the composition of the board at the time the demand could have been made, rather than when the underlying conduct at issue took place.  *See, e.g., id.*, at *10, *31 (dismissing complaint after analyzing composition of "the board in existence at the time the complaint was filed"); *In re CNET Networks, Inc.*, 483 F. Supp. 2d 947, 955 (N.D. Cal. 2007) (same).  The wisdom of that rule is apparent here:  the ERB has seven trustees, NMSA 1978, § 22-11-3(B), but only two of the current trustees who were also in office at the time the complaint was filed (Mr. Mallott and Ms. Garcia)[1] are named as defendants in this case.  (A third continuing trustee, Ms. Cameron, has not been accused of any misconduct.) While the allegations against the trustees who served on the board *in 2006* are a far cry from establishing the type of self-interest that would excuse demand, the Court need not decide that issue because no allegations have been made to impugn the independence of a majority of the *current* board.  Because there is no allegation that five of the seven board members at the time the complaint was filed did anything wrong, Plaintiffs have failed to offer an adequate excuse for why they did not demand that the ERB board pursue this action before they ran to court.

Plaintiffs' other alleged bases for refusing to make the requisite demand on the ERB board are similarly without merit.  Plaintiffs allege that the board failed to take action after the publication of "numerous news articles exposing the corrupt 'pay to play' schemes" and the filing of the *Foy* whistleblower action (Am. Compl. ¶ 119), but this allegation falls far short of what is required to plead demand futility.  *See, e.g., Midwestern Teamsters Pension Trust Fund v. Deaton*, 2009 U.S. Dist. LEXIS 50521, *21-24, *40 (S.D. Tex. May 7, 2009) (dismissing

---

[1]    The composition of the board is a matter of public record.  *See* NMSA 1978, § 22-11-3(B); Minutes, ERB Meeting (Dec. 11, 2009), www.nmerb.org/pdfs/boardminutes121109.pdf (board members as of Dec. 11, 2009) (Ex. F); "NMERB Board of Trustees," www.nmerb.org/board.htm (same membership as of Aug. 25, 2010) (Ex. G).

complaint, despite board's alleged failure to act in the face of "red flags" like newspaper articles, because "Plaintiffs have failed to show that a majority of the current…board of directors could not impartially consider a demand to bring this action"). Plaintiffs maintain that the board has "intentionally failed to commence legal action against their friends, colleagues, and political confederates" (Am. Compl. ¶ 119), but this too is not an adequate basis to forgo making the requisite demand before filing suit. *See, e.g.*, *Kenney v. Koenig*, 426 F. Supp. 2d 1175, 1187 (D. Col. 2006) ("Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence.").

Because there is no legal basis for Fund beneficiaries to bring suit derivatively, and because in any case Plaintiffs have not satisfied the prerequisites for a derivative action, the Court must dismiss this suit insofar as it purports to be a derivative action on behalf of the ERB.

## II.     THE COMPLAINT ALSO FAILS AS A CLASS ACTION

### A.     Plaintiffs and the Class Have No Direct Injury

Plaintiffs' own complaint establishes that the class claims cannot proceed. The essence of a class action, in contrast to a derivative suit, is that each of the plaintiffs claims he or she was *individually* and *directly* injured by the challenged conduct. *See, e.g.*, *Marchman v. NCNB Tex. Nat'l Bank*, 120 N.M. 74, 81, 898 P.2d 709, 716 (1995) ("When a corporation is directly injured, shareholders, employees, and creditors of the corporation may suffer indirect injury. The corporation, having suffered the direct injury, has the right to bring an action against the wrongdoer, *while other parties suffering indirect injuries cannot individually assert the corporate cause of action*.") (emphasis added); *Kramer v. W. Pac. Industr., Inc.*, 546 A.2d 348, 351 (Del. 1988) ("In [the shareholder's derivative] suit, the shareholder sues on behalf of the corporation for harm done to it…. Shareholders may also bring direct actions, both as individuals and as a class, *for injuries done to them in their individual capacities* by corporate fiduciaries.") (emphasis added) (citing R. Clark, Corporate Law 639-40 (1986)).

Plaintiffs' admission that no class member invested any money in VFT, and their acknowledgement that class members were allegedly injured only "indirectly" because it was the

ERB which lost money, demonstrate that the complaint fails as a class action.  (Am. Compl. ¶¶ 11, 112(h).)  Similarly, Plaintiffs seek no relief for individual class members, but rather merely request "[a]n award of actual damages to the Fund."  (*Id.*, Prayer for Relief, at 60 ¶ A; *see id.* ¶ 1 (both direct and derivative claims seek to "recover for the Fund" or "on the Fund's behalf").)

Aside from the absence of any direct injury to members of the class, the complaint also lacks any allegation that Plaintiffs or any class member relied on any misrepresentation or omission by the Vanderbilt defendants.  Indeed, nowhere do Plaintiffs allege that they or any other class member ever had any direct dealings with the Vanderbilt defendants.  The purported class fraud and negligent misrepresentation claims (Counts XII-XV) fail as a matter of law for this independent reason.  *See, e.g.*, *Saylor*, 2003-NMCA-037, ¶¶ 20, 21 (dismissing negligent misrepresentation claim because "the complaint does not allege that Plaintiffs relied on the misrepresentations at any point in time" and fraud claim because "the complaint is void of an allegation that [plaintiff] in fact and to its detriment relied upon Defendants' misrepresentations"); *see also Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996) ("a fraud class action cannot be certified when individual reliance will be an issue").

Plaintiffs' allegation that the *ERB* relied on misrepresentations by the defendants (Am. Compl. ¶¶ 181, 201, 207) is irrelevant to the purported class claims; to state a direct claim for fraud, Plaintiffs must show that they and other class members *themselves* relied on statements made by the defendants.  *Marchman*, 120 N.M. at 81, 898 P.2d at 716 (where "alleged wrongful acts" – including purported misrepresentations – were "directed at the corporation and not at the shareholders, the cause of action accrues to the corporation and not to the shareholders in their individual capacity").

