## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

| | |
|---|---|
| **DONNA J. HILL and YOLANDA CHACON-VALLE, On Behalf of the EDUCATIONAL RETIREMENT FUND and its Members and Beneficiaries, or Alternatively On Behalf of Themselves and All Others Similarly Situated,** | ) ) ) ) ) ) **No. 6:10-cv-00133 JB-KBM** |
| **Plaintiffs,** | ) ) |
| **vs.** | ) ) |
| **VANDERBILT CAPITAL ADVISORS, LLC, PATRICK A. LIVNEY, ALDUS EQUITY, LLC, MARC CORRERA, NEPC, LLC, BRUCE MALOTT, GARY BLAND, VERONICA GARCIA, and DOUGLAS M. BROWN,** | ) ) ) ) ) ) ) ) |
| **Defendants, and** | ) ) |
| **THE EDUCATIONAL RETIREMENT FUND,** | ) ) ) |
| **Nominal Defendant.** | ) ) ) |

### PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Plaintiffs, Donna Hill and Yolanda Chacon-Valle ("Plaintiffs"), by and through

undersigned counsel, respectfully move, pursuant to Fed. R. Civ. P. 56(c), for partial summary

judgment. This motion relates solely to the Plaintiffs' claim of breach of fiduciary duty against

Bruce Malott, Gary Bland, Veronica Garcia and Douglas M. Brown (the "Trustee Defendants"[1])

pertaining to the Fund's investment in the Vanderbilt Financial Trust.  This motion is supported

by an incorporated memorandum of law as well as the Declarations of Matthew E. Miller

---

[1] The Trustee Defendants were members of the New Mexico Educational Retirement Board (the "ERB"), which serves as trustee of the New Mexico Educational Retirement Fund ("the Fund").

("Miller Decl.), Lynn E. Turner ("L. Turner Decl."), and Ram Padmanabhan ("Padmanabhan Decl."), and the deposition testimony of Dr. Pauline Turner ("P. Turner Dep.").

## I.  Statement of Material Facts as to Which No Genuine Issue Exists

### A.        The Fund, the ERB and the Trustees

#### 1.         The ERB's Statutory Mandate

1.        The Fund, a nominal defendant, is a pension fund, and trust fund, established by New Mexico's Educational Retirement Act, 2009 N.M.S.A. § 22-11-11,  *See also* N.M. Const., Art. XX § 22 ("all funds, assets, proceeds, income, contributions, gifts and payments from any source whatsoever paid into or held by … an educational retirement system … shall be held … in a trust fund to be administered and invested …. For the sole and exclusive benefit of the members, retirees and other beneficiaries of that system").

2.        The Fund provides retirement benefits to teachers, professors, and employees in New Mexico's public primary schools, colleges, and universities.

3.        The Fund has approximately 63,700 active members and 31,200 retired members, and a portfolio of approximately $8.5 billion in assets.[2]

4.        The ERB is designated by the New Mexico Constitution as the trustee of the Fund.  N.M. Const Art. XX, §22(B) ("the board of the educational retirement system shall be the trustee[] … and have the sole and exclusive fiduciary duty and responsibility for administration and investment of the trust fund").

5.        The ERB has exclusive authority "to invest or reinvest the fund in accordance with the Uniform Prudent Investor Act."  2009 N.M.S.A. § 22-11-13(A).

---

[2] ERB Website, at http://www.nmerb.org/history.htm, last visited August 3, 2010.

**2.  The Members of the ERB and its Investment Committee**

6.      The ERB consists of the following seven members: "(1) the superintendent of

public instruction [secretary of public education]; (2) the state treasurer; (3) one member to be

elected for a term of four years by members of the New Mexico association of educational

retirees; (4) one member to be elected for a term of four years by the members of the New

Mexico education association; (5) one member to be elected for a term of four years by the New

Mexico members of the American association of university professors; and (6) two members to

be appointed by the governor for terms of four years each."  2009 N.M.S.A. § 22-11-3(B).

7.      As of May 12, 2006, the three members elected by Fund members were Dr.

Pauline Turner (representing New Mexico members of the American Association of University

Professors), Mr. Delman Shirley (representing members of the New Mexico association of

educational retirees), and Ms. Mary Lou Cameron (representing members of the National

Educational Association of New Mexico).

8.      The remaining four members of the ERB were effectively selected by Bill

Richardson, Governor of New Mexico --  the two *ex officio* members, Garcia, who had been

appointed by the Governor as Secretary of Education, and Brown, who was appointed[3] by the

Governor as State Treasurer in 2005, and the Governor's  two direct appointees to the ERB,

(Chairman) Malott and Bland.

9.      Malott's accounting firm, Meyners & Co., received millions of dollars in business

from state contracts following his appointment to the ERB (and only a nominal amount prior to

_____

[3] Although the office of Treasurer is an elected office, Brown was appointed by Governor
Richardson to replace the prior Treasurer, Robert Vigil, who resigned amid a corruption scandal
involving allegations that Vigil accepted kickbacks from investment advisors
 in exchange for steering state investments to them.

that time), and Malott had served as the Governor's campaign treasurer in 2006 and as accountant of the Governor's political action committee and charitable foundation.

10. Brown was appointed, in 2009, as Dean of the Business School at the University of New Mexico, without a competitive national search.[4]

11. The four Trustees selected by or allied with the Governor tended to vote as a bloc, and without much discussion or analysis.  P. Turner Dep., at 48:22 to 49:22 ("Occasionally, there would be a question or a comment from the block voters[, b]ut mostly … these individuals were voting the way Mr. Malott wanted them to vote").