### B.   Plaintiffs Have a Disabling Conflict of Interest That Prevents Them from Pursuing a Class Claim

Independent of the class claim's lack of viability, an inherent conflict exists where, as here, plaintiffs assert both class and derivative claims that seek to recover the same damages for competing constituencies.  *See Kamerman v. Steinberg*, 113 F.R.D. 511, 516 (S.D.N.Y. 1986)

("suing in both an individual and derivative capacity presents a substantial potential for conflict"); *see also Koenig v. Benson*, 117 F.R.D. 330, 334-35 (E.D.N.Y. 1987) (similar). Specifically, in the context of a breach of fiduciary duty claim, "[i]f it is proved that the directors and officers violated the law, the proposed class and [the corporation] would be in direct competition with each other for the damages that the directors and officers would be required to pay in compensation for their illegal actions." *Horowitz v. Pownall*, 582 F. Supp. 665, 666 (D. Md. 1984). So too here, if Plaintiffs recover on any of their individual claims, their status as a representative of the ERB's beneficiaries seeking damages for the beneficiaries would conflict with their role as the persons suing to recover money for the ERB itself. This unmistakable conflict of interest is yet another reason why the class claims should be dismissed.

## III.   WHETHER CLASS OR DERIVATIVE IN NATURE, ALL OF THE CLAIMS AGAINST THE VANDERBILT DEFENDANTS FAIL AS A MATTER OF LAW

Regardless of whether the claims are derivative or direct, they still must be dismissed for a host of additional and independent reasons.

### A.   Legal Standard

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a court must accept as true all well-pleaded factual allegations in the complaint." *See In re Thornburg Mortg., Inc. Sec. Litig.*, 683 F.Supp.2d 1236, 1247 (D.N.M. 2010). However, "[c]onclusory allegations without supporting factual averments are insufficient." *Cory v. Allstate Ins.*, 583 F.3d 1240, 1244 (10th Cir. 2009).

"[A] plaintiff's obligation to set forth the grounds of his or her entitlement to relief 'requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" *See Carpenter v. New Mexico*, 2010 WL 2292890, at *5 (D.N.M. May 26, 2010) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Therefore, "naked assertions devoid of further factual enhancement" do not suffice; the factual allegations in the complaint must "plausibly give rise to an entitlement to relief." *Carpenter*, 2010 WL 2292890,

at *5 (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009)); *see also Phillips v. Bell*, 365 Fed. Appx. 133, 137-40 (10th Cir. 2010).

In addition to reviewing the plaintiffs' own allegations, the Court may also consider the minutes of the ERB Investment Committee's and Board of Trustees' May 12, 2006 meetings (Exs. A and B) where the challenged conduct occurred because they are referred to in Plaintiffs' amended complaint (¶¶ 56, 77, 81-82, 84) and central to their claims.  *See, e.g.*, *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007).  Similarly, the Court may consider the audio recording of the May 12, 2006 ERB Investment Committee meeting at which Livney made an hour-long presentation to the ERB about VFT (Ex. C) because it is repeatedly quoted in the complaint (albeit without attribution, *see* Am. Compl. ¶¶ 59-60, 62-64, 66-67, 69-70, 72-73, 75, 85) and Plaintiffs' claims are based upon alleged misstatements during that presentation.  *See Martin v. Cent. States Emblems, Inc.*, 150 Fed. Appx. 852, 858 n.6 (10th Cir. 2005) (considering document "implicitly referred" to in complaint on motion to dismiss); *Midgley v. Rayrock Mines, Inc.*, 374 F. Supp. 2d 1039, 1048 (D.N.M. 2005) (similar); *accord In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them.").  Audio and video recordings are no different than any other document, and the Court properly may consider them on a motion to dismiss.  *See, e.g.*, *Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 56 n.5 (D.D.C. 2009) (considering video submitted by defendants with 12(b)(6) motion); *Condit v. Dunne*, 317 F. Supp. 2d 344, 357 (S.D.N.Y. 2004) (considering audio recording).

The Court may also consider the offering memorandum by which the VFT investment was sold (Ex. D) because it too is referred to in the complaint and central to Plaintiffs' claims. (Am. Compl. ¶ 54.)  Although Plaintiffs allege that the offering memorandum "was not provided to the ERB during the course of its deliberations," they admit that it exists and was furnished (*id.*), the ERB acknowledged in writing having received it before signing the subscription agreement that accompanied it (Ex. E, attached to the offering memorandum as Annex III), and

9

the audio recording of the ERB meeting on which the Plaintiffs rely demonstrates that Livney walked the ERB board through a draft of it at the May 12, 2006 Investment Committee meeting. (Ex. C at 1:40-2:00.)  Moreover, as Plaintiffs admit (Am. Compl. ¶¶ 86-87), the ERB's decision to invest in VFT was not final after the May 12 vote; it took another ten weeks before the ERB actually subscribed to the offering (Ex. E at III-9).  Because the ERB reviewed and acknowledged the offering memorandum in deciding whether to make the investment in VFT (*id.* at ¶¶ 11, 14-15), the Court should consider it in determining whether Vanderbilt misstated or omitted material facts.  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) (affirming consideration of offering memorandum and stock purchase agreement even though not attached to the complaint or incorporated by reference).[2]

## B.   The Fraud and Negligent Misrepresentation Claims against the Vanderbilt Defendants [Counts XII-XVI] Fail as a Matter of Law

As a matter of law, none of the Plaintiffs' claims based on alleged misrepresentations is viable – and for several independent and equally dispositive reasons.

### 1.   Elements of the Claim

In New Mexico, common law fraud requires that (1) the defendant knowingly or recklessly make a false representation of fact with intent to deceive, and that (2) the plaintiff suffer damages that (3) were proximately caused by (4) justifiable reliance on the defendant's misrepresentation.  *Cain v. Champion Window Co. of Albuquerque, L.L.C.*, 2007-NMCA-085, ¶ 22, 142 N.M. 209, 164 P.3d 90; *see Coronado Credit Union, Inc. v. Bevill, Bresler & Schulman Inc.*, 1983 WL 1420, at *15 (D.N.M. Dec. 23, 1983) (dismissing fraud claim because these elements were not met).  The elements of a negligent misrepresentation claim are similar.  *See, e.g., Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A.*, 106 N.M. 757, 761, 750 P.2d 118,

---

[2]     Certain undisputed public record facts of which the Court may take judicial notice in connection with this motion, *see Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276, 1278 n.1 (10th Cir. 2004), are also attached as Exs. F-I.

122 (1988) (plaintiff must plead the existence of a misrepresentation and pecuniary loss caused by justifiable reliance thereon to avoid dismissal of negligent misrepresentation claim).