12. Malott would "cut[] off discussion when he doesn't want to hear what board members have to say, particularly Turner and Shirley." *Id*. at 63:3-6.

13. The ERB had an "Investment Committee" appointed by the ERB's Chairman, which, in the April-May 2006 time frame,  consisted of Defendants Malott, Brown and Bland, and also Dr. Evalynne Hunnemuller, Chairman of the Investment Committee, who was the ERB's Executive Director.

### 3. The ERB's Investment Policies and Procedures

14. On its website, the ERB acknowledges that it "stands in a fiduciary relationship to the members covered under the Educational Retirement Act."[5]

15. More specifically, the ERB describes its "Mission Statement" as  provid[ing] secure retirement benefits for our active and retired members from school districts, higher education and educational agencies."   "New Mexico Educational Retirement Board Investment

---

[4] P. Turner Dep., 206:12-16 (Dr. Turner, a member of the faculty at the University for many years, testified that the " accepted academic practice is to have an open, national search for every dean, with a committee that is represented by faculty and administrators and students and community people," which "did not happen in Mr. Brown's case").

[5] ERB Website, at http://www.nmerb.org/board.htm, last visited July 30, 2010.

Goals, Objectives and Policies" (the "Investment Policy") (February 2006), Miller Decl., Exh. A, at 3.   The ERB further states that its members "strive to make our members' retirement experience optimal by… [p]rudently managing the financial assets of the fund…." *Id.*

16.     The "Background" section of the Investment Policy further provides that "the prudent investor rule shall govern the decision-making functions of the Board," and that, "[i]Investment of the fund shall be made with the exercise of that degree of judgment and care, under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs, not for speculation but for investment, considering the probable safety of their capital as well as the probable income to be derived." *Id.* at 3-4.

17.     Finally, the "Investment Philosophy" section of the Investment Policy provides that "Investment strategies will be long term in nature and will avoid ad-hoc decision-making based upon short-term factors." *Id.*

### 4.  Advice Provided by Expert Advisors Concerning the Responsibilities of the ERB

18.     Ennis Knupp & Associates, Inc., a Chicago-based benefits consulting firm, conducted an "independent operational and fiduciary review of the governance, organizational structure, current policies, procedures and practices of the [ERB]." Excerpts from, Ennis Knupp & Associates, Inc., "Fiduciary Review of the Educational Retirement Board," Miller Decl., Exh. B, at 1.

19.     The report noted that the prudent investor rule was stricter than past standards.  *Id.* at 15.

20.     The report indicated that the Trustees would be judged by the "care, skill and

diligence that a person acting in a like capacity and familiar with such matters would use under the same circumstances," and recommended that the ERB should mimic the "contemporary best practices of other public retirement systems and relevant institutional investors" in order to meet the standard. *Id.* at 29.

21.     The report made several recommendations, including encouraging the ERB to improve its process for selecting investments and imploring the ERB to better-document its due diligence processes. *Id.* at 73-76.

22.     The "ERB fiduciary counsel," attorney Ian Lanoff, Esq. of the Washington, D.C.-based Groom Law Group, who advised and counseled the Trustees, made a presentation to the ERB concerning the scope of the Trustees' fiduciary responsibilities.  Minutes of December 8, 2006 ERB Meeting, Miller Decl., Exh. C.

23.     Lanoff discussed the unique position of the ERB members as trustees, noting that "[f]iduciaries who are trustees are subject to the highest standard of conduct know to the law," and that the "ERB has a much higher responsibility under its law than a corporate trustee or member of a board of directors would have."  *Id.* at 7.

24.     Lanoff also highlighted the language in the New Mexico Constitution and Statutes concerning the duty of loyalty and the exclusive benefit rule, which he described as "as specific and broad ranging as he has seen in any state statute or constitution."  *Id.*

25.     At the conclusion of his presentation on the heightened fiduciary duties of the Trustees, Lanoff advised the Trustees to buy fiduciary insurance in the interest of paying any attorneys' fees that might come up. *Id.* at 9.

**B.  About Mortgage Backed Securities and Collateralized Debt Obligations**

26.     Mortgage-backed securities ("MBS") are "bundles" or "pools" of mortgages

6

assembled and securitized, typically by financial institutions (who are not necessarily the originators of the mortgages themselves).  Securities and Exchange Commission, "Mortgage-Backed Securities," Miller Decl., Exh. D.

27.     The purchaser of such an instrument is typically entitled to the cash flow on its *pro rata* share of the underlying pool of mortgages.  *Id.*

28.     The MBSs themselves, in turn, may be bundled to create CDOs, which hold inventories of asset-backed or income securities at various risk levels.  *See* THE WALL STREET JOURNAL, "The Making of a Mortgage CDO," Miller Decl. Exh. E.  *See also* L. Turner Decl., ¶ 14.

29.     Underwriters then market rights to the income from these various levels in tranches set by debt type and risk levels.  L. Turner Decl., ¶ 14.

30.     These tranches range from more "junior" or "equity" tranches, in which investors assume the greatest share of the risks of default of the underlying collateral, but receive higher yields, than more "senior" or "debt" tranches, in which investors are more insulated from the risk of default, but receive lower yields.  *Id.*[6]

31.     These securities are inherently complex and their values depend on several variables, including market, credit, liquidity, and other market conditions affecting the various constituent securities.  *Id.*, ¶ 14. Most significantly, their values are based upon the quality of the underlying securities.