Similar standards govern the federal securities law claim.  "In a private securities fraud action the plaintiff must prove that the defendants (1) made a material misrepresentation or omission; (2) with scienter; (3) in connection with the purchase or sale of a security; (4) upon which the plaintiff relied; (5) that the plaintiff suffered an economic loss; and (6) that the material misrepresentation was the cause of that loss."  *In re Williams Sec. Litig.*, 558 F.3d 1130, 1136 (10th Cir. 2009).[3]  Courts interpreting New Mexico's securities fraud statute adhere to these same elements.  *See Stone v. Fossil Oil & Gas*, 657 F. Supp. 1449, 1461-62 (D.N.M. 1987) (because "[n]o reported New Mexico case law has set forth the elements of a cause of action" for securities fraud under New Mexico Securities Act, and "[t]he New Mexico prohibition against fraudulent practices is practically identical to the federal Rule 10b-5," court "appl[ied] the same analysis to the state statute as to the federal cause of action"); *State v. Ross*, 104 N.M. 23, 26, 715 P.2d 471, 474 (Ct. App. 1986) (adopting federal courts' interpretation of securities fraud requirements).

### 2.   **Plaintiffs Do Not Allege Falsity**

The most basic element of any fraud or misrepresentation claim is that the statement at issue be untrue.  Plaintiffs cannot ground a fraud or misrepresentation claim upon statements that they never claim were false.  *See, e.g.*, *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1124 (10th Cir. 1997) (affirming dismissal of common law fraud and federal securities fraud claims because "nowhere in the complaint are facts alleged showing that anything about these statements is false").  Yet that is precisely what happens here.  For example:

---

[3]      The Vanderbilt defendants reserve all rights to challenge Plaintiffs' claim under the Securities Exchange Act of 1934 as time barred once the facts on that issue are more fully developed.  *See* 28 U.S.C. § 1658(b).

- Plaintiffs allege that Livney stated "[t]hat Citigroup was the 'lead placement agent' for the deal" (Am. Compl. ¶¶ 57, 183(b)), but nowhere claim that this statement was false or that someone else was actually the lead placement agent.

- Plaintiffs also assert that Livney stated that the underwriters agreed not to charge a fee to the ERB and agreed to give the ERB priority before the underwriters oversubscribed VFT (*id.* ¶¶ 69, 75, 183(j), 183(s)) but do not claim that the underwriters in fact charged fees or that they did not give the ERB priority.

- Plaintiffs assert that the Vanderbilt defendants stated "[t]hat the Vanderbilt Defendants had come to the Board for an investment in connection with its other investments with the SIC" (*id.* ¶ 183(n)) but fail to explain how this was untrue.

- Plaintiffs claim that the Vanderbilt defendants stated "that Vanderbilt 'will try to sell out of deals before they hit bottom'" (*id.* ¶¶ 73, 183(q)) but plead no facts showing that Vanderbilt did not intend to try to do exactly that.

Plaintiffs' additional claim (a) that it was misleading to state that "historically the default rate of Vanderbilt since 1999 is zero" (*id.* ¶ 183(o)) because the "historical performance of the Vanderbilt Defendants' other pools of CDOs were entirely irrelevant in the context of this specific proposal" (*id.* ¶ 72), and (b) the corresponding allegation that the Vanderbilt defendants had some duty to disclose the purported irrelevance of its historical performance (*id.* ¶ 185(i)), both fail as a matter of law to plead fraud. Plaintiffs do not challenge the factual accuracy of the historical data, but only what inference should have been drawn from it. That is not an actionable misrepresentation. *See, e.g.*, *Carney v. Cambridge Tech. Partners, Inc.*, 135 F. Supp. 2d 235, 250-51 (D. Mass. 2001) ("The plaintiffs do not allege that this historical information is inaccurate. In any event, the accurate reporting of historical information cannot be the basis for a securities fraud claim. Moreover, *the fact that a company has reported accurately about past successes does not by itself burden the company with a duty to inform the market that the present circumstances are less positive*.") (emphasis added).

### 3. Plaintiffs Cannot Show Reliance on the Supposed Misstatements

Equally fatal to Plaintiffs' claim is their failure to establish justifiable reliance on the supposed misrepresentations. *See Healthsource, Inc. v. X-Ray Assoc. of N.M.*, 2005-NMCA-097, ¶ 31, 138 N.M. 70, 116 P.3d 861; *see also Elliott Indus. Ltd. v. BP Am. Prod. Co.*, 407 F.3d

1091, 1116 (10th Cir. 2005); *In re Williams*, 558 F.3d at 1136 (securities fraud).  In the context of fraud claims involving the sale of securities, courts analyze what a reasonable investor would rely on in making investment decisions.  *See, e.g.*, *Grossman*, 120 F.3d at 1119-20 (citing cases).

Here, as discussed above, Plaintiffs do not allege that they or any class member relied on anything Vanderbilt said or omitted – indeed, they do not claim they had any direct dealings with the Vanderbilt defendants.  Further, Plaintiffs' definition of the class as including all current Fund participants (Am. Compl. ¶ 109), rather than only those who were ERB members in 2006 when the Vanderbilt investment was made, underscores this lack of reliance.  But even if the Court looks past this deficiency, the fraud and misrepresentation claims still fail because even the ERB itself did not rely on the claimed misrepresentations and omissions.

"Vague optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions."  *In re Sun Healthcare Group, Inc. Sec. Litig.*, 181 F. Supp. 2d 1283, 1291 (D.N.M. 2002).  Plaintiffs' allegation that Livney claimed that "the Vanderbilt investment is 'a state of the art, "top of the food chain" investment vehicle'" (Am. Compl. ¶¶ 56, 183(a)) is precisely the kind of "generalized statement[] of optimism that [is] not capable of objective verification" and is not actionable as a matter of law.  *See In re Sun Healthcare Group.*, 181 F. Supp. 2d at 1291.