### C.  The Vanderbilt Trust Offering

32.     On May 12, 2006, the Board considered a proposed investment presented by

---

[6] *Citing* George Chacko, Anders Sjoman, Hideto Motohashi, and Vincent Dessain, CREDIT DERIVATIVES, A PRIMER ON CREDIT RISK, MODELING AND INSTRUMENTS (2006), at 191.

defendant Vanderbilt Capital Advisors, LLC ("VCA,") which ultimately consisted of participation in a private offering (the "Vanderbilt Trust Offering") of shares in the Vanderbilt Financial Trust (the "Vanderbilt Trust"), a Delaware statutory trust that would later be created in order to own the membership interests in Vanderbilt Financial, LLC ("Vanderbilt Financial"), a Delaware limited liability company that would also later be created. Offering Memorandum Excerpts, Miller Decl., Exh. F, at i.

33.  The Vanderbilt Trust and Vanderbilt Financial were formed on May 17, 2006. Miller Decl., ¶¶ 8-9, Exhs. G and H.

34.  Vanderbilt Financial would be a holding company that would acquire certain collateralized debt obligations ("CDOs") and other alternative investments. Offering Memorandum Excerpts, Miller Decl., Exh. F, at 1-2.

35.  The Offering Memorandum was still being prepared in June 2006. Padmanabhan Decl., ¶ 11 (in June 2006, the documents "were substantially complete"). The declarant, an attorney with a Chicago law firm that represented VCA, acknowledges that he is an author of the Offering Memorandum.

36.  "Roadshow" meetings (the principal means of marketing the investment to prospective participants) took place in July 2006. *Id.,* ¶ 12.

37.  The final "Offering Memorandum" was issued in August 2006, *id.*, well after the Trustees voted to participate in the offering.

38.  The Offering Memorandum described the holdings of Vanderbilt Financial as follows:

(i) Diversey Harbor ABS CDO, Ltd. ("Diversey Harbor"), an asset-backed CDO that is

8

managed by Vanderbilt Capital and owns primarily high-grade RMBs,[7] CMBs[8] and debt tranches of third-party CDOs and which closed on June 1, 2006,

(ii) Lincoln Avenue ABS CDO, Ltd. ("Lincoln Avenue"}, an asset-backed CDO that is managed by Vanderbilt Capital and owns primarily mid-grade RMBs, CMBs and debt tranches of third-party CDOs, and which closed on July 5, 2006,

(iii) Montrose Harbor CDO I, Ltd. ("Montrose Harbor"), an asset-backed CDO that is managed by Vanderbilt Capital and owns primarily mezzanine RMBs, CMBs and debt tranches of third-party CDOs, and which closed on July 31,2006,

(iv) Mayflower CDO I Ltd. ("Mayflower"), a synthetic asset-backed CDO that will be managed by Vanderbilt Capital, the reference obligations of which will be primarily mezzanine RMBs, CMBs and debt tranches of third-party CDOs, and

(v) two CLOs [(collateralized loan obligations)] to be managed by third parties that will each own corporate leveraged loans and debt tranches of third-party CLOs.

Offering Memorandum Excerpts, Miller Decl., Exh. F, at 1-2.

39.     Notably, the portfolio of Vanderbilt Financial would consist principally of the equity, or most junior and most risk-prone, tranches of the relevant CDOs.  Transcript of May 12, 2006 Investment Committee and Board meetings ("Meeting Transcript"), P. Turner Dep. Exh. X, at 005:22-24 (Defendant Patrick A. Livney stated that "proceeds …are going to be buying equity pieces of CDOs…").  *See also* October 26, 2007 ERB Minutes, P. Turner Dep. Exh. J, Miller Decl. Exh. I, at 3 (due to holding of equity tranche positions, Vanderbilt Trust shares had lost substantially all value).

### D.  The ERB's Consideration of the Vanderbilt Trust Offering

#### 1.  The April 21, 2006 Investment Committee Meeting

40.     The proposed investment was first discussed at an Investment Committee meeting on April 21, 2006, when it was noted that the State Investment Commission ("SIC") had

---

[7] Residential mortgage-backed securities.
[8] Commercial mortgage-backed securities.

previously committed to investing with VCA.  Minutes of April 21, 2006 Investment Committee Meeting, P. Turner Dep. Exh. 2, Miller Decl., Exh. J, at 3.

41.     In fact, Defendants Malott and Bland took the position that the ERB should rely on whatever due diligence may have been conducted by the SIC.  *Id*.

42.     Frank Foy, the Board's Chief Investment Officer, recommended against it concluding that it "would not be an appropriate investment for staff to consider." *Id*.

43.     Nonetheless, Malott moved to have SIC representatives make a presentation to a special Investment Committee meeting, followed by a meeting of the Board.  Defendants Malott, Bland and Brown voted in favor of the motion, with Dr. Hunnemuller voting against it.  *Id*.

## 2. The May 12, 2006 Meeting

44.     Two meetings were scheduled to take place on May 12, 2006 to evaluate and vote upon the proposed investment:  a meeting of the Investment Committee scheduled to commence at 11:25 a.m., and a "special" meeting of the Board scheduled to commence just one hour later, at 12:30 p.m.  Minutes of the May 12, 2006 New Mexico Educational Retirement Board, Miller Decl. Exh. K, at 1.  *See also*  Turner Dep., 93:7-13 (purpose of special meeting was to expedite approval of the investment, as the ERB did not regularly meet in the month of May).  In substance, it was a single meeting, as the attendees were identical, with the full Board attending both meetings.

45.     On that date, Dr. Hunnemuller "called the [Investment] Committee meeting to order at 11:25 a.m."  Minutes of the May 12, 2006 Meeting of the Investment Committee, P. Turner Dep. Exh. 3, Miller Decl. Exh. L, at 1.