Furthermore, the recording of the ERB Investment Committee's May 12, 2006 meeting and the official meeting minutes show that the ERB did not rely upon the alleged misrepresentations outlined in the complaint, and also that many of the challenged statements were clarified at the meeting itself, with the clarification negating the claimed misimpression (as the complaint itself acknowledges in a number of instances, *see* Am. Compl. ¶¶ 62, 66, 73).  Moreover, the 21 pages of risk disclosures in the offering memorandum directly refute Plaintiffs' suggestion that the ERB was hoodwinked into making the investment.  For example:

**Yield.**  Plaintiffs assert that the ERB was told that "the Fund *could expect* an annualized return of 12-15% on its investment" (*id.* ¶¶ 70, 183(m)), that Vanderbilt was "*targeting* an annual dividend yield of approximately 10%" (*id.* ¶¶ 53, 182), and that "the Fund *could expect* to

13

receive back its entire principal investment by the end of the 1.3-year term (*id.* ¶¶ 70, 183(l)) (emphases added).  These kinds of forecasts simply do not constitute an actionable basis for a fraud claim.  *See, e.g.*, *In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, at *5 (S.D.N.Y. Nov. 25, 2003) ("future earnings, sales goals, and the Company's desire to achieve continued prosperity are just the sort of predictive statements of opinion and belief that courts have found immaterial").  In any event, Plaintiffs concede that Livney explicitly stated that if the underlying bonds in which VFT invested were to experience greater than projected defaults, the VFT investment could "blow up" and lead to a "negative return" for the ERB.  (Am. Compl. ¶¶ 72-73.)  This admission makes unjustifiable any supposed reliance on the claimed promised yield.[4]

**Risk.**  The complaint alleges that the Vanderbilt defendants misrepresented that the possibility of defaults on the underlying bonds was "priced in up front," which according to Plaintiffs meant that there was no further risk to ERB from additional defaults.  (Am. Compl. ¶¶ 73, 183(p).)  Plaintiffs also allege that the Vanderbilt defendants did not disclose that the proposed investment in VFT actually "was highly speculative and risky, excessively leveraged, and virtually worthless," and that "due to the high-risk nature of the underlying assets, a high default rate was probable."  (*Id.* ¶¶ 185(a), 185(c).)  But Plaintiffs acknowledge that Livney clarified at the Investment Committee meeting that VFT would be investing in the "lowest level position" that had the "highest risk" (and corresponding potential for high return), and that the investment could "blow up" and experience "a negative return" if there were defaults in the underlying portfolio which exceeded Vanderbilt's assumptions.  (*Id.* ¶¶ 66, 72-73; Ex. C at 22:42-23:24, 56:12-57:10.)  The offering memorandum contained similar cautionary statements

---

[4]     Indeed, the offering memorandum itself explained why VFT might lose money and made it absolutely clear that VFT was not promising a particular rate of return or even a return greater than zero.  (Ex. D at 17-18.)  Thus, any reliance on a supposed promise about a particular rate of return was unjustified as a matter of law.  *See, e.g.*, *Glassman v. Computervision Corp.*, 90 F.3d 617, 626 n.11 (1st Cir. 1996) (securities fraud claims were not actionable where prospectus "provided investors with explicit and specific warnings as to factors that might cause the prices of the securities to fall").

(*see* Ex. D at 17, 28) and thus "warned investors of the very risks Plaintiff claims were not disclosed." *Recupito v. Prudential Sec., Inc.*, 112 F. Supp. 2d 449, 457 (D. Md. 2000).  The ERB could not justifiably have assumed that all further risk had been eliminated in the face of such warnings.

**VFT's Investment in Synthetic CDOs.**  Plaintiffs assert that at the May 12, 2006 Investment Committee meeting "Livney denied that the portfolio contained synthetic CDOs." (Am. Compl. ¶¶ 47, 63, 183(u).)  This is a gross distortion of what the recording shows Livney actually said.  At the meeting, Livney had been walking the Investment Committee through the "basic concept" of what a CDO is in response to a request from ERB Trustee Douglas Brown. (Ex. C at 15:49-16:37.)  Brown questioned Livney's reference to CDOs pooling assets or bonds and "reengineering" cash flows based on Brown's prior belief that CDOs by their very nature were "synthetic."  (*Id.* at 16:37-40 ("Reengineering?  Aren't these synthetics and things?").) Livney corrected Brown and went on to explain in detail what a CDO is.  (*Id.* at 16:40-20:06.) Livney said nothing about synthetic CDOs other than correcting Brown's misimpression that all CDOs were inherently synthetic.  Neither Brown nor Livney talked about VFT during this exchange, and there is *no statement* that VFT would not invest in synthetic CDOs.

In any event, the offering memorandum *explicitly and repeatedly* disclosed that VFT intended to invest in "Mayflower CDO I Ltd. ('Mayflower'), a *synthetic* asset-based CDO" (Ex. D at 2, 38, 45, 52-53 (emphasis added)) and made clear that VFT's "CDO subsidiaries may have limited synthetic exposures or be comprised entirely of synthetic exposures" (*id.* at 60).  Even if Livney had said what Plaintiffs claim he said (and the recording shows he did not), Plaintiffs could not justifiably have relied upon such a statement in light of the clear warning to the contrary in the offering memorandum.  *See Kennedy v. Josephthal & Co.*, 814 F.2d 798, 805 (1st Cir. 1987) ("When they closed their eyes and passively accepted the contradictions between Sinclair's statements and the offering memorandum, appellants could not be said to have justifiably relied on the misrepresentations.").

15

**CDO Subsidiaries' Underlying Investments.**  Plaintiffs allege that Livney represented that the bonds in which VFT's CDO subsidiaries invested were "investment grade" and "financed by AAA, AA, and BBB rated bonds" and that Vanderbilt failed to disclose that "the underlying assets purportedly collateralizing the CDOs consisted mainly of subprime loans, including adjustable rate residential mortgages, toxic waste, liar's loans, and exceptional loans." (Am. Compl. ¶¶ 59, 183(e)-(g), 185(b).)  But what Livney actually said (and in reference to Vanderbilt's activities generally rather than VFT in particular) was not an unequivocal statement about *all* assets in the CDO portfolio, but a more limited, qualified statement about certain assets:  "[*f*]*or the most part*, at Vanderbilt, everything we do is *pretty much* investment grade on the underlying bonds."  (Ex. C at 12:06-14 (emphases added).)  Similarly, his statement about AAA, AA, and BBB rated bonds was not talking about VFT in particular, but rather was part of his "primer" explanation of the basic concept of a CDO.  (*Id.* at 15:36-16:37.)  Plaintiffs cannot manufacture a misrepresentation claim by divorcing a statement from its context.  *See, e.g.*, *Grossman*, 120 F.3d at 1120 ("statements must be analyzed in context" when determining whether or not they are materially misleading").

To the extent this discussion supposedly caused any confusion to the ERB, the offering memorandum cleared it up.  The offering memorandum stated clearly that "[w]e expect that our CDO subsidiaries will acquire investment grade *and non-investment grade* [asset-backed securities]" and that the commercial mortgage-backed securities in which VFT was likely to invest "may be senior, subordinate, investment grade *or non-investment grade* securities.  (Ex. D at 49 (emphases added); *see also id.* at 33, 50 (same).)  Similarly, the offering memorandum disclosed that VFT's CDO subsidiaries would likely acquire residential mortgage-backed securities ("RMBS") and that among the types of RMBS in which VFT's CDO subsidiaries might invest were "Residential B/C MBS" which "entitle the holders thereof to receive payments that depend on the cash flow from *subprime* residential mortgage loans."  (*Id.* at 49 (emphasis added).)