46.     In attendance at the commencement of the meeting were (1) the members of the Investment Committee, Dr. Hunemuller, and Defendants Malott, Bland and Brown, (2)  ERB

members Dr. Turner, Shirley and Garcia, (3) Livney, on behalf of VCA, (4) a representative of

New England Pension Consultants ("NEPC"), and (5) several members of the ERB staff,

including Foy. *Id.* at 1.

      47.    Livney made a presentation to the Trustees about the purported return on the

proposed investment.

      48.    "Mr. Livney reviewed a document entitled  'CDO's A primer on Collaterized

Debt Obligations,' which he provided to the committee." *Id.* at 2.

      49.    Livney laid out five "steps," detailing the expected growth and return of the initial

investment by the ERB, which were as follows:

> Step 1: Investor invests $15 million into Special Purpose Vehicle (SPV)(bankruptcy remote)
>
> Step 2: SPV issues callable debt for an additional $285 million
> Terms: 10 yr maturity @ 0.32% over LIBOR (London Inter Bank Offered Rate)
> Interest rate: Floats with LIBOR for entire term
>
> Step 3: SPV invests approximately $300 million into investment grade, high quality fixed income securities
> Terms: 10 year maturity @ 0.65% over LIBOR
> Interest Rate: Floats with LIBOR entire term
>
> Step 4: SPV collects the interest earned on the $300 million fixed income securities
> SPV pays the interest owed on the $285 million debt
> SPV pays the excess interest (spread) quarterly, after fees, to the Investor
> Expected Annual Return: 10% - 12% (because of leverage)
>
> By the end of the 10 year term, it is expected that:
> Step 5: The $300 million fixed income securities will have matured
>      The $285 million debt is repaid from proceeds
> The Investor will have received back the initial $15 million invested.

*Id.* at 2.

      50.    Livney stated that "[t]here are 4 classes of holders, with the equity holder

receiving the most return," that "the fee would be 1 3/4 % of a point plus 25% over 9 1/2

dividend yield," and that "Citibank and Bear Stearns agreed to not charge a fee to 'friends and family' of Vanderbilt, which ERB would be considered under that umbrella." *Id.* at 3.

51.     Livney also made the rather remarkable representation that VCA was not doing the transaction "to make a bunch of fees," but was instead "doing it to complement [its] business, which is why it's unique in the marketplace." Meeting Transcript, P. Turner Dep. Exh. X, at 38:13-16. *Accord* P. Turner Notes, P. Turner Dep. Exh. A, at 3.

52.     Dr. Turner and Shirley believed Livney was making unrealistic promises, as Dr. Turner stated in her notes, that she had "[q]uit believing in S[anta] C[laus] when [she] was 7," P. Turner Notes, Turner Dep. Exh. A, at 5, and, in response to Livney's absurd representation that VCA was not interested in fees from the transaction, she similarly wrote "spare me." *Id.* at 3.

53.      "Mr. Brown asked what exactly a CDO is." May 12, 2006 IC Minutes, P. Turner Dep. Exh. 3, Miller Decl. Exh. L, at 2.

54.     Dr. Turner testified that, until she had spoken with Foy (in advance of the ERB meeting to discuss the Vanderbilt Investment), she, too, "didn't know what a CDO was." P. Turner Dep., 90:6-9.

55.     Dr. Turner contemporaneously noted that the Board did "not have a clue whether this was a good inv[estment]." Notes, P. Turner Dep. Exh. A, at 5.

56.     In addition, there was confusion about whether the investment was a fixed income or private equity investment.

57.     Dr. Turner "questioned if th[e] instrument was fixed income or private equity," to which Livney responded "that it would be referencing all fixed income underlying assets." Meeting Transcript, P. Turner Dep. Exh. X, at 9:16-19.

58.     When Dr. Turner "continued to question whether it was fixed income or private

equity, stating that the board had agreed on an asset allocation of 5% to private equity," Livney

responded that Vanderbilt Financial Trust "is a private company that ERB will own shares of,

and the company itself will generate revenue from fixed income." *Id.* at 10:16-19.

59.     Later in the meeting, Foy "commented that even though Mr. Bland holds

CDO's in their fixed income portfolio, … the CDO will become part of the 5% allocation

[to] private equity." *Id.* at 30:7-10.

60.     Garcia, "arrived at 11:55" a.m. to the Investment Committee meeting, thirty

minutes after it was called to order at 11:25 a.m.  May 12, 2006 IC Minutes, P. Turner Dep. Exh.

3, Miller Decl. Exh. L, at 1.

61.     "Livney stated that they are looking for a June 15th deadline to close this deal,"

*id.* at 2, thus pressuring the Board to complete the transaction in one month.

62.     Shirley asked Livney for "further information about the May 15th deadline,"

to which "Livney responded that the actual deadline was June 15th, but he wanted to give

ERB the opportunity to invest and give priority to 'friends and family'." *Id.   See also*

Meeting Transcript, P. Turner Dep. Exh. X, at 50:13-19 *(*"friends" or "family" of VCA who

failed to act early would "be shut out" when "Wall Street, Citi[group] and Bear [Stearns] over

subscribe this thing*").*

63.     The only written description of the Vanderbilt Investment distributed to the

Investment Committee, as reflected in the minutes, was the document titled "CDO's A primer on

Collaterized Debt Obligations," which was distributed during, and not prior to, the meeting.  The

minutes report that, "Livney reviewed the 'CDO's A primer on Collaterized Debt Obligations'

document that he provided the committee."   May 12, 2006 IC Minutes, P. Turner Dep. Exh. 3,

Miller Decl. Exh. L, at 2.