16

**Categorization of Investment Type.**  Plaintiffs protest that at the May 12, 2006 Investment Committee meeting, Livney supposedly misrepresented that an investment in VFT should be categorized as a "fixed income" investment rather than a "private equity" investment. (Am. Compl. ¶¶ 59-61, 183(c), (d), (g).)  While the audio recording shows that Livney in fact said the exact *opposite* of what the Plaintiffs claim,[5] it does not matter because Plaintiffs acknowledge that the ERB's Chief Investment Officer stated at that meeting that the investment would be in fact treated by the ERB as a private equity investment (*id.* ¶ 62), and that was the judgment of the ERB's investment consultant as well.  (*See* Ex. C at 33:33-45.)  Further, the minutes from both the Investment Committee meeting and the subsequent Board of Trustees meeting confirm that the ERB placed the VFT investment in its "private equity allocation."  (Ex. B at 2; Ex. A at 3.)  Thus, even if Livney had made the claimed misrepresentation about how to classify this investment (and the recording is to the contrary), the ERB plainly did not rely upon it because it did not follow the claimed recommendation.

**Deadline.**  Plaintiffs allege that Livney falsely represented that there was a May 15, 2006 or June 15, 2006 "deadline" by which the ERB board had to decide whether to invest in VFT. (Am. Compl. ¶¶ 75, 183(r).)  But Livney explicitly stated at the Investment Committee meeting that "it's not a deadline per se."  (Ex. C at 53:09-38.)  Indeed, the ERB did not sign the subscription agreement by which it agreed to invest in VFT until late July, and the deal did not close until August.  (Ex. D, cover; Ex. E at III-9.)  Since the ERB did not actually invest until weeks after the claimed "deadline" passed, the ERB plainly did not rely on the claimed deadline.

**Term.**  Plaintiffs allege that, in response to a question about the term of the deal, Livney "answered: '1.3 years,' stating 'you could own this for 1.3 years if you want and be out 100 percent if you want.'"  (Am. Compl. ¶ 70; *see also id.* ¶ 183(k).)  But in fact, what Livney

---

[5]     Livney himself clarified at the meeting that "this deal, this company, is a privately held company and you're getting equity in the company.  The company itself is going to generate the value for the shareholders by investing in fixed income on the underlying assets," but the investment in VFT itself "is a private equity investment."  (Ex. C at 9:38-10:56; *accord* Am. Compl. ¶ 59.)

actually said was that he *thought* 1.3 years could be the term: "The term of the deal – *I think* you could, you could own this for 1.3 years if you want, and be out 100 percent if you want." (Ex. C at 40:26-35 (emphasis added).) Indeed, one trustee's follow-up question to Livney made clear that he understood that Livney was speaking "hypothetically" about a possible term, not making a representation of fact regarding the term of the investment. (*Id.* at 40:35-45.) Moreover, the statement about a supposed "term" was in the context of the plan to list VFT shares on a public exchange after about a year and a half, so that investors could sell their shares into the public market if they wanted an exit (*see* Ex. D, cover & at 25 regarding a planned public listing after January 2007); there was no discussion of any other "term" to the investment.

      **Public market.** Contrary to Plaintiffs' allegation that the ERB was promised that "the securities involved in the Vanderbilt investment would be listed on the New York Stock Exchange through an initial public offering and would be liquid soon after closing" (Am. Compl ¶ 183(t)), and that they would be listed on a European stock exchange (*id.* ¶ 87), the offering memorandum expressly warned that "there can be no guarantee that we will ever conduct an initial public offering of our shares" (Ex. D at 26) and the ERB agreed that it understood that "there is no established market for the Shares and that no public market for the Shares may develop" (Ex. E ¶ 6). *See In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, at *5 (dismissing claims where "defendants gave no guarantees when making the complained of statements"). In addition, there was express discussion at the ERB Investment Committee meeting itself that it was possible that a public market for the shares might not develop. (Ex. C at 1:05:00-14 ("And if something happens where they don't establish a market…").) These caveats negate any claimed reliance on a purported promise that VFT shares would be publicly traded.

      **4.**     **The ERB Expressly Disclaimed Reliance on Oral Statements**

      Not only are the admitted facts inconsistent with any claim of reliance, but the ERB was expressly warned not to rely on any oral statements and it expressly disclaimed doing so. The

offering memorandum explicitly and repeatedly stated that the ERB was not to rely on any representations outside of the offering memorandum (*e.g.*, Ex. D at ii, xxii, xxiii).  In the subscription agreement, the ERB warranted that it was a sophisticated investor; it was aware of the risks incident to its investment in VFT; it was capable of assessing those risks; it had received the offering memorandum; it was given the opportunity to request any additional information it considered necessary to make an investment decision and had received any and all information it deemed necessary; and ***it was relying solely upon the offering memorandum and its independent investigation, and not upon representations outside the offering memorandum, in deciding whether to invest***.  (Ex. E ¶¶ 5, 11, 14-17 (emphasis added).)  Indeed, the very first sentences of the offering memorandum (Ex. D at ii) warned investors:

> You should rely only on the information contained in this offering memorandum. Neither we nor the initial purchasers have authorized anyone to provide you with information different from that contained in this offering memorandum.

Therefore, if the ERB relied on any oral statements or other statements outside the offering memorandum, such reliance was unjustifiable as a matter of law because the ERB warranted that it was not doing so.  *See, e.g.*, *Kennedy*, 814 F.2d at 805 (reliance not justifiable where sophisticated party alleged that it relied on "oral misrepresentations completely at odds with the offering memorandum"); *Rissman v. Rissman*, 213 F.3d 381, 383-84 (7th Cir. 2000) (the "written anti-reliance clause precludes any claim of deceit by prior representations" because "[s]ecurities law does not permit a party to a stock transaction…to say, in effect, 'I lied when I told you I wasn't relying on your prior statement' and then to seek damages for their contents").