64.     Malott moved to invest $40 million in the Offering, Bland seconded, and the "motion passed." *Id.* at 3.

65.     The presentation and purported consideration of the Vanderbilt Investment lasted for approximately one hour, as the meeting was concluded when "Malott moved to adjourn at 12:30" with a "2nd by Mr. Brown." *Id.* at 3.  .

66.      "A Special Meeting of the [ERB] was called to order on" May 12, 2006, "at approximately 12:30 p.m." ERB Minutes, Miller Decl. Exh. K, at 1.

67.     The meeting was attended by the same persons who attended the Investment Committee meeting.

68.     At the meeting, Dr. Turner "cited three reasons for voting against the Investment Committee's recommendation: 1) she felt this investment instrument to be very complicated, and was concerned about what appeared to be a hasty decision; 2) the Board has not yet been educated on this investment instrument, and no written materials were provided for Board members to study in advance; and 3) the Board has not yet discussed policies and procedures with respect to alternative investment strategies." *Id.* at 2.

69.     Dr. Turner further stated "said she had no idea whether this was a good investment or not, and was concerned about what appeared to be unrealistic promises made by the Vanderbilt representative, Mr. Livney." *Id.*

70.     Shirley also voiced specific concerns about the propriety of the investment. Shirley stated that "Dr. Turner had spoken to most of his concerns," and that " he did not have enough information to make an informed decision, objected to the hastiness of this decision, and was not sure the Board was following its own policies and procedures." *Id.* at 3.

71.     Shirley also said "he was not comfortable in using the SIC's evaluations on any of

these alternative investments because the SIC is not the fiduciary agent for the ERB."  *Id.*

72.    Defendants Malott, Bland, Garcia and Brown, the Governor's appointees, voted for the proposed investment.  *Id.* at 2.

73.    Dr. Turner and Shirley, the two present members who were elected by Fund members, voted against it.  *Id.*

74.    Accordingly, by a 4-2 vote, the proposed investment was approved.  *Id.*

75.    With "[i]ts business completed, the Educational Retirement Board adjourned the meeting at approximately 12:45 p.m.," just 15 minutes after the meeting had commenced. *Id.* at 4.

### E.  The Collapse of the Vanderbilt Trust

76.    At its October 26, 2007 meeting, the ERB noted that the Vanderbilt Trust had lost substantially all of its value, that there was no market for the shares, and that the entire amount of the investment would be written off.  Minutes of October 26, 2007 ERB Meeting, Turner Dep. Exh. J, Miller Decl. Exh. I, at 3.

77.    By this time, Dr. Hunnemuller had been fired as the ERB's senior executive, which she believed was due to her unwillingness to terminate Foy.  Turner Dep., at 175:1-6.

78.    Also by this time, Foy was demoted, *id.* at 175:7-19, and replaced as the ERB's Chief Investment Officer by Robert Jacksha, who was at least partially responsible for causing the SIC to invest in Vanderbilt CDOs.  *Id.* at 177:3-4.

## II.  Argument

Pursuant to Fed. R. Civ. P. 56(c), a party is entitled to summary judgment in its favor upon "show[ing] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." An issue is "genuine" only if it is supported by such

evidence that a reasonable jury could return a verdict in the nonmoving party's favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Plaintiffs seek an order granting partial summary judgment only as to their claim of breach of fiduciary duty against the Trustee Defendants as to the investment in the Vanderbilt Trust.  For the reasons stated below, there are no genuine issues of material fact precluding judgment for Plaintiffs against the Trustee Defendants as to this claim.

### A.  The Trustee Defendants Breached Their Fiduciary Duty of Prudence

#### 1.  A Trustee's Fiduciary Duty of Prudence is the "Most Stringent" of any Fiduciary Duty

Trustees owe to their *cestui qui trust* the duties of prudence (or care) and loyalty.

Restatement (Third) of Trusts §§ 77-78.  The Restatement (Third) of Trusts states:

> (1) The trustee has a duty to administer the trust as a prudent person would, in light of the purposes, terms, and other circumstances of the trust.

> (2) The duty of prudence requires the exercise of reasonable care, skill, and caution.

> (3) If the trustee possesses, or procured appointment by purporting to possess, special facilities or greater skill than that of a person of ordinary prudence, the trustee has a duty to use such facilities or skill.

Restatement (Third) of Trusts, § 77.  The duty of prudence encompasses the duty to exercise reasonable care and skill in trust administration and the duty to act with a degree of caution suitable to the particular trust and its objectives, circumstances, and overall plan of administration. *Id.  Compare F.D.I.C. v. Schuchmann*, 235 F.3d 1217, 1223 (10th Cir. 2000) (holding that New Mexico law obligates a fiduciary to "exercise the degree of care that an ordinarily prudent and diligent [person] would exercise under similar circumstances").  "A trustee's approach to investing must be reasonably supported in concept and must be implemented with proper care, skill, and caution." Restatement (Third) Trusts § 90, Comment f.

The objective standard of prudence includes a procedural element that requires trustees "to exercise reasonable effort and diligence in making and monitoring investments for the trust." *Id.*, comment d.  The duty to act with caution "refers to a degree of caution that is reasonably appropriate or suitable to the particular trust, its purposes and circumstances, the beneficiaries' interests, and the trustee's plan for administering the trust and achieving its objectives."  *Id.* Courts applying this standard in both the ERISA[9] and common law contexts have recognized that the trustee's fiduciary duty of care is the most stringent of any fiduciary duty.  *Katsaros v. Cody*, 568 F. Supp. 360, 367 (E.D.N.Y.1983)  (*citing Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982) ("The fiduciary obligations of the trustees to the participants and beneficiaries of the plan are those of trustees of an express trust-the highest known to the law")).