     5.     **The Vanderbilt Defendants Did Not Proximately Cause Any Damages**

Just as the lack of justifiable reliance dooms Plaintiffs' fraud and other similar claims, so too does the complaint's failure to allege that the actions of the Vanderbilt defendants proximately caused any damages to the ERB or class members mandate dismissal of these claims.  *See Cain*, 2007-NMCA-085, ¶ 27 (dismissing fraud claim because "as a matter of law such misrepresentation could not be the proximate cause of the damages caused"); *Norwest Bank*

*New Mexico v. Chrysler Corp.*, 1999-NMCA-070, ¶ 50, 127 N.M. 397, 981 P.2d 1215 (affirming defense verdict on negligent misrepresentation claim because plaintiff failed to prove that misrepresentations proximately caused plaintiff's injuries).  A plaintiff must "identify a 'causal connection'" that "specifically links losses to misrepresentations" because "[t]he securities laws are not meant to 'provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause.'"  *In re Williams Sec. Litig.*, 558 F.3d at 1136-37 (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345, 347 (2005)).

    (i)  **There Is No Linkage between the Claimed Misrepresentation and the Losses**

    Plaintiffs fail to identify any link between the Vanderbilt defendants' alleged misrepresentations and VFT's eventual loss in value.  The complaint offers the conclusory allegation that the ERB relied on alleged misstatements in deciding whether to invest in VFT and that "the Fund's entire $40 million principal investment eventually was lost."  (Am. Compl. ¶¶ 95, 207.)  But Plaintiffs fail to tie that loss to the materialization of any risks allegedly concealed or misrepresented rather than unrelated market factors.  "Without that linkage…the 'lies' cannot be said to have been the proximate cause of any injury."  *In re Worldcom, Inc. Sec. Litig.*, 456 F. Supp. 2d 508, 516 (S.D.N.Y. 2006) (dismissing fraud and negligent misrepresentation claims because plaintiff "has not identified any materialization of any risk concealed or misrepresented by the defendants that could be said to have proximately caused his alleged losses"), *aff'd Holmes v. Grubman*, 2010 WL 2540752 (2d Cir. June 23, 2010); *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 684 (7th Cir. 1990) ("The plaintiffs alleged that they invested…because of the defendants' misrepresentations, and that their investment was wiped out.  But they suggest no reason *why* the investment was wiped out.  They have alleged the cause of their entering into the transaction in which they lost money but not the cause of the transaction's turning out to be a losing one.").

20

Moreover, the Court may take judicial notice of the collapse of the CDO market in 2007 and 2008 and need not ignore the obvious inference that when the entire market in which the defendants invested collapsed, "it would be highly unlikely that the plaintiffs' loss was due to the defendants' fraud." *Bastian*, 892 F.2d at 684 (granting motion to dismiss – even though plaintiffs would not have invested with the defendants absent the alleged fraud – because "the alternative oil and gas limited partnerships to which these plaintiffs would have turned had the defendants leveled with them were also doomed, despite competent and honest management, to become worthless" because of the collapse of oil and gas market between 1981 and 1984, and therefore "the plaintiffs were not hurt by the fraud").

> (ii)     **Plaintiffs Allege that Politics, Not Fraud, Was the Proximate Cause of the Investment**

The complaint alleges that the ERB approved the investment in VFT "to further political goals, repay political factors, and/or accede to political pressures." (Am. Compl. ¶ 89.) Assuming that to be the case, the ERB would have invested in VFT no matter *what* was represented at the Investment Committee meeting. On that theory, the investment was *not* caused by any alleged false statement about the nature or structure of VFT, but by some back-room deal among public officials. In that event, politics, rather than misstatements, drove the investment, and there could not have been any reliance on, or any losses from, any misstatements. *See Thomas v. Farley*, 31 F.3d 557, 558-59 (7th Cir. 1994) ("[I]f a plaintiff … plead[s] particulars, and they show that he has no claim, then he is out of luck – he has pleaded himself out of court.").

It does not matter that Plaintiffs also allege reliance on claimed misstatements (Am. Compl. ¶ 181). The allegations are internally contradictory and therefore self-defeating – if the investments would not have been made but for the political pressures, as Plaintiffs allege, then the supposedly "material misrepresentations and omissions" (*id.*) were not the proximate cause of the investments. When a plaintiff's allegations are internally contradictory, dismissal of the complaint is appropriate because "[plaintiff]'s own pleading tends to defeat his claim."

*Friedman v. Kennard*, 248 Fed. Appx. 918, 921 (10th Cir. 2007); *see also Widjaja v. Nicholson*, 2006 WL 2871634, at *7 & n.5 (D. Colo. Oct. 4, 2006) (court need not accept internally inconsistent factual claims); *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001) (court "need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely").

      6.    **The Allegations that Vanderbilt Failed to Disclose the Purported "Pay to Play" Scheme Are Untenable**

      Plaintiffs allege that Vanderbilt should have disclosed to the ERB purported "'pay to play' arrangements" involving Marc and Anthony Correra and Governor Bill Richardson's presidential campaign. (Am. Compl. ¶¶ 49-52, 185(d)-(h).)  However, Plaintiffs also claim that a majority of the ERB board already *knew* about this supposed scheme.  (*Id.* ¶ 71 (alleging that the "Trustee Defendants" – Malott, Bland, Garcia, and Brown – "knew the true answer" as to "the truth regarding the 'pay to play' arrangements").)  Because Plaintiffs claim that every ERB board member who voted for the investment in VFT already knew about any alleged corruption, according to Plaintiffs' own complaint any failure by the Vanderbilt defendants to disclose these alleged arrangements was harmless, and thus the corresponding claims fail as a matter of law. *See Mountain Highlands, L.L.C. v. Hendricks*, 2009 WL 2432678, at *9 (D.N.M. July 2, 2009) (plaintiff's "actual knowledge of the facts … makes any reliance upon the alleged misrepresentation unreasonable and makes a fraud claim unsustainable.").

      What is more, the "pay to play" allegations are inherently untenable.  The complaint asserts that Vanderbilt should have disclosed to the ERB in April 2006 (when it approved the investment in VFT) that "the Vanderbilt Defendants had agreed to generate political contributions to the Richardson presidential campaign" (Am. Compl. ¶¶ 51, 185(e).)  However, there was no Richardson presidential campaign at that time; Richardson first formed an exploratory committee for a potential presidential campaign *nine months later* – in January

2007.[6]  Claims must be plausible to survive a motion to dismiss, *see Twombly*, 550 U.S. at 556-57, and claims that are predicated on non-disclosure of events that have not happened yet are inherently implausible.