The duty of prudence requires plan trustees to employ appropriate methods to investigate the merits of investment and monitor the suitability of new investments, 2009 N.M.S.A., § 45-7-603(D), described as the "traditional responsibility of the fiduciary investor to examine information likely to bear importantly on the value or the security of an investment."  Uniform Laws Annotated, Uniform Prudent Investor Act of 1994, § 2, comment to subsection (D).  A trustee who is "unfamiliar with an unusual or difficult investment decision is charged with

---

[9] Most pension funds are affiliated with private employers, and are governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §  1001 et seq.  Accordingly, most modern decisional law concerning the responsibility of pension fund trustees arises in the ERISA context.  Under ERISA, "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . ." 29 U.S.C. § 1104(a)(1)(B).  This standard of care derives directly from the common law of trusts. *Donovan v. Mazzola* 716 F.2d 1226, 1231 (9th Cir. 1983); *U.S. v. Mason Tenders Dist. Council of Greater New York*, 909 F. Supp. 882, 886 (S.D.N.Y. 1995).   As under the common law, an ERISA plan fiduciary "who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach." 29 U.S.C. § 1109(a).

making an 'independent inquiry into the merits of particular investments rather than [relying] wholly upon the advice of others.'" *Katsaros*, 568 F. Supp. at 367.

Plaintiffs' expert, Lynn E. Turner, former chief accountant with the SEC and himself a trustee and member of the audit committee of the Colorado Public Employees Retirement Association,[10] has testified that pension fund trustees have a duty to act "with a standard of care applicable to a prudent investor - with reasonable care, skill and caution." *Id.*, ¶ 16.  With respect to specific investments, the trustees "should be clear about what it is that they are investing in," and those "who are not familiar with and who do not understand an investment product, will need to take the necessary steps to make an informed decision regarding that investment, much as if they were investing in that product for their own portfolio." *Id.,* ¶ 22.  It is not enough to "[m]erely accept[] someone's word that an investment is appropriate and suitable for one's portfolio, with acceptable returns for risks, without an understanding or verification of such information;" a trustee taking such an approach "is not acting in a prudent fashion." *Id.*  It is only "after trustees have become *adequately informed* concerning an investment product can they fulfill their fiduciary obligations by evaluating and making a determination as to whether or not to make an investment." *Id.*, ¶ 23 (emphasis in original). Ideally, they will receive sufficient written information to become educated about the investment *before* any informational session, and will defer any decision until *after* that session to afford them the opportunity to conduct their own independent due diligence. *Id.*, ¶¶ 23-24.  The trustees should consider, among other things, (1) the "inherent risks" (including "the risk of losing the investment"), (2) the structure of the product, (3) the term of the investment, (4) what class of

---

[10] L. Turner Decl., Exh. A.

asset it falls in, (5) what priority of claim on cash flows will the investment have, (6) the key

assumptions underlying the investment and how they will be monitored, (7) who are the other

investors in the product and how much have they invested, and (8) for "exotic derivative

securities" such as the Vanderbilt Trust Offering, whether they "have express or hidden leverage

features or significant elements of optionality." *Id.*, ¶ 25.[11]

     Trustees of a pension fund, or other trust, will be held personally liable when they do not

adequately investigate a prospective investment. *Fink v. National Savs. & Trust Co.*, 772 F.2d

951, 957 (D.C. Cir 1985). A court's task in evaluating a fiduciary's compliance with this standard

is to inquire "whether the individual trustees, at the time they engaged in the challenged

transactions, employed the appropriate methods to investigate the merits of the investment and to

structure the investment." *Donovan*, 716 F.2d at 1232.   It is not enough to blindly rely on

information provided by others, moreover, as trustees must "make independent inquiry into the

merits of particular investments rather than to rely wholly on the advice of others."*Mason*

*Tenders Dist. Council of Greater New York*, 909 F. Supp. at  887.

### 2.    The Trustee Defendants' Cursory "Investigation" of the Vanderbilt Trust Offering Was Woefully Inadequate

     The Vanderbilt Trust Offering was a highly speculative, risky, and leveraged investment

that was inappropriate for the Fund, and the Trustee Defendants violated their fiduciary duties to

the Fund and its beneficiaries by failing to adequately investigate the Vanderbilt investment as a

prudent investor would.

### a.  The Board Did Not Understand the Nature of the Investment, and Was Not Given A Sufficient Opportunity to

---

[11] *Citing Public Pension Systems - Statements of Key Investment Risks and Common Practices to Address Those Risks*, (2000), a report developed jointly by the Association of Public Pension Fund Auditors and selected chief investment officers of public pension funds, at 21.

**Do So**

CDOs are, by their nature, quite complex. L. Turner Decl., ¶ 14.  *Accord* Miller Decl., Exh. E.   Additionally, they were virtually unknown to lay persons in 2006, evidenced by the Trustees unfamiliarity with the term, as they were described by the WALL STREET JOURNAL, even in March 2007, as an "obscure Wall Street investment vehicle."[12]  Even for those who are well-educated and well-intentioned, the concepts involved are hardly intuitive or self-explanatory, and considerable study is needed to obtain the requisite understanding to evaluate such instruments. *See* Miller Decl. Exh. E (describing the extraordinary complexity of a mortgage CDO).  In this instance, the ERB Trustees clearly lacked sufficient expertise in, or understanding of, CDOs to even consider such an investment of such complexity.