   **C.    The Aiding and Abetting Breach of Fiduciary Duties Claim [Count IV] Fails as a Matter of Law**

   Under New Mexico law, to state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must demonstrate that the defendant knew of, and substantially assisted in, a third party's breach of a fiduciary duty and that "damages to the plaintiff were proximately caused thereby."  *Richter v. Van Amberg*, 97 F. Supp. 2d 1255, 1265 (D.N.M. 2000).  "The gravamen of a claim of aiding and abetting a breach of fiduciary duty is the defendant's 'knowing participation' in the fiduciary's breach of trust."  *GCM, Inc. v. Kentucky Cent. Life Ins. Co.*, 1997-NMSC-052, ¶ 18, 124 N.M. 186, 947 P.2d 143.  A party to a transaction does not knowingly participate in its counter-party's alleged breach of duty just because the parties reached an agreement after arm's length negotiations.  *See E.L. Greenfield v. Tele-Comm'ns, Inc.*, 1989 WL 48738, at *2 (Del. Ch. May 10, 1989); *see also Stanley Ferber & Assocs. v. Ne. Bancorp. Inc.*, 1993 WL 489334, at *6 (Conn. Super. Nov. 16, 1993) ("If the mere entering into the transaction were seen to constitute aiding and abetting a breach of fiduciary duty, then every arm's length offeror would be subject to liability for motivations on the other side of the transaction of which the offeror had neither control nor knowledge.").  Rather, a plaintiff must show that "the defendant *intentionally* provided *substantial* assistance or encouragement to the fiduciary to commit an act which the defendant *knew* to be a breach of duty."  *See GCM*, 1997-NMSC-052, ¶ 18 (emphases added).

   Whatever the merits of an investment in VFT, Plaintiffs allege no facts to establish that the Vanderbilt defendants knew of, much less assisted in, a breach of fiduciary duties by the ERB trustees.  The ERB had a fiduciary duty to determine whether the VFT investment was

---

[6]        *See* Federal Election Commission Form 1, filed January 22, 2007 (Ex. H).

suitable for the Educational Retirement Fund.  (*See* Am. Compl. ¶¶ 121, 123-125, 129.)  The Vanderbilt defendants were on the other side of the table and were entitled to assume that the ERB was fulfilling that duty by attempting to make the best deal possible for itself, just as Vanderbilt was.  *See, e.g.*, *Stanley Ferber*, 1993 WL 489334, at *6 (dismissing aiding and abetting fiduciary duty claim because the defendant "had a duty to its own shareholders to pursue aggressively a transaction economically favorable to itself, not to shield [plaintiff's] shareholders from the consequences of their own directors' decisions").  Indeed, the ERB used investment consultants (defendant NEPC) to evaluate the VFT investment opportunity, and Plaintiffs' own descriptions of Livney's presentation to the ERB Investment Committee show that this was an arm's length transaction:  ERB board members asked pointed questions and forced Vanderbilt to make concessions and provide clarifications.  (*See, e.g.*, Am. Compl. ¶¶ 66, 73.)

In addition, an essential element of the claim for aiding and abetting a breach of fiduciary duty is that "damages to the plaintiff were proximately caused thereby."  *Richter*, 97 F. Supp. 2d at 1265.  When plaintiffs bring such a claim on their own behalf, rather than derivatively, they must establish that the breach caused "an injury separate and distinct from an injury suffered by the [entity]" and that "direct injury to the [plaintiff] rather than an indirect injury through the [entity]" resulted.  *See GCM*, 1997-NMSC-052, ¶ 23.  Consequently, to the extent that Plaintiffs claim any injury to themselves, the claim fails for one of the same reasons that the fraud claims do:  the alleged injuries are too indirect to satisfy these requirements, as Plaintiffs acknowledge.  (*See* Am. Compl. ¶ 112(h).)

Plaintiffs' only attempt to establish an injury to themselves and fellow class members "separate and distinct" from the alleged injury suffered by the ERB is to claim that the defendants' conduct caused "increased payroll contributions, and a looming increase in the number of years new employees must work to be entitled to full retirement benefits."  (*Id.* ¶ 151.)  But the increased payroll contributions and required years of service were not proximately caused by the trustees' decision to invest in VFT.  They constituted subsequent judgments by the ERB board as how best to respond to the ERB's investment losses from its *entire investment*

24

*portfolio.*  (*See id.* ¶ 3.)  Indeed, Plaintiffs admit that "the Fund has been underfunded" for "years," and the failure of the VFT investment merely "exacerbated" those broader preexisting financial difficulties (*id.*).  Such an attenuated theory of damages is not a direct and proximate injury.  *See, e.g., Moran Foods, Inc v. Mid-Atl. Market Dev. Co.*, 476 F.3d 436, 439 (7th Cir. 2007) ("There is a 'for want of a nail the kingdom was lost' flavor to [the] theory of damages.").

> **D.    The Aiding and Abetting Breach of Contract Claim [Count V] Does Not Exist**

New Mexico has never recognized a cause of action for "aiding and abetting breach of contract" (Am. Compl. ¶¶ 152-54).  A party to a contract may breach it, and a claim may lie for tortious interference with contract.  But that is not what Plaintiffs alleged against the Vanderbilt defendants, and there is no case law recognizing this new claim that Plaintiffs have invented out of whole cloth.

> **E.    The Aiding and Abetting Impairment of Vested Property Rights Claim [Count VI] Is Similarly Made Up**

Like Plaintiffs' claim for "aiding and abetting breach of contract," the claim for "aiding and abetting impairment of vested property rights" (*id.* ¶¶ 155-57) appears to be Plaintiffs' creative invention.

Moreover, Plaintiffs' theory – that ERB members possess a vested property right in ERB funds, which the ERB board members impaired because the ERB's investment in VFT turned out to be worthless (*id.* ¶¶ 146-48) – makes no sense.  As Plaintiffs acknowledge, the ERB board must comply with the Uniform Prudent Investor Act and the Prudent Investor Rule and therefore "must invest and manage the retirement funds as a prudent investor would."  (*Id.* ¶¶ 28, 35, 44.) Prudent investors, despite their best efforts, sometimes lose money.  Plaintiffs' claim that any loss on an investment constitutes an unlawful impairment of ERB members' vested property rights would require that all investments have a guaranteed return (or at least protection of principal).  But that is simply not the standard under the Uniform Prudent Investor Act.  For this reason as well, this claim should be dismissed.