The sole written information provided to the Trustees was a "primer" on CDOs presented by Livney.  The primer was distributed during, rather than before, the May 12, 2006 Investment Committee meeting which made it impossible for the Trustees to read, absorb, and evaluate, any useful information, if any, it might have contained.  It would have been impossible for any Trustee to read the entire primer and listen to everything Livney had to say during the Investment Committee meeting, let alone consult with any independent expert as to the propriety of the proposed investment.

Members of the Board demonstrated that they did not understand the investment. Brown, then an ERB member, a member of the ERB's Investment Committee, New Mexico's State Treasurer, and the future Dean of the Business School of the University of New Mexico, asked what a CDO was during Livney's presentation.

---

[12] *See* Miller Decl., Exh. M.

20

The Trustees' confusion about the nature of the investment was further reflected in their uncertainty about whether the investment was properly classified as "fixed income" or "private equity," a material distinction to the Board since the ERB was permitted to invest only 5% of the Fund's portfolio in "private equity" investments. Although Livney represented that the investment was essentially a "fixed income" investment, the ERB's Chief Investment Officer, Frank Foy, allocated the investment to "private equity," and ultimately Malott moved to invest $40 million into the "Private Equity" allocation.  Regardless of how the investment should have been characterized for purposes of the Fund's allocation, this exchange should have raised a "red flag" to the ERB Trustees that there was little, if any, understanding of the investment and that, at a minimum, further investigation was needed.

The Board's lack of understanding about the instrument being marketed to it by Livney was  expressly noted by the two dissenting Trustees.  They noted that the instrument was complicated and the ERB had not been properly educated about its function.  They specifically noted that the ERB did not have enough information to make an informed decision about the investment.   *Compare* L. Turner Decl., ¶ 22 ("trustees who are not familiar with and who do not understand an investment product, will need to take the necessary steps to make an informed decision regarding that investment…").

### b.  The Trustees Did Not Have *Any* Material Information About the Particular CDOs in Which the Fund Would Invest

More fundamentally, the ERB did not have *any* information about the particular CDOs in which the Fund would ultimately be investing.  The "primer" was a generic pamphlet about CDOs, and said nothing about the specific instruments that Vanderbilt Financial would acquire. These instruments were not identified until the Offering Memorandum was (belatedly) finalized

in August 2006, and, even then, the Offering Memorandum said almost nothing about them other than identifying their generic names, and that they were backed principally by the mezzanine and debt tranches of various RMBs and CMBs.  Did the underlying pools of RMBs and CMBs consist of mortgages on strip malls in Fresno, California?  Subprime mortgages on trailer parks outside of Fort Myers, Florida?  Who decided which RMBs and CMBs were included?   What would the risk be to the Fund in the event of a 2% default rate on the underlying mortgage obligations?  What about a 10% rate?  What about a 20% rate?  The Trustees did not know.  The Trustees did not ask.  The Trustees did not even know what questions *should* be asked.  *Compare* L. Turner Decl., ¶ 25 (trustees should understand, among other things, the "priority of claim on cash flows," and the "inherent risks" of the investment).

### c.  Livney's Projections Made No Sense

The projected numbers contained in the "primer" did not add up to support Livney's projected return. According to the primer, a $15 million investment would be leveraged by a ratio of 20 to 1 with an additional $285 million in loans with a 10-year term, and investing the total of $300 million in purportedly "investment grade, high quality fixed income securities" also with a 10-year term. After collecting interest on the $300 million CDO and paying the interest on the $285 million in debt and fees, the "Expected Annual Return," as noted above, was represented to be "10%-12%."

By VCA's own analysis, the investment could not perform as represented.  The interest on the $285 million debt was represented to be .32% over LIBOR and the interest on the $300 million investment was represented to be .65% over LIBOR, resulting in a purported spread of 33 basis points. A spread of 33 basis points on $285 million, or even $300 million, would have resulted in a return of approximately $1 million before deducting fees. A return of $1 million on

22

an initial $15 million investment is a return of approximately 6.5% -- well short of the purported "Expected Annual Return" of 10%-12% promised by Livney.  After deducting fees, which Livney represented to be "1 3/4 of a point plus 25% over 9 ½ dividend yield," the actual return would be even smaller.

### d.  The Trustees' Deliberation Was Inexplicably Rushed

The decision to invest in the Vanderbilt Trust was made after a one-hour meeting of the Investment Committee and a fifteen-minute meeting of the Board (and Garcia was only there for approximately one half of that period).   The meeting was specially called in order to expedite the Board's approval of the investment.   At the meeting, Livney alternatively represented that the investment had a "deadline" of May 15, 2006 or June 15, 2006, and that purported "friends" or "family" of VCA who failed to act would "be shut out" when "Wall Street, Citi[group] and Bear [Stearns] over subscribe this thing."

There was, of course, no need to rush.  In fact, the Vanderbilt Trust and Vanderbilt Financial did not even *exist* on May 12, 2006, the initial Offering Memorandum was still being prepared June 2006,  "roadshow" meetings (the principal means of marketing the investment to prospective participants) took place in July 2006, and the final Offering Memorandum would not be issued until August 2006.

The dissenting Trustees, Dr. Turner and Shirley, expressly noted that "the decision to invest was too hasty," that the ERB had not considered alternative investment strategies, and that the investment would force the ERB to violate its own policies and procedures.  Of course, they were correct.  The Trustees could not have educated themselves about CDOs and MBSs, learned about the actual CDOs they would be investing in, examined the possible returns, examined the risk of default, and considered alternative investments that might be a better use of the  $40

million, let alone evaluated VCA and Livney, the promoters of the investment, all during the course of an hour.