**F.      The Unjust Enrichment and Constructive Trust Claim [Count XVII] Fails as a Matter of Law**

Plaintiffs' unjust enrichment claim – and their accompanying request that a constructive trust be imposed to remedy the defendants' supposedly improper enrichment – is cumulative and predicated on the same allegedly wrongful conduct on which their other claims are purportedly based.  This claim fails for the same reasons as did those.  *See Davis & Assocs. Inc. v. Midcon, Inc.*, 1999-NMCA-047, ¶ 20, 127 N.M. 134, 978 P.2d 341 (affirming dismissal of unjust enrichment claim because of "absence of an allegation and a showing of illegality, or fraudulent or wrongful conduct, or otherwise tortious conduct");  *Boardman v. R.M. Kendrick*, 59 N.M. 167, 175, 280 P.2d 1053, 1058 (1955) ("A constructive trust . . . may grow out of a variety of facts, but fraud, either actual or constructive, is an essential element and must always be present."); *see also Ass'n Benefit Servs. Inc. v. Caremarx RX, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007) ("[W]here the plaintiff's claim of unjust enrichment is predicated on the same allegations of fraudulent conduct that support an independent claim of fraud, resolution of the fraud claim against the plaintiff is dispositive of the unjust enrichment claim as well.").

**IV.    THIS SUIT IS STATUTORILY BARRED**

Under FATA, "[w]hen a person brings an action pursuant to this section, no person other than the attorney general on behalf of the state may intervene ***or bring a related action based on the facts underlying the pending action***."   NMSA 1978, § 44-9-5(E) (emphasis added).  Frank Foy, the ERB's former Chief Investment Officer, has already brought an action under FATA. *See* Complaint, *Foy v. Vanderbilt Capital Advisors, LLC*, No. D-101-CV-2008-1895 (NM 1st Jud. Dist. Ct. July 14, 2008) (Ex. I).[7]  This action is based on the same underlying facts as Foy's pending FATA action.  For example:

---

[7]      The court's recent dismissal of the Foy complaint because retroactive application of FATA to pre-enactment conduct would be unconstitutional does not alter this analysis. FATA contains no provision stating that the dismissal of the first-filed suit opens the court doors to imitators.

- Both actions claim that Vanderbilt fraudulently induced the ERB to invest $40 million in VFT (Am. Compl. ¶¶ 53-87; Foy Compl. ¶¶ 2, 46-47).

- This action, like Foy's action, alleges that the interests of Vanderbilt conflicted with those of the ERB and that Vanderbilt sought to unload virtually worthless assets on the ERB (Am. Compl. ¶ 48; Foy Compl. ¶¶ 51, 75);

- This action, like Foy's action, claims that the Vanderbilt defendants engaged in a "pay to play" scheme to induce the ERB's investment in VFT (Am. Compl. ¶¶ 49-52, 58; Foy Compl. ¶¶ 63-65, 73-74, 80-81);

- This action, like Foy's action, alleges that the ERB board members breached their fiduciary duties by voting in favor of the ERB's investment in VFT (Am. Compl. ¶¶ 76-80; Foy Compl. ¶¶ 65, 69, 71).

Plaintiffs themselves acknowledge that Foy's suit relates to theirs and is based on the same underlying conduct.  (*E.g.*, Am. Compl. ¶ 119 (alleging that the ERB board's failure to take action against the Vanderbilt defendants in response to Foy's "'whistleblower' suit" excuses them from having to demand that the board pursue their claims).)  Therefore, this action is statutorily barred and must be dismissed.

### CONCLUSION

For all of the foregoing reasons the complaint should be dismissed with prejudice.

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By      */s/ Andrew G. Schultz*
    Andrew G. Schultz
Post Office Box 1888
Albuquerque, New Mexico  87103-1888
Telephone: (505) 765-5900
Facsimile:  (505) 768-7395
aschultz@rodey.com

Peter L. Simmons
FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
One New York Plaza
New York, NY  10004-1980
Telephone:  (212) 859-8000
Facsimile:    (212) 859-4000
Peter.Simmons@friedfrank.com
*Attorneys for Defendant Vanderbilt Capital Advisors, LLC.*

27

Williams C. Madison
MADISON HARBOUR & MROZ, P.A.
201 Third Street NW – Suite 1600
Albuquerque, New Mexico  87102
Telephone:  (505) 242-2177
wcm@madisonlaw.com

Peter A. Silverman
FIGLIULO & SILVERMAN, P.C.
10 South LaSalle Street  – Suite 3600
Chicago, Illinois  60603
Telephone:  (312) 251-5275
Facsimile:  (312) 251-4610
psilverman@fslegal.com

*Attorneys for Defendant Patrick A. Livney*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 31, 2010, the foregoing *Motion to Dismiss Complaint and Memorandum of Law in Support* was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Gordon H. Rowe III
The Rowe Law Firm
1200 Pennsylvania N.E., Suite 2B
Albuquerque, NM 87110

Jonathan W. Cuneo
Cuneo Gilbert & LaDuca
507 C. Street, N.E.
Washington, DC 20002

Richard D. Greenfield
Greenfield & Goodman
250 Hudson Street, 8th Floor
New York, NY 10013

William C. Madison
Madison Harbour & Mroz
201 Third Street NW – Suite 1600
Albuquerque, NM 87102

Peter S. Silverman
Figliulo & Silverman
10 South LaSalle Street – Suite 3600
Chicago, IL 60603

Martin R. Esquivel
Narvaez Law Firm
601 Rio Grande Blvd, N.W.
Albuquerque, NM 87104

Gregg Vance Fallick
Gold Avenue Lofts -- Suite 205
100 Gold Avenue, S.W.
Albuquerque, NM 87102

Stephen S. Hamilton
Montgomery & Andrews
325 Paseo de Peralta
Santa Fe, NM 87501

Ellen Casey
Hinkle, Hensley, Shanor & Martin
218 Montezuma
Santa Fe, NM 87501

Wesley G. "Grey" Handy
Comeau Maldegen Templeman &
   Indall
P.O. Box 669
Santa Fe, NM 87504-0669

Jennifer Chunias
Goodwin Procter
Exchange Place
53 State Street
Boston, MA 02109

Nicholas A. Foley
Douglas J. Buncher
Neligan Foley
Republic Center
325 N. St. Paul, Suite 3600
Dallas, TX 75201

Paul Schechtman
Stillman, Friedman & Schechtman
425 Park Avenue
New York, NY 10022

Richard J. Shane
Riley & Shane
3880 Osuna Road, N.E.
Albuquerque, NM 87109

Joseph Goldberg
Freedman, Boyd, Hollander,
   Goldberg, Ives & Duncan, PA
20 First Plaza #700
Albuquerque, NM 87102

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.


By_____/s/_Andrew G. Schultz_____
        Andrew G. Schultz