As a consequence of the urgency and speed with which the Vanderbilt Investment was presented, the ERB was not sufficiently educated about the investment, and as such was ill-equipped and unprepared to approve it. The extreme brevity of the oral presentation and deliberation, and the virtual impossibility that any of the Board members fully read and absorbed the information contained in the primer, is itself enough to constitute behavior falling short of the prudent investor standard, and the requirement to investigate contained therein.  When "urgency and speed overrode the need for calm deliberate inquiry and discussion," and "the Trustees considered only the information and representations given by the borrowers," it is abundantly clear that they have not fulfilled their fiduciary obligations. *Katsaros*, 568 F. Supp. at 367. *Compare* L. Turner Decl., ¶¶ 23-24 (materials should be distributed in advance, and decisions should be deferred until trustees have had sufficient opportunity to perform their own due diligence and to consider whether there is additional information they would like to have).

### B.  The Trustee Defendants Cannot Meet Their Burden of Establishing that the Fund's Losses Were Not Caused by Their Breach of Fiduciary Duty

Under the common law of trusts, once the plaintiff has established a breach of fiduciary duty and a *prima facie* case of loss to the trust, the burden of proof shifts to the fiduciary to prove that the loss was not caused by the breach of duty.  *In re Beck Industries, Inc.,* 605 F.2d 624, 636-37 (2d Cir.1979); *Austin v. U.S. Bank of Washington*, 73 Wash. App. 293, 869 P.2d 404 (1994); *Estate of Stetson*, 463 Pa. 64, 345 A.2d 679, 690 (1975).[13]  As noted by Judge Friendly in

---

[13] This is one respect in which the common law of trusts *may* differ from the law under ERISA. As noted recently by the Tenth Circuit, the courts are divided as to whether the burden similarly shifts under ERISA, and the issue has not been decided by the Tenth Circuit.  *Holdeman v.*

*Beck Industries*, "[c]ourts do not take kindly to arguments by fiduciaries who have breached their obligations that, if they had not done this, everything would have been the same." 605 F.2d at 636.

First, as discussed in some detail above, there is overwhelming evidence of a breach of fiduciary duty whether a common law or ERISA standard is applied. Second, there is also more than a *prima facie* case of a loss to the Fund – it is beyond dispute that the ERB wrote off the *entirety* of its $40 million investment in the Vanderbilt Trust.

## III. Conclusion

For the reasons stated above, Plaintiffs respectfully pray that the Court grant their motion for partial summary judgment, and enter judgment in their favor on their claim of breach of fiduciary duty, as to the Fund's investment in the Vanderbilt Financial Trust, , in the amount of $40 million plus prejudgment interest, as against Defendants Bruce Malott, Gary Bland, Veronica Garcia and Douglas M. Brown.


Dated:  September 3, 2010                          Respectfully submitted,


                                                   THE ROWE LAW FIRM


                                                   _____/s/_____
                                                   Gordon H. Rowe III
                                                   1200 Pennsylvania NE, Suite 2B
                                                   Albuquerque, NM 87110
                                                   Phone: 505-232-2800
                                                   Fax: 505-266-1031

_____

*Devine,* 572 F.3d 1190, 1195 n.1 (10th Cir. 2009).  *See also In re Unisys Savings Plan Litig.*, 173 F.3d 145, 160 n. 23 (3d Cir. 1999) (describing split among circuits).

Jonathan W. Cuneo
Matthew E. Miller
Brendan S. Thompson
CUNEO GILBERT & LaDUCA, LLP
507 C Street, N.E.
Washington, D.C. 20002
Phone: 202-789-3960
Fax: 202-789-1813

Richard D. Greenfield
Marguerite R. Goodman
GREENFIELD & GOODMAN, LLC
250 Hudson Street, 8th Floor
New York, N.Y.  10013
Phone: 917-495-4446

*Attorneys for Plaintiffs*

26

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of September, 2010, a true and correct copy of the foregoing pleading, with all attachments, was delivered via electronic notification through the CM/ECF system to the following attorneys of record:

| | |
|---|---|
| William Arland III | warland@thearlandfirm.com |
| Roberto Braceras | rbraceras@goodwinprocter.com |
| Douglas Buncher | dbuncher@neliganlaw.com |
| Ellen Casey | ecasey@hinklelawfirm.com |
| Denise Chanez | dchanez@narvaezlawfirm.com |
| Jennifer Chunias | jchunias@goodwinprocter.com |
| Michael Comeau | mcomeau@cmtisantafe.com |
| Joseph Donado | jdonado@fslegal.com |
| Martin Esquivel | mesquivel@narvaezlawfirm.com |
| Nicholas Foley | nfoley@neliganlaw.com |
| John Gaither | jgaither@neliganlaw.com |
| Bryan Garcia | bgarcia@narvaezlawfirm.com |
| Stephen Hamilton | shamilton@montand.com |
| Grey Handy | ghandy@cmtisantafe.com |
| Rebecca Kenny | rsk@madisonlaw.com |
| William Madison | bill@madisonlaw.com |
| Jaclyn McLean | jmclean@hinklelawfirm.com |
| Henry Narvaez | hnarvaez@narvaezlawfirm.com |
| Andrew Schultz | aschultz@rodey.com |
| Richard Shane | rshane@rileyandshane.com |
| Peter Silverman | psilverman@fslegal.com |
| Peter Simmons | peter.simmons@friedfrank.com |

/s/

Gordon H. Rowe III