# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

DONNA J. HILL and YOLANDA
CHACON-VALLE, on Behalf of the New
Mexico Educational Retirement Fund
and its Members and Beneficiaries, or
Alternatively On Behalf of Themselves and
All Others Similarly Situated,

      Plaintiffs,

vs.                                                                No. CIV 10-0133 JB/KBM

VANDERBILT CAPITAL ADVISORS, LLC;
VANDERBILT FINANCIAL, LLC; VANDERBILT
FINANCIAL TRUST; PIONEER INVESTMENT
MANAGEMENT, U.S.A., BRUCE MALOTT,
GARY BLAND, VERONICA GARCIA, DOUGLAS
M. BROWN, PATRICK LIVNEY, OSBERT M.
HOOD, STEPHEN C. BERNHARDT, KURT W.
FLORIAN, JR., ANTHONY J. KOENIG, JR.,
MARK E. BRADLEY, RON D. KESSINGER,
ROBERT P. NAULT, JAMES R. STERN, NEW
ENGLAND PENSION CONSULTANTS LLC,
ALDUS EQUITY, SAUL MEYER, JOHN DOE #1
JOHN DOE #2, AND DOES 3-100, inclusive,

      Defendants,

and

THE NEW MEXICO EDUCATIONAL
RETIREMENT FUND,

      Nominal Defendant.

## MEMORANDUM OPINION AND ORDER

     **THIS MATTER** comes before the Court on:  (i) the Vanderbilt Defendants' Motion to

Dismiss Complaint, filed August 31, 2010 (Doc. 36); (ii) the Individual State Defendants' Motion

to Dismiss Plaintiffs' Claims, filed August 31, 2010 (Doc. 41); and (iii) the Motion of the

Educational Retirement Fund to Dismiss Plaintiffs' Claims Under Rule 12(b)(6), Federal Rules of Civil Procedure, filed September 7, 2010 (Doc. 48).  The Court held a hearing on October 29, 2010. The primary issues are:  (i) whether the Plaintiffs have standing to sue under Article III of the United States Constitution; (ii) whether a first-to-file provision in the New Mexico Fraud Against Taxpayers' Act, N.M.S.A. 1978, §§ 44-9-1 to 14 (2007)(the "FATA"), precludes this lawsuit based on the state court action in Foy v. Vanderbilt Capital Advisors, LLC, No. D-101-CV-2008-1895 (1st Jud. Dist. Ct., N.M., filed July 14, 2008);(iii) whether the Plaintiffs may properly bring any of these causes of actions derivatively; (iv) if determined to be proper under statutory or common-law trust principles, whether the Plaintiffs are subject to a demand requirement before filing suit and, if so, whether the Plaintiffs satisfied the requirement or plead facts sufficient to excuse demand as futile; (v) whether any of the ERB Defendants[1] are entitled to immunity on the Plaintiffs' claims for Breach of Fiduciary Duty (Count I), Fourteenth Amendment violation (Count II), Unjust Enrichment (Count XVII), or Constructive Trust (Count XVII); and (vi) whether the Plaintiffs have pled facts sufficient to state a claim upon which relief may be granted for Counts II-VI and XII-XVIII.  Because the Court finds that the Plaintiffs' lack constitutional standing to assert their claims, the Court will grant the Individual State Defendants' Motion to Dismiss Plaintiffs' Claims for lack of subject-matter jurisdiction pursuant to rule 12(b)(1) and will remand the case to New Mexico state court.  Because the Court does not have subject-matter jurisdiction and it is remanding to state court, the Court will not decide the merits of any of the Defendants' motions to dismiss pursuant to rule 12(b)(6).

---

[1]Collectively, Defendants Bruce Malott, Gary  Bland, Veronica Garcia and Douglas M. Brown are referred to as the "ERB Defendants."

## FACTUAL BACKGROUND

The Plaintiffs are members[2] of the Educational Retirement Fund (the "Fund"), a public pension plan that the New Mexico Education Retirement Act, N.M.S.A. 1978, § 22-11-11 (the "ERA"), established for the benefit of employees in New Mexico's public schools, colleges, and universities. See Amended Complaint ¶ 1, at 1, filed June 30, 2010 (Doc. 30).

The New Mexico Constitution mandates that "all funds . . . paid into or held by . . . an educational retirement system . . . shall be held . . . [i]n a trust fund to be administered and invested . . . [f]or the sole and exclusive benefit of the members, retirees and other beneficiaries of that system." N.M. Const. Art. XX § 22(A). The ERB is "the trustee[] for [its] system [] and ha[s] the sole and exclusive fiduciary duty and responsibility for administration and investment of the trust fund held by . . . [the] system[]." N.M. Const. Art. XX § 22(B). The Fund holds approximately $8.5 billion in assets and has approximately 95,000 current members and participants. See Am. Compl. ¶¶ 26, 109-10, at 8, 34. During the national economic crisis in 2007 and 2008, the Fund lost approximately $40 million on certain private equity investments. See Am. Compl. ¶ 4(b), at 2. The Plaintiffs allege injury from the Defendants' improper investment actions in the form of increased employee contributions, reduced services, tax increases, and increased risk that the Fund will have insufficient assets to satisfy its obligations in the future. See Am. Compl. ¶¶ 1, 10, at 1, 3.

In passing the Prudent Investor Act of 2005, N.M.S.A §45-7-601, the New Mexico

---

[2]The New Mexico Educational Retirement Act, N.M.S.A. 1978, § 22-11-1 to -55, defines a "member" as "an employee, except for a participant or a retired member, coming within the provisions of the Educational Retirement Act." N.M.S.A. 1978, § 22-11-2(A)(2007). A "retired member" is "a person whose employment has been terminated by reason of age and who is receiving or is eligible to receive retirement benefits." N.M.S.A. 1978, § 22-11-2Z (2007). A "beneficiary," by contrast, is defined as "a person who has an insurable interest in the life of a member or participant." N.M.S.A. 1978, § 22-11- 2E (2007).

Legislature for the first time authorized the ERB to make "prudent" investments in alternative or non-traditional investments. Gaining access to funds newly available for alternative investments was allegedly competitive, and those marketing investments to the ERB hired third parties known as "placement agents" to facilitate access to investment decision-makers. Am. Compl. ¶ 7, at 3. At times, placement agents were retained primarily because of their political connections. The Plaintiffs contend that Defendant Marc Correra was hired to market the Vanderbilt Financial Trust ("VFT") to the ERB, because he was well-connected politically in New Mexico and could "[sell] access to public money, including [] the Fund." Am. Compl. ¶ 25, at 7.

In early 2006, the Vanderbilt Defendants[3] devised an alternative investment vehicle, the Vanderbilt Trust Offering ("VTO"), for the specific purpose of marketing the VFT investment to the ERB and the New Mexico State Investment Council ("SIC"). See Am Compl. ¶ 45, at 13. The VTO consisted of a private placement of the shares in the VFT, a statutory trust created specifically to own the membership interests in Vanderbilt Financial. See Am. Compl. ¶ 45, at 13. Vanderbilt Financial served as a holding company that would acquire alternative investments and its portfolio was ultimately comprised principally of heavily leveraged, equity tranche positions in certain collateralized debt obligations ("CDOs").[4] See Am. Compl. ¶ 46, at 13. By design, a substantial

---

[3]Together, Defendants Patrick Livney and Vanderbilt Capital Advisors, LLC ("Vanderbilt Capital") are referred to as the "Vanderbilt Defendants."

[4]CDOs are derivative investments valued by (i) their position or tranche; they are paid sequentially, from the most senior to the most subordinate, and (ii) the quality of the underlying assets represented by the instruments. Stated differently, CDOs issue multiple classes of equity and debt that are tranched in order of seniority in bankruptcy and timing of repayment. The equity tranche is the lowest tranche in the CDO's capital structure. The equity tranche sustains the risk of payment delays and credit losses first, to make debt tranches less credit risky. The equity tranche position receives what, if any, cash flows are left after the satisfaction of debt tranche claims. See Collateralized Debt Obligation, WIKIPEDIA.ORG, http://en.wikipedia.org/wiki/Collateralized_debt_obligation (last visited September 8, 2011).

portion of the underlying assets were allegedly subprime, Alt-A or A-minus mortgages,[5] having been extended to borrowers who provided little to no verification of assets or proof of ability to repay, and who did not meet minimal lending standards.  See Am. Compl. ¶ 46, at 13-14.  Vanderbilt Financial's portfolio also included synthetic CDOs, which were not backed by any assets but instead amounted to wagers on whether other "reference CDOs" would succeed or fail.[6]  See Am. Compl. ¶ 47, at 14.

In May 2006, the ERB elected to cause the Fund to invest in the VFT.  The ERB Investment Committee, which recommends investments to the full ERB, met to consider the Vanderbilt Trust Offering at 11:25 a.m. on May 12, 2006.  Defendant Patrick Livney, Chief Executive Officer and a director of the now defunct Vanderbilt Financial, LLC ("Vanderbilt Financial"), presented the Vanderbilt Financial Trust ("VFT") investment to the Investment Committee and, according to the Investment Committee's minutes, Livney represented the VFT investment to be "a state of the art, top of the food chain investment vehicle." Am.  Compl. ¶ 56, at 16.  The Plaintiffs contend that Livney made these statements knowing they were false and misleading, or in reckless disregard for their truth, to induce the ERB to authorize the VFT investment where Livney "knew that the portfolio of Vanderbilt Financial consisted of toxic waste, liar's loans, and exceptional loans, and

---

[5]An Alt-A mortgage classifications designates a risk profile that falls between prime and subprime.  The mortgage borrowers typically have clean credit histories, some factor exists which increases the mortgage's risk profile.  See Alt-A, INVESTOPEDIA.ORG, http://www.investopedia.com/terms/a/alt-a.asp#axzz1YWMkpt6i (last visited September 20, 2011).

[6]A synthetic CDO is a complex form of CDO in which underlying credit exposures are incurred through a credit default swap arrangement, rather than by an investment vehicle purchasing assets.  Synthetic CDOs enable wagers to be made on the value of mortgage-related securities.  As such, they have been blamed for playing a major role in the lower lending standards and fraud that contributed to the sub-prime mortgage crisis.  The "reference CDO" is the underlying security which the synthetic CDO effectively wagers on.  See Synthetic CDO, WIKIPEDIA.ORG, http://en.wikipedia.org/wiki/Synthetic_CDO (last visited September 8, 2011).

[that the investment] was highly speculative, risky, and leveraged, and virtually worthless from the outset."[7] Am. Compl. ¶ 56, at 16.  When presenting to the ERB Investment Committee, Livney also allegedly "concealed the material fact that Correra would receive inflated and unjustifiable fees as placement agent in connection with the transaction."  Am.  Compl. ¶ 58, at 17.  Livney also allegedly misrepresented to the ERB that the VFT investment was backed by "fixed income underlying assets," and that the CDOs consisted of "a pool of assets/bonds that is financed by AAA, AA, and BBB rated bonds and they re-engineer cash flow."  Am. Compl.¶ 59, at 17.  Throughout the meeting, Livney continued to use the allegedly false and misleading phrase "fixed income securities" to refer to the CDOs investment.   Am. Compl. ¶ 60, at 17.   Additionally, Livney allegedly falsely stated that Vanderbilt Financial "re-underwrites everything to our specs" and that no part of the investment contained synthetic CDOs.  Am. Compl. ¶ 63, at 17.

While fielding questions about the dangers of the investment, Livney responded with the purportedly misleading statement that "historically the default rate of Vanderbilt since 1999 is zero." Am. Compl. ¶ 72, at 22.  The Plaintiffs allege that Livney knew that statement's potential to mislead because of the nature of the underlying investments.  See Am. Compl. ¶ 72, at 22. Livney allegedly misleadingly implied that the risk of default was accounted for, stating that, "[t]here is an assumption of recovery and default in every deal, [which] is priced up front."  Am. Compl. ¶ 73, at 23.  The Plaintiffs further allege that the CDO primer provided to the ERB Investment Committee

---

[7]"Toxic waste" is a slang term for securities that are unattractive because of underlying provisions or risk, while "liar's loans" refers to a mortgage requiring little or no documentation of income from the borrower.  See Toxic Waste, INVESTOPEDIA.COM FINANCIAL DICTIONARY, http://www.investopedia.com/terms/t/toxicwaste.asp#axzz1XN7HRgcz (last visited September 8, 2011); see also Liar Loan, INVESTOPEDIA.COM FINANCIAL DICTIONARY, http://www.investopedia.com/terms/l/liar_loan.asp#axzz1XN7HRgcz (last visited September 8, 2011).

was filled with misleading information.  The primer presentation is purportedly mathematically incorrect and  internally flawed, and the VFT could not perform as presented.  See Am. Compl. ¶¶ 64-65, at 19.

During the course of the meeting, several members of the ERB asked questions.  The Plaintiffs allege that exchanges prompted by Dr. Pauline Turner's questions raised red flags and demonstrated a need for further investigation.  See Am. Compl. ¶¶ 62, 66, at 18, 20.  Disagreement between the ERB members existed whether the ERB could rely on the SIC's vetting process as a basis for their vote.  See Am. Compl. ¶ 68, at 20. Turner questioned Livney's characterization that the equity holder receives the most return and Livney conceded that the Fund's equity tranche would place the Fund in the lowest position.  See Am. Compl. ¶ 66, at 20.  When asked how Vanderbilt Financial came before the ERB, Livney allegedly concealed the truth and responded that it was through prior investments by the SIC, rather than admitting it was through purported "pay-for-play" payments to M. Correra.  Am. Compl. ¶ 71, at 22.

A Special Meeting of the ERB convened at 12:30 p.m. on the same day, immediately following the 11:30 a.m. Investment Committee meeting.  See Am. Compl. ¶ 55, at 16.  The Special Meeting was called to seek the ERB's approval of the Investment Committee's recommendation to invest in the VFT.  See Am. Compl. ¶ 55, at 16.  By 1:00 p.m. on May 12, 2006, the ERB had considered and approved a forty-million dollar alternative investment for the Fund in VFT shares. See Am Compl. ¶ 55, at 16.  Defendants Bruce Malott, Gary Bland, Veronica Garcia, and Douglas Brown each voted in favor of the investment when the ERB approved it four votes to two.  See Am. Compl. ¶ 84, at 26.

Malott has served on the ERB since 1999, was Chairman of the ERB from 2004 to 2010, and also served as Chairman of the ERB's Investment Committee.  See Am Compl ¶ 17, at 5.  The

Plaintiffs contend that Malott is a close personal "ally" of then-Governor Bill Richardson, and that Malott and others associated with Malott's accounting firm served on Richardson's campaign committee, as well as serving as accountants for the former Governor's political action committee and charitable foundation.  See Am. Compl. ¶ 17, at 5-6.  The Plaintiffs allege that Malott's accounting firm "garnered millions of dollars of additional state contracts at the time he served on the ERB."  Am. Compl. ¶ 17, at 5-6.

Defendant Bland was an ERB member when the VFT investment was chosen, served as New Mexico's State Investment Officer during the relevant time period, and was a member of the SIC until his resignation in October 2009.  See Am. Compl. ¶ 18, at 6.  Garcia began serving on the ERB attendant to her appointment as Secretary of the New Mexico Public Education Department in 2006.  See Am. Compl. ¶ 19, at 6.  Brown served as an ERB member from 2005 through the relevant period in 2006 by virtue of his position as interim Treasurer of the State of New Mexico.  See Am. Compl. ¶ 20, at 6.  Because he was the interim State Treasurer, Brown was also the Custodian of the Fund at the time of the VFT investment.  See Am.  Compl. ¶ 20, at 6.

Livney was the Chief Executive Officer and a director of the now-defunct Vanderbilt Financial.  See Am. Compl. ¶ 13, at 4.  VFT owned equity interests in a portfolio of CDOs, and the Fund lost its entire forty million dollar VFT investment when mortgage-backed securities defaulted at an exceedingly high rate.  See Am. Compl. ¶ 95, at 31.

After the Fund's shares in the VFT lost all value and were written off, it was disclosed that Vanderbilt Capital had paid millions of dollars in "placement agent" fees to M. Correra, son of Anthony Correra, a close advisor to then-Governor Bill Richardson, for his role in causing the ERB and the SIC to invest in Vanderbilt securities.  See Am.  Compl. ¶¶ 16, 51, at 5, 15.  The Plaintiffs contend that after M. Correra was successful in his role, "Vanderbilt, its employees, and their

families contributed, directly and indirectly, to the Governor's presidential campaign, including the maximum contribution allowed by law from both Livney and his wife." Am. Compl. ¶ 51, at 15. Defendant Malott recently disclosed that he received a $350,000.00 loan from M. Correra in August 2006, when the Fund transmitted forty million dollars to Vanderbilt Capital.  See Plaintiffs' Memorandum of Law in Opposition to Motions to Dismiss at 3, filed October 1, 2010 (Doc. 69)("Response").  Plaintiff's allege that the loan was secured with a mortgage in favor of an acquaintance of M. Correra's for purposes of concealment.  See Response at 3.

The Plaintiffs contend that the four ERB Defendants breached their duty as trustees of the Fund by failing to perform due diligence in considering the investment and voting in favor of the investment to further political aspirations, to repay political favors, and to accede to political pressures.  See Am. Compl. ¶¶ 88-93, at 28-30.

The Plaintiffs allege that, in causing the Fund to invest in the VFT, the Vanderbilt Defendants committed common-law fraud; violated the New Mexico Uniform Securities Act, N.M.S.A. 1978 § 58-13C-509; violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and rule 10b-5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5; negligently misrepresented the VFT investment to the ERB; aided and abetted breach of fiduciary duty and breach of contract; and were unjustly enriched.  The Plaintiffs contend that the Vanderbilt Defendants knew their interests conflicted with those of the ERB, of the Fund, and of the Fund beneficiaries.  The Vanderbilt Defendants intended to profit from selling the defective mortgages that were difficult to unload, knowing but not disclosing that even a modest percentage of defaults among the mortgagers would render the VFT worthless and that a high default rate on the loans underlying the investment was likely given the nature of the underwriting.  See Am. Compl.¶ 48, at 14.  In marketing the VFT to the ERB and to the SIC, the Vanderbilt Defendants made

misrepresentations and omissions of material fact concerning the performance projections for the VFT.  See Am.Compl. ¶ 53, at 15-16.  The Plaintiffs' Amended Complaint references an electronic mail transmission sent from Kurt Florian, Jr., Chief Operating Officer and Counsel for Vanderbilt Financial, to Malott, stating: "We are targeting an annual dividend yield of approximately 10% for the Vanderbilt Trust."  Am. Compl. ¶ 53, at 15-16.  The Plaintiffs characterize this statement as knowingly or recklessly false and misleading, asserting that the Vanderbilt Defendants had no basis in fact for such projection.  See Am. Compl.  ¶ 53, at 15-16.

## PROCEDURAL BACKGROUND

On February 12, 2010, Plaintiff Donna J. Hill filed her Complaint in the First Judicial District, County of Santa Fe, New Mexico.  See Doc. 1-1.  The same day, Garcia, with the consent of all served Defendants, removed this case pursuant to 28 U.S.C. §§ 1441, 1443, 1453(b) and 1446.  The Court has jurisdiction over the Complaint, which includes constitutional claims, pursuant to 28 U.S.C. § 1331, and where the Complaint was filed as a class action, pursuant to 28 U.S.C. § 1332(d)(2).

The Fund is a nominal defendant. The Plaintiffs bring this suit to recover damages for the Fund, asserting a variety of theories which they contend comprise "two branches of standing." Hearing Transcript at 15:10-16 (October 29, 2010)(Cuneo, Court).  First, the Plaintiffs identify their strongest theory as a hybrid of "trust and derivative under the same rubric of asserting claims on behalf of the Fund."  Tr. at 16:3-5 (Cuneo).  Second, the Plaintiffs assert claims under "direct theories" of liability sounding in contract and civil rights.  See Tr. at 16:18-20 (Cuneo).  The Plaintiffs maintain that, regardless of the theory under which their claims would proceed, any and all recovery would inure to the Fund's.  See Am. Compl. ¶ 11, at 3; Tr. at 89:21-23.

On June 30, 2010, the Plaintiffs filed their Amended Complaint, asserting eighteen counts

based on the circumstances surrounding the ERB's decision to purchase an interest in the VFT for the Fund.  See Doc. 30.  In June 2010, the Court entered its Stipulation Regarding Certain Vanderbilt-Related Defendants, dismissing Vanderbilt Financial Trust and Vanderbilt Financial, LLC without prejudice because those entities were dissolved and unsuable, and also dismissing without prejudice individual Defendants Osbert M. Hood, Stephen C. Bernhardt, Kurt W. Florian, Anthony J. Koenig, Jr., Mark E. Bradley, Ron D. Kessinger, Robert P. Nault, and James R. Stern. See Stipulation (Doc. 31).  The Court also added M. Correra as a defendant in June 2010. In early October 2010, the Court entered its Stipulation of Dismissal, dismissing Defendants New England Pension Consultants and Aldus Equity, LLC without prejudice.  See Docs. 68, 71.

Following the dismissals, the remaining claims in Plaintiffs' Amended Complaint are:  Count I for breach of fiduciary duty against the ERB Defendants; Count II for breach of contract against the ERB Defendants; Count III for impairment of vested property rights against the ERB Defendants; Count IV for aiding and abetting breach of fiduciary duty against the Vanderbilt Defendants and M. Correra; Count V for aiding and abetting breach of contract against the Vanderbilt Defendants and M. Correra; Count VI for aiding and abetting impairment of vested property rights against the Vanderbilt Defendants and M. Correra; Count XII for common-law fraud against the Vanderbilt Defendants; Count XIII for violation of New Mexico Uniform Securities Act, N.M.S.A. § 58-13C-509, against the Vanderbilt Defendants; Count XIV for violation of New Mexico Uniform Securities Act, N.M.S.A.. § 58-13C-509, aiding and abetting against Livney, the ERB Defendants, and M. Corerra; Count XV for negligent misrepresentation against the Vanderbilt Defendants; Count XVI for violation of Section 10(b) of the Exchange Act and SEC rule 10b-5 against the Vanderbilt Defendants; Count XVII for unjust enrichment and constructive trust against all remaining Defendants; and Count XVIII for unjust enrichment and constructive trust to remedy

breach of fiduciary duties and violation of the Constitution of the State of New Mexico against the ERB Defendants.

In July, 2008, the ERB's former Chief Investment Officer Frank Foy brought a qui tam action under the FATA, asserting, *inter alia*, claims related to investments that the ERB made.  See Foy v. Vanderbilt Capital Advisors, LLC No. D-101-CV-2008-1895, Complaint (1st Jud. Dist. Ct., N.M., filed July 14, 2008)("Foy I").   In April, 2010, the state district court dismissed all of Foy's claims that were based on conduct occurring before the FATA's enactment in 2007.[8]  Subsequently, the New Mexico Attorney General intervened in Foy I, taking over prosecution of certain of Foy's claims, but making it clear in the process that his office seeks no order concerning Foy I's claims pertaining to the investment that the ERB made with Vanderbilt Capital, which forms the basis of the claims asserted in this lawsuit.  See Letter from Andrew Schultz to the Court at ¶ 2 (dated August, 26, 2011)(Doc. 100).   The Foy plaintiffs amended their complaint to allege some post-enactment conduct, and the Foy action has not been dismissed in its entirety, but is proceeding in some fashion.  See Foy Docket Sheet, Notice of Filing Concerning Violations of Section 44-9-3(A)(9) After July 1, 2007, filed October 18, 2010; Order Permitting Plaintiffs to Proceed on Remaining Claims, filed February 7, 2011.

On August 31, 2010, the Vanderbilt Defendants filed the Vanderbilt Defendants' Motion to Dismiss Complaint, seeking dismissal on multiple grounds.  The Vanderbilt Defendants contend that there is no statutory authority under which these Plaintiffs may bring a derivative action on behalf of the ERB, a state agency.  See Vanderbilt Def.s' Mot. to Dismiss at 3.  The Vanderbilt Defendants further argue that even if the Court treated the ERB like a corporation, the Plaintiffs failed to make

---

[8]The Court is permitted to take judicial notice of the court proceedings in Foy at the motion to dismiss stage.  See Tellabs, Inc. v. Makor Issues $ Rights, Ltd., 551 U.S. 308, 322 (2007).

-12-

a demand upon the ERB to pursue these claims in the first instance or, alternatively, to sufficiently plead the futility of such a demand.  See Vanderbilt Def.s' Mot. to Dismiss at 4-5.  The Vanderbilt Defendants also contend that the claims against them fail as direct, derivative, or class action claims, because the Plaintiffs do not allege they interacted directly with the Vanderbilt Defendants, heard, or read any misrepresentations from the Vanderbilt Defendants, or relied on anything the Vanderbilt Defendants said or omitted in connection with the sale of the VFT shares.  See Vanderbilt Def.s' Mot. to Dismiss at 6-7.  The Vanderbilt Defendants contend that, whether the claims are direct or derivative, the Plaintiffs' claims fail, not only because they allege no facts indicating that the ERB relied on any misrepresentations, but in some instances, fail even to plead facts suggesting that the representations were false.  See Vanderbilt Def.s' Mot. to Dismiss at 11-12.  The Vanderbilt Defendants also direct the Court to an audio recording of the relevant ERB meeting and contend it disproves Plaintiffs' allegations against them as a matter of law.  See Vanderbilt Def.s' Mot. to Dismiss at 2, 9.  The Vanderbilt Defendants assert that the Plaintiffs' causes of action for "aiding and abetting breach of contract," and "aiding and abetting impairment of vested property rights," do not exist under New Mexico law, and that the Plaintiffs' unjust enrichment claim is similarly flawed.  See Vanderbilt Def.s' Mot. to Dismiss at 25-26.  Finally, the Vanderbilt Defendants state that the underlying facts forming the basis for the Plaintiffs' claims mirror the facts underlying a first-filed FATA action and, accordingly, the FATA's provisions preclude the suit.  See Vanderbilt Def.s' Mot. to Dismiss at 26-27.

Also on August 31, 2010, the ERB Defendants filed the Individual State Defendants' Motion to Dismiss Plaintiff's Claims.  The ERB Defendants assert that the Court should dismiss all claims against them on grounds that the Plaintiffs have demonstrated no statutory authority for the derivative claim; that only the Attorney General's office may properly bring an action to remedy the

asserted damage to the Fund or to enforce the Fund's asserted claims; that the Plaintiffs have failed to establish that the demand requirement is excused; that the Court should dismiss the Plaintiffs' claims for lack of standing; and the ERB Defendants are immune from liability for the tort claims asserted. <u>See</u> Individual State Defendants' Memorandum in Support of Their Motion to Dismiss at 5, 13, 14, 15, 25, filed August 31, 2010 (Doc. 42). The ERB Defendants also contend that the Plaintiffs have failed to state a cause of action under either the state or federal constitutions, and that no implied contract between the ERB Defendants and the Fund Members exists under New Mexican law. <u>See</u> Individual State Def.s' Mem. Mot. to Dismiss at 18, 21. The ERB Defendants further assert that the Court should dismiss the Plaintiffs' unjust enrichment and constructive trust claims for failure to state a claim. <u>See</u> Individual State Def.s' Mem. Mot. to Dismiss at 28-30.

On September 7, 2010, the Fund filed its Motion of the Educational Retirement Fund to Dismiss Plaintiffs' Claims Under Rule 12(b)(6), Federal Rules of Civil Procedure. <u>See</u> Doc. 48. In addition to adopting many of the arguments presented in the Individual State Defendants' Motion to Dismiss, the Fund moves to dismiss all of the Plaintiffs' claims against it, because the Plaintiffs state that they "do not seek any damages from the Fund," Am. Compl. ¶ 11, at 3, and because, although the prayer for relief purports to seek an unspecified injunction against the Fund, the Fund is not the object of any count in the Amended Complaint, nor is there any legal or factual basis for relief against the Fund based upon the allegations in the Amended Complaint, <u>see</u> Am. Compl. ¶ 11, at 3.

On October 1, 2010, the Plaintiffs filed the Plaintiffs' Memorandum of Law in Opposition to Motions to Dismiss ("Response"). <u>See</u> Doc. 69. The Plaintiffs assert standing to bring claims to recover losses for the Fund under fundamental principles of trust law, because the Fund is a trust, the ERB members are its trustees, and the Plaintiffs are its beneficiaries. <u>See</u> Response at 6.

-14-

Alternatively, the Plaintiffs argue, they enjoy standing to bring a derivative action on behalf of the Fund as "stakeholders" akin to "shareholders" for purposes of an action under rule 23.1 of the Federal Rule of Civil Procedure 23.1.  Response at 7-10.  On October 25, the Vanderbilt Defendants filed the Vanderbilt Defendants' Reply Memorandum in Support of Motion to Dismiss Complaint ("Vanderbilt Def.s' Reply")(Doc. 77) and the ERB Defendants filed the Individual State Defendants' Reply in Support of Motion to Dismiss ("Individual State Def.s' Reply")(Doc. 78).  The Defendants reasserted the basis of their motions to dismiss and addressed the Plaintiffs' Response.  See Vanderbilt Def.s' Reply at 1-2; Individual State Def.s' Reply at 1-2.  Finally, the ERB Defendants argue that the Court should dismiss Count XIV as abandoned and refers the Court to Plaintiffs' Response, which states: "Plaintiffs concur with the analysis of Trustee Defendants, and do not oppose the dismissal of Count XIV as against the Trustee Defendants."  See Individual State Def.s' Reply at 36 (citing Response at 27, n. 37).

After the briefing on these motions was completed, the Plaintiffs notified the Court that they had made demand on the ERB to substitute itself as plaintiff in this action and to prosecute the case on behalf of the Educational Retirement Fund.  See Letter to the Court from Shane C. Youtz ¶ 2, at 1 (dated November 24, 2010) filed November 24, 2010 (Doc. 84).  On July 1, 2011, the Court was notified that on January 14, 2011, the ERB voted to reject the Plaintiffs' demand.  See Letter to the Court from Shane Youtz (dated July 1, 2011), filed July 1, 2011 (Doc. 99); Letter to the Court from Joseph Goldberg  ¶ 8, at 3 (dated July 20, 2011), filed July 20, 2011 (Doc.  96, Ex.  B)(containing the January 14, 2011 Minutes of the New Mexico Education Retirement Board Regular Meeting).

## **LEGAL STANDARD FOR MOTIONS TO DISMISS UNDER RULE 12(b)(1)**

"Federal courts are courts of limited jurisdiction; they are empowered to hear only those cases authorized and defined in the Constitution which have been entrusted to them under a

jurisdictional grant by Congress." <u>Henry v. Office of Thrift Supervision</u>, 43 F.3d 507, 511 (10th Cir. 1994)(citations omitted). A plaintiff generally bears the burden of demonstrating the court's jurisdiction to hear his or her claims. <u>See</u> <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 104 (1998)("[T]he party invoking federal jurisdiction bears the burden of establishing its existence."). Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a party to raise the defense of the court's "lack of jurisdiction over the subject matter" by motion. Fed. R. Civ. P. 12(b)(1). The United States Court of Appeals for the Tenth Circuit has held that motions to dismiss for lack of subject-matter jurisdiction "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject-matter jurisdiction; or (2) a challenge to the actual facts upon which subject-matter jurisdiction is based." <u>Ruiz v. McDonnell</u>, 299 F.3d 1173, 1180 (10th Cir. 2002). As the Court explained in <u>Alto Eldorado Partners v. City of Santa Fe</u>, No.. 08-0175, 2009 WL 1312856 (D.N.M. Mar.11, 2009)(Browning, J.):

> On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a rule 12(b)(6) motion: the court must consider the complaint's allegations to be true. <u>See</u> <u>Ruiz v. McDonnell</u>, 299 F.3d at 1180; <u>Williamson v. Tucker</u>, 645 F.2d 404, 412 (5th Cir. 1981). But when the attack is aimed at the jurisdictional facts themselves, a district court may not presume the truthfulness of those allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 [summary-judgment] motion.

<u>Alto Eldorado Partners v. City of Santa Fe</u>, 2009 WL 1312856, at *8-9 (citations omitted). As the United States Court of Appeals for the Fifth Circuit has stated:

> [T]he trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction -- its very power to hear the case -- there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

-16-

Williamson v. Tucker, 645 F.2d 404, 412-13 (5th Cir. 1981)(quoting Mortenson v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).

When making a rule 12(b)(1) motion, a party may go beyond the allegations in the complaint to challenge the facts upon which jurisdiction depends, and may do so by relying on affidavits or other evidence properly before the court.  See New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995); Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995).  In those instances, a court's reference to evidence outside the pleadings does not necessarily convert the motion to a rule 56 motion for summary judgment.  See Holt v. United States, 46 F.3d at 1003 (citing Wheeler v. Hurdman, 825 F.2d 257, 259 n.5 (10th Cir. 1987)).  Where, however, the court determines that jurisdictional issues raised in rule 12(b)(1) motion are intertwined with the case's merits, the court should resolve the motion either under rule 12(b)(6) or under rule 56.  See Franklin Sav. Corp. v. United States, 180 F.3d 1124, 1129 (10th Cir. 1999); Tippet v. United States, 108 F.3d 1194, 1196 (10th Cir. 1997).  "When deciding whether jurisdiction is intertwined with the merits of a particular dispute, 'the underlying issue is whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim.'"  Davis ex rel. Davis v. United States, 343 F.3d 1282, 1296 (10th Cir. 2003)(quoting Sizova v. Nat'l Inst. of Standards & Tech., 282 F.3d 1320, 1324 (10th Cir. 2002)).

## LAW REGARDING THE FATA

In 2007, the New Mexico Legislature passed the FATA, a false claims act with a qui tam provision.  See N.M.S.A. 1978, §§ 44-9-1 to -14 (2007).  The FATA contains a first-to-file provision, stating: "When a person brings an action pursuant to this section, no person other than the attorney general on behalf of the state may intervene or bring a related action based on the facts underlying the pending action."  N.M.S.A. 1978, § 44-9-5E.  The FATA also contains the following

non-exclusivity clause: "The remedies provided for in the Fraud Against Taxpayers Act are not exclusive and shall be in addition to any other remedies provided for in any other law or available under common law." N.M.S.A. 1978, § 44-9-14.

The federal analog to the FATA is the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA"), which has as its purpose "encourag[ing] 'whistleblowers to act as private attorneys-general' in bringing suits for the common good." Walburn v. Lockheed Martin Corp., 431 F.3d 966, 970 (6th Cir. 2005)(quoting United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co., 41 F.3d 1032, 1041-42 (6th Cir. 1994)). It acts as a "jurisdictional limit on the court's power to hear certain duplicative qui tam suits." United States ex rel. Grynberg v. Koch Gateway Pipeline Co., 390 F.3d 1276 (10th Cir. 2004). The FCA also recognizes the need "to discourage opportunistic plaintiffs from bringing parasitic lawsuits whereby would-be relators merely feed off a previous disclosure of fraud." Walburn v. Lockheed Martin Corp., 431 F.3d at 970. See United States ex rel. Grynberg, 390 F.3d at 1278 ("The False Claims Act's qui tam provisions are designed to encourage private citizens to expose fraud but to avoid actions by opportunists seeking to capitalize on public information."). The FATA allows for recovery of three times the actual losses that the State suffered. See N.M.S.A. 1978, § 44-9-3C.

## RELEVANT NEW MEXICO LAW REGARDING TRUSTS

The Restatement (Third) of Trusts sets forth a definition of trusts:

A trust, as that term is used in this Restatement when not qualified by the word "resulting" or "constructive," is a fiduciary relationship with respect to property, arising from a manifestation of intention to create that relationship and subjecting the person who holds title to the property to duties to deal with it for the benefit of charity or for one or more persons, at least one of whom is not the sole trustee.

Restatement (Third) of Trusts § 2 (2003).[9]   A trustee shall administer a trust "in good faith, in accordance with its terms and purposes and the interests of the beneficiaries."  N.M.S.A. 1978, § 46A-8-801.  A trustee's duties include protection and management of trust property "to provide returns or other benefits to the trust." State ex rel. King v. Lyons, 149 N.M. 330, 248 P.3d 878, 906 (2011) (citing Restatement (Third) of Trusts § 86, cmt. B. (2007)).  Moreover, "[a] trust relationship imposes stringent and high standards of conduct upon the trustee." Pino v. Budwine, 90 N.M. 750, 752, 568 P.2d 586, 588 (1977) (citing Iriart v. Johnson, 75 N.M. 745, 411 P.2d 226 (1965)).

1.   **Beneficiaries of a Trust May Bring Claims on Behalf of the Trust Against the Trustees and Responsible Third Parties.**

The beneficiaries of a trust may sue the trustees to assert claims of damages to the *res* of the trust that the breach caused.  The Restatement (Second) of Trusts provides that:

> If the trustee commits a breach of trust, he is chargeable with (a) any loss or depreciation in value of the trust estate resulting from the breach of trust; or (b) any profit made by him through the breach of trust; or (c) any profit which would have accrued to the trust estate if there had been no breach of trust."

---

[9]Before the New Mexico Legislature's enactment of the New Mexico Uniform Trust Code ("NMUTC") in 2003, the Restatement of Trusts, along with the multi-volume trust treatises by Scott, Scott & Fratcher, The Law of Trusts (4th ed. 1987), and Bogert, G. Bogert & G. Bogert, The Law of Trusts and Trustees (rev. 2d ed. 1977), were the primary sources of trust law in New Mexico. See, e.g., Matter of Estate of McKim, 111 N.M. 517, 807 P.2d 215 (1991); Forest Guardians v. Powell, 130 N.M. 368, 24 P.3d 803 (Ct. App. 2001); Matter of Will of Coe, 113 N.M. 355, 826 P.2d 576  (Ct. App. 1992).  See also D. English, The New Mexico Uniform Trust Code, 34 N.M. L. Rev. 1, 2 (2004).  The NMUTC was drafted in connection with the revision of the Restatement of Trusts, and the Restatement of Trusts is an important source of materials for interpreting the NMUTC.  See English, supra, 34 N.M. L. Rev. at 2-3.  Even after New Mexico's adoption of the NMUTC, New Mexico courts continue to rely on the Restatement of Trusts to inform their interpretation of trust law.  See State ex rel. King v. Lyons, 149 N.M. 330, 248 P.3d 878, 906 (2011) (citing Restatement (Third) of Trusts § 86, cmt. b (2007)); In re Cable Family Trust, 148 N.M. 127, 130,  231 P.3d 108, 111 (2010)(citing the Uniform Trust Code, N.M.S.A. 1978, §§ 46A-1-101 to 46A-11-1105 (2003, as amended through 2009) and Restatement (Third) of Trusts § 4 (2003)).

Restatement (Second) of Trusts § 205 (1959).[10]  The beneficiaries of a trust may also sue responsible third parties; a beneficiary may bring an action against a third-party where "the trustee improperly refuses or neglects to bring an action."  Restatement (Second) of Trusts § 282.  The Supreme Court of New Mexico has recognized this principle.  In Iriart v. Johnson, 75 N.M. 745, 411 P.2d 226 (1966), the beneficiaries of a trust filed suit against a real estate agent for violating his fiduciary duties while selling trust property.  Notwithstanding the beneficiaries' lack of possession of the trust property's legal title and the lack of statutory authorization, the Supreme Court of New Mexico held in Iriart v. Johnson that the trust beneficiaries were the "real party in interest" with proper standing commensurate with beneficiaries enjoying a right of action under principles of contract law.  75 N.M. at 750, 411 P.2d at 229.

The New Mexico Uniform Trust Code ("NMUTC") also expresses this principle.  The NMUTC provides that a trust beneficiary can bring a proceeding against a trustee for breach of trust, and against a third-party who participates in or benefits from the trustee's breach of trust.  See N.M.S.A. 1978, § 46A-10-1001 (stating that "a violation by a trustee of a duty the trustee owes to a beneficiary is a breach of trust" and listing remedies for this misconduct).

New Mexico's law is in accord with the law of other jurisdictions.  See, e.g., Brown v. United States Postal Servs., 459 U.S. 212, 243 (1982)(citing Restatement § 282 rule that a trust beneficiary may assert a claim belonging to the trust if the trustee improperly refuses or neglects to bring an action against a third person); Estate of Bowles, 169 Cal. App. 4th 684, 691-92

---

[10]The NMUTC recognizes that the common-law of trusts and principles of equity supplement the Uniform Trust Code.  See N.M.S.A. 1978, § 46A-1-106.  New Mexico courts rely on both the Restatement (Second) of Trusts, see State ex rel. Pub. Emps.' Ret. Ass'n v. Longacre, 131 N.M. 156, 33 P.3d 906, (Ct. App. 2001), and the Restatement (Third) of Trusts, see State ex rel. King v. Lyons, 149 N.M. 330, 248 P.3d 878, 906 (2011).

(2008)(finding that beneficiary's cause of action was independent and not derivative through the

trustee, lest the cause of action be barred by delay in enforcement by a wrongdoing trustee).  In

Harnedy v. Whitting, 110 Cal. App. 4th 1333 (2003), the California Court of Appeals stated:

> When the claim being asserted rests in whole or in part on alleged breaches of duty
> by the trustee, a beneficiary has standing to pursue such a claim against either (i) the
> trustees directly, (2) the trustee and third parties participating in or benefitting from
> his, her, or its breach of trust, or (3) such third parties alone.

110 Cal. 4th at 1341-42.  See Booth v. Security Mut. Life Ins. Co., 155 F.Supp. 755, 761

(D.N.J. 1957)(holding that, where a trustee transfers property in breach of trust involving a third-

party, the beneficiary has a direct right of action against the third party); Anderson v. Dean Witter

Reynolds, Inc., 841 P.2d 742,745 (Utah Ct. App. 1992)("Although Utah substantive law is

especially sparse in this area, it appears the beneficiary has the right to bring an action against a third

party when the beneficiary's interests are hostile to those of the trustee."(citations omitted.)).

While the New Mexico state courts do not appear to have addressed the specific question

whether the law of trusts applies to the ERB, the New Mexico Court of Appeals has applied the law

of trusts to other state pension funds.  See State ex rel. Pub. Emps' Ret. Assoc. v.  Longacre, 131

N.M. 156, 33 P.3d 906 (Ct. App. 2001)(finding that trustee of the fund is a fiduciary to the Public

Employees Retirement Act ("PERA")] members, and "*following the principles of trust law*," the

PERA Board has a duty to collect overpayments for the trust)(emphasis added)(citing N.M. Const.

art. XX, § 22; 2 N.M.A.C. § 80.800.8.1; and Restatement (Second) of Trusts § 254, at 637-38

(1959)), reversed on other grounds by State ex rel. Pub. Emps.' Ret. Assoc. v. Longacre, 133 N.M.

20, 59 P.3d 500 (2002). New Mexico is not alone in applying the law of trusts to public pension

funds; courts in numerous jurisdictions have made the same determination.  See Petition of Barney,

710 A.2d 408, 40 (N.H. 1998)(holding, under common-law of trusts, the board of trustees of the

New Hampshire Retirement System owe members and beneficiaries a fiduciary duty to manage the system for the benefit of the members and beneficiaries); City of Sacramento v. Pub. Emps.' Ret. Sys., 229 Cal. App. 3d 1470, 1494 (1991)(holding that, under "well-established rules of the law of trusts," the trustee of the pension system owed undivided loyalty to the beneficiaries).

> **2.** **When Trust Beneficiaries Sue on Behalf of a Trust, the Common Law of Trusts Requires Demand on the Trustees**

A demand requirement exists in the private trust realm and is even said to predate the demand requirement for shareholder derivatives.  See C. E. Rounds, Jr. and A. Dehio, Publicly-Traded Open End Mutual Funds in Common Law and Civil Law Jurisdictions:  A Comparison of Legal Structures, 3 N.Y.U. J.L. & Bus. 473, 494 (2007)("The common law of trusts has a comparable demand requirement which predates its corporate counterpart:  If a trust suffers harm at the hands of a third party, e.g., the trustee's investment agent, the trust beneficiaries first must make a demand on the trustees to correct the problem."(citing G.G. Bogert & G.T. Bogert, The Law of Trusts and Trustees § 869, at 199 n.35 and accompanying text (rev. 2d ed., repl. vol. 1995)).  In the private trust context, the demand requirement is rooted in the Restatements. See Restatement (Second) of Trusts, § 282 ("Suit in Equity by Beneficiary"); Bankers Nat. Corp v. Barr, 7 F.R.D. 305, 308 (S.D.N.Y. 1945)("Furthermore, under Delaware law, stockholder's derivative suits are equitable and the usual rules of equity that demand first be made on the trustee to sue, and demand refused, or reason shown why such demand would be useless . . . would seem applicable."(citing Bogert on Trusts and Trustees, §870, at 2553 (vol. 4); Restatement of Trusts, §282)).  That said, there is no New Mexico case that the parties or the Court have found that imposes a demand

requirement in the private trust context.[11]

## LAW REGARDING DERIVATIVE ACTIONS

Federal law and New Mexico law both allow derivative actions.  Rule 23.1 of the Federal Rules of Civil Procedure states the federal derivative suit pleading requirements.  New Mexico law states the requirements for bringing a derivative suit in N.M.S.A. 1978, § 52-11-47.

### 1.    Rule 23.1 of the Federal Rules of Civil Procedure Requires that Plaintiffs Plead Demand or Demand Futility.

Rule 23.1(b) sets forth pleading requirements for derivative actions. See Fed. R. Civ. P. 23.1(b).  The complaint must (i) allege that the plaintiff was a shareholder or member at the time of the transaction complained of; (ii) allege that the action is not a collusive one to confer jurisdiction that the court would otherwise lack; and (iii) state with particularity:  (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort.  See Fed. R. Civ. P. 23.1(b).  A derivative action may not be maintained if a plaintiff cannot fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right.  See Fed. R. Civ. P. 23.1(a).

The Supreme Court of the United States has determined that rule 23.1 does not contain a substantive demand requirement.  In Kamen v. Kemper Fin. Servs., 500 U.S. 90 (1991), the Supreme Court ruled that, while rule 23.1 clearly contemplates both the demand requirement and the possibility that demand may be excused, "it does not create a demand requirement of any particular

---

[11]While there are no New Mexico cases imposing a demand requirement in the private trust context, New Mexico follows the Restatements of Trusts, and it might well follow the Restatement (Second) of Trusts, § 282.  See State ex rel. Public Emps.' Ret. Ass'n v. Longacre, 131 N.M. 156, 33 P.3d 906 (Ct. App. 2001)(applying the Restatement (Second) of Trusts, § 254).

dimension.  On its face, rule 23.1 speaks only to the adequacy of the shareholder representative's pleadings." 500 U.S. at 108-09.  Because rule 23.1 is a procedural requirement, whether it has been satisfied is governed by federal law, although federal courts look to the law of the state of incorporation as the source of federal common law in determining whether demand is met.  See Cadle v. Hicks, 272 F. App'x 676, 678 (10th Cir. 2008)(looking to state law to interpret rule 23.1)("The Supreme Court has held in analogous circumstances that the law of the state of incorporation is an appropriate source of federal common law."(citing Kamen v. Kemper Fin. Servs., 500 U.S. at 96, 108)).  The Supreme Court has looked to state law to supply the contours of any demand requirement because the presumption that state law should be incorporated into federal common law "is particularly strong where parties have entered into legal relationships with the expectation that their rights and obligations would be governed by state-law standards."  Kamen v. Kemper Fin. Servs., 500 U.S. at 98.  New Mexico has recognized the general rule that a pre-suit demand or sufficiently pled facts showing futility is necessary to a shareholder derivative action. See White ex rel. Banes Co. Derivative Action v. Banes Co., 116 N.M. 611, 614, 866 P.2d 339, 342 (1993)("A shareholder derivative action is a procedure by which the shareholder can assert a right of action on behalf of the corporation *when the corporation has refused a properly made demand to enforce the corporation's rights*."(emphasis added)(citing Koster v. Lumbermens Mut. Cas. Co., 330 U.S. 518, 522 (1947))).

## 2.  N.M.S.A. 1978, § 53-11-47 Permits Derivative Suits and Requires that Plaintiffs Plead Demand or Demand Futility.

New Mexico's statute relating to derivative actions focuses solely on suits brought by shareholders.  See N.M.S.A. 1978, § 53-11-47 ("Provisions relating to derivative actions by shareholders").  The Supreme Court of New Mexico extended the scope of derivative suits beyond

the corporate context in First Nat'l Bank v. Sanchez, 112 N.M. 317, 815 P.2d 613 (1991), and allowed a partner's derivative suit on behalf of a general partnership.  See First Nat'l Bank v. Sanchez, 112 N.M. at 325, 815 P.2d at 621 ("[A] cause of action accruing to the partnership . . . belongs to the partnership rather than to the individual partners."); Fate v. Owens, 130 N.M. 503, 509, 27 P.3d 990, 996 (Ct. App. 2001)("It is well settled in New Mexico that shareholders of a corporation may bring a derivative action on behalf of a corporation . . . . Similarly, our Supreme court has state the same principle in the context of a general partnership").  The Court of Appeals of New Mexico explained that "[d]erivative actions work effectively when the partnership has been damaged by a third party and the general partners refuse to enforce the partnership's rights."  Fate v. Owens, 130 N.M. at 510, 27 P.3d at 997.  The court went on to explain that "a breach of fiduciary duty can be either individual or derivative, depending on the nature of the duty and who suffers the injury."  Fate v. Owens, 130 N.M. at 510, 27 P.3d at 997.  Additionally, the Court of Appeals has twice considered cases relating to other derivative actions, and both times declined to decide whether the plaintiff could bring a derivative suit.  See In the Matter of Norwest Bank of New Mexico, 134 N.M. 516, 520, 80 P.3d 98, 102 (Ct. App. 2003) ("New Mexico law is silent on whether a beneficiary of a testamentary trust may bring a derivative action.  Accordingly, we assume, without deciding, that such a derivative action is permissible."); Saylor v. Valles, 133 N.M. 432, 436, 63 P.3d 1152, 1156 (Ct. App. 2002) ("Whether members of a nonprofit corporation have standing to bring derivative actions is a question that we decline to answer in this case because Plaintiffs' pleadings are deficient in at least two respects.").

New Mexico shareholder derivative suits can proceed only where a plaintiff alleges with particularity "the efforts, if any, by the plaintiff to obtain the actions he desires from the directors" and "the reasons for his failure to obtain the action or for not making the effort."  N.M.S.A. 1978,

§ 53-11-47(A)(3).  The Supreme Court of New Mexico has stated that "the demand requirement is crucial to the derivative action."  White ex rel. Banes Co, Derivative Action v. Banes Co., 116 N.M. at 614, 616, 866 P.2d at 342, 344.  Demand may be excused as futile, but only where a plaintiff can establish that "the circumstances are such as to clearly show that it would be a mere useless form." Porter v. Mesilla Valley Cotton Prods. Co., 42 N.M. 217, 220, 76 P.2d 937, 939 (N.M. 1937). Accord Saylor v. Valles, 133 N.M. 432, 63 P.3d 1152 (Ct. App. 2002)(dismissing derivative claim on behalf of nonprofit organization because there were no allegations that plaintiffs made the requisite demand to the organization's directors or officers, or adequately explained why such demand would be futile).  It can be said that, within the corporate structure, the demand requirement allows "the board of directors or majority shareholders [to] set the corporation's business policy, including whether to pursue a lawsuit."  Haren v. Brown, 431 Mass. 838, 845, 730 N.E.2d 859, 865 (Mass. 2000).

## LAW REGARDING 12(B)(6) MOTIONS TO DISMISS

Under rule 12(b)(6) of the Federal Rules of Civil Procedure, a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  It is settled, however, that when entertaining a motion to dismiss, a court is permitted "to take judicial notice of its own files and records, as well as facts which are a matter of public record."  Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).  A court may also consider any documents referred to which the complaint refers, provided the documents are central to the plaintiff's claim and the parties do not dispute their authenticity.  See Jacobsen v. Deseret Book Co.,

287 F.3d 936, 941-42 (10th Cir. 2002).  If a document is not attached to the complaint, but is both referenced in the complaint and found to be central to the plaintiff's claim, a defendant may submit an "indisputably authentic copy to the court to be considered on a motion to dismiss."  GFF Corp. v. Assoc. Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997).  See 5A C. Wright & A. Miller, Federal Practice & Procedure § 1327, at 439 (3d ed. 2004)("[W]hen the plaintiff fails to introduce a pertinent document as part of her pleading . . . the defendant may introduce the document as an exhibit to a motion attacking the sufficiency of the pleading.").

The sufficiency of a complaint is a question of law, and when considering and addressing a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006); Hous. Auth. of Kaw Tribe v. City of Ponca City, 952 F.2d 1183, 1187 (10th Cir. 1991).  A complaint challenged by a rule 12(b)(6) motion to dismiss does not require detailed factual allegations, but a plaintiff's obligation to set forth the grounds of entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  "Factual allegations must be enough to raise a right to relief above the speculative level . . . ."  Bell Atlantic v. Twombly.  550 U.S. at 565 (internal citation omitted). "[T]he Supreme Court [has recently] . . . prescribed a new inquiry for [courts] to use in reviewing a dismissal: whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"  Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570). "The [Supreme] Court explained that a plaintiff must 'nudge his claims across the line from conceivable to plausible' in order to survive a motion to dismiss." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d at 1177

-27-

(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570).

## LAW REGARDING SOVEREIGN IMMUNITY

After the Supreme Court of New Mexico abolished common-law sovereign immunity in

Hicks v. State, 88 N.M. 588, 544 P.2d 1153 (1976), the New Mexico Legislature enacted the New

Mexico Tort Claims Act ("NMTCA"), which provides, in pertinent part, that "governmental entities

and public employees shall only be liable within the limitations of the Tort Claims Act and in

accordance with the principles established in that act."  N.M.S.A. 1978, § 41-4-2A (1976).  State

governmental entities and public employees acting within the scope of duty are, therefore, immune

from liability for any tort except as waived by the Act.  N.M.S.A. 1978, § 41-4-4A.  The NMTCA

defines a "governmental entity" as "the state or any local public body."  N.M.S.A. 1978, § 41-4-3B.

The NMTCA defines "public employees" as an "officer, employee or servant of a governmental

entity" and includes "elected or appointed officials" as well as "persons acting on behalf or in

service of a governmental entity in any official capacity."  N.M.S.A. 1978, § 41-4-3F(1)-(16).

## LAW REGARDING FRAUD AND MISREPRESENTATION

To establish a claim for common-law fraud under New Mexico law, a plaintiff must show

that (i) the defendant knowingly or recklessly made a false representation of fact with intent to

deceive; (ii) the plaintiff suffered damages and (iii) those damages were proximately caused by (iv)

the plaintiff's justifiable reliance on the defendant's false representation.  See Cain v. Champion

Window Co. of Albuquerque, LLC, 142 N.M. 209, 216, 164 P.3d 90, 97 (Ct. App. 2007).

Similarly, to state a claim for negligent misrepresentation in New Mexico, a plaintiff must plead

facts supporting the existence of a misrepresentation and pecuniary loss caused by justifiable

reliance thereon.  See, e.g., Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A., 106 N.M. 757,

761, 750 P.2d 118,122 (1988).

-28-

**ANALYSIS**

In their motions, the ERB Defendants urge the Court to dismiss the Plaintiffs' Amended Complaint for a lack of constitutional standing, because the Plaintiffs have not alleged a "cognizable injury." The Court agrees that the Plaintiffs fail to satisfy the requirements of Article III that there be a "case or controversy." The Plaintiffs do not satisfy the constitutional minimum for a case or controversy, because they fail to allege an injury in fact fairly traceable to the Defendants, which the Court can redress. The Plaintiffs did not offer to plead any jurisdictional facts and the Court believes that it is futile to allow the Plaintiffs to amend this flaw because the Plaintiffs cannot remedy the lack of causation or redressability. The Court will, therefore, remand the case to New Mexico state court.

## I.   THE PLAINTIFFS LACK CONSTITUTIONAL STANDING TO BRING THIS ACTION IN FEDERAL COURT.

The ERB Defendants move to dismiss the Plaintiffs' claims for lack of subject-matter jurisdiction under rule 12(b)(1) of the Federal Rules of Civil Procedure, asserting that the Plaintiffs lack constitutional standing to sue directly, or on behalf of the Fund, because they have not demonstrated a concrete injury-in-fact or causal connection between the VFT investment and their alleged injuries. See Individual State Def.s' Mem. Mot. to Dismiss at 5 (Doc. 42); Individual State Def.s' Reply at 5. The Plaintiffs contend that, as trust beneficiaries, they have standing to assert their claims directly against the Defendants or, alternatively, to bring the suit on the Fund's behalf. See Am. Compl. ¶ 118, at 38. The Court concludes that, because the Amended Complaint does not sufficiently allege any injury-in-fact fairly traceable to the Defendants' conduct or redressable by the Court, the Plaintiffs' claims fail to meet the requirements of Article III standing.

Where standing is placed at issue, the proper inquiry is "whether the person whose standing

is challenged is a proper party to request an adjudication of a particular issue, and not whether the issue itself is justiciable." Flast v. Cohen, 392 U.S. 83, 100 (1968). The burden is on the plaintiff to clearly "allege facts demonstrating that [they are] a proper party to invoke judicial resolution of the dispute." United States v. Hays, 515 U.S. 737, 743 (1995)(citations omitted). The Supreme Court of the United States has established the minimal constitutional requirements for standing, which include three essential elements. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). First, the plaintiff must have suffered an "injury in fact." Lujan v. Defenders of Wildlife, 504 U.S. at 560. An "injury in fact" is an invasion of a legally protected interest which is (i) concrete and particularized, Allen v. Wright, 468 U.S. 737, 756 (1984); Warth v. Seldin, 422 U.S. 490, 508 (1975); Sierra Club v. Morton, 405 U.S. 727, 740-741 (1972); and (ii) "actual or imminent, not 'conjectural' or 'hypothetical,'" Whitmore v. Arkansas, 495 U.S. 149, 155 (1990) (quoting Los Angeles v. Lyons, 461 U.S. 95 (1983)). Next, "there must be a causal connection between the injury and the conduct complained of -- the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court.'" Lujan v. Defenders of Wildlife, 504 U.S. at 560 (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41-42 (1976)). Finally, it must be "likely," and not merely "speculative," that the alleged injury will be "redressed by a favorable decision." Simon v. E. Ky. Wildlife 426 U.S. at 38, 43.

To bring a suit on the Fund's behalf in a representative capacity, the Plaintiffs must establish the same Article III requirements that they would if suing as individuals.[12] See Loren v. Blue Cross

---

[12]It is not clear from the case law whether these courts consider this third-party standing. In any event, the cases establish that it does not matter in what capacity the plaintiffs sue, Article III standing must be established.

& Blue Shield of Mich., 505 F.3d 598, 608-09 (6th Cir. 2007)(applying Article III standing requirements to a party suing on behalf of an ERISA plan); Glanton v. Advancepcs, Inc., 465 F.3d 1123, 1127 (9th Cir. 2006)("We have no quarrel with this proposition [that Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA"), beneficiaries sue on behalf of the plan] - so long as plaintiffs otherwise meet the requirements for Article III standing."). Even if suing on the Fund's behalf, Article III's case and controversy requirement demands that  the plaintiffs make an independent showing of an injury in fact, causation, and redressability. See Harley v. Minn. Mining & Mfg. Co., 284 F.3d 901, 908 (8th Cir. 2002)("Thus, the limits on judicial power imposed by Article III counsel against permitting participants or beneficiaries who have suffered *no* injury in fact from suing to enforce ERISA fiduciary duties on behalf of the Plan.").

The injury-in-fact requirement is satisfied differently depending on whether the plaintiff seeks retrospective or prospective relief. See City of L.A. v. Lyons, 461 U.S. 95, 101-02 (1983). A plaintiff seeking retrospective relief satisfies the injury-in-fact requirement if she suffered a past injury that is concrete and particularized. See Adarand Constructors Inc. v. Pena, 515 U.S. 200, 210-11 (1995). To seek prospective relief, a plaintiff must be suffering from a continuing injury or be under a real and immediate threat of being injured in the future. See City of L.A. v. Lyons, 461 U.S. at 101-02. The threatened injury must be "certainly impending." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 190 (2000). The Plaintiffs seek both retrospective and prospective relief. See Am. Compl. at 60, 61.

## A. THE PLAINTIFFS DO NOT HAVE STANDING TO SUE FOR RETROSPECTIVE RELIEF.

To bring a claim on behalf of themselves, as individuals, the Plaintiffs must establish that they have suffered an injury-in-fact. See Lujan v. Defenders of Wildlife, 504 U.S. at 560 (stating

that standing requires an injury-in-fact).  To bring a claim on the Fund's behalf the Plaintiffs must also establish that the minimum Article III constitutional standing requirements are met.  See In re Novak, 92 F. App'x. at 683 (citing Powers v. Ohio, 499 U.S. at 411); Harley v. Minn. Mining & Mfg. Co., 284 F.3d at 908.

Although the Plaintiffs have alleged eighteen causes of action, they allege the same injuries for each.  The Plaintiffs, in their Amended Complaint, allege that the Fund members face contribution increases, that there are diminished services and tax increases,[13] that there will be an increase in the number of years that employees must work to achieve benefits and that the current balance plus projected returns will be insufficient to meet anticipated obligations.  See Am Compl. ¶¶ 3, 10, 144, 151, 154, 161, 165, 169, 173, 186, 193, at 1-3, 45-49, 54, 56.   The Plaintiffs go on to assert that "these problems are exacerbated by the fraudulent conduct alleged."  Am. Compl. ¶ 3, at 2.  The Plaintiffs contend that these injury allegations satisfy the requirements of constitutional standing.  See Response at 30.  The ERB Defendants assert that the Plaintiffs' alleged injuries are not concrete or causally related to the alleged actions of the Defendants.    See Individual State Def.s' Mem. Mot. to Dismiss at 10 (Doc. 42).   They further contend that there is "no allegation or showing in this Complaint that either Plaintiffs' defined benefit pension or that of any potential class member will not be paid in full."  Individual State Def.s' Mem. Mot. to Dismiss at 8.  The ERB Defendants also report that increases in employee ERA Fund contributions will be the same as increases in employee contributions to the PERA Fund, which did not invest in the VFT.[14]  See

---

[13]While the Plaintiffs assert that they will experience diminished services and tax increases because of the VFT investment, the Plaintiffs do not explain to what services they are referring or what taxes will increase.

[14]The ERB Defendants raised rule 12(b)(1) in the Memorandum in Support of their Motion to Dismiss, and the Plaintiffs and the Defendants argued and briefed the issue.  See Independent

Individual State Def.s' Mem. Mot. to Dismiss at 10; Tr. at  60:12-19 (Casey).

### 1. The Plaintiffs' Allegations of Tax Increases and Diminished Services Do Not Establish an Injury in Fact Fairly Traceable to the Defendants.

The Plaintiffs' first allegations of an injury are that they face tax rate increases and service decreases as a result of the ERB Defendants' conduct.  Neither the Plaintiffs' Amended Complaint nor the Plaintiffs' Response explains how these tax increases are imposed or what services were diminished.  It is not known whether the Plaintiffs refer to taxes that they pay individually or taxes that the Fund pays.  The Plaintiffs do not indicate whether they are complaining of a decrease in quality or quantity of services.  Additionally, they do not allege how the VFT investment loss caused taxes to increase or services to decrease.  These blanket assertions of an injury and causation without more are insufficient to establish standing; the Court lacks important information and allegations. See Hackford v. Babbitt, 14 F.3d 1457, 1465 (10th Cir. 1994)(explaining that when reviewing jurisdictional motion to dismiss, "we are not bound by conclusory allegations, unwarranted inferences, or legal conclusions");United Transp. Union v. Interstate Commerce Comm'n, 891 F.2d 908, 914 (D.C. Cir. 1989)("This indeterminancy is enough to defeat petitioner's standing."); Munoz-Mendoz v. Pierce, 711 F.2d 421, 425 (1st Cir. 1983)(explaining that, where an injury-in-fact is not obvious, "the plaintiff must plead their existence in his complaint with a fair degree of

---

State Def.s' Mot. to Dismiss ¶ 1, at 1; Individual State Def.s' Mem. Mot. to Dismiss at 5; Individual State Def.s' Reply at 4-13; Response at 4-11.  Courts have held that, when a motion to dismiss for lack of subject-matter jurisdiction involves an attack on jurisdictional facts, there is no presumption of truthfulness and the court has wide discretion to consider documents and evidence other than the complaint.  See New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995); Williamson v. Tucker, 645 F.2d 404, 412-13 (5th Cir. 1981); Plant Oil Powered Diesel Fuel Sys. Inc. v. Exxon Mobil Corp., No. 11-0103, 2011 WL 3510755, at *10 (D.N.M. July 2011)(Browning, J.).  Here the ERB Defendants appear to be attacking both the sufficiency of the Plaintiffs' jurisdictional allegations and the actual facts upon which subject-matter jurisdiction is based.  See Individual Def.s' Reply at 4; Individual State Def.s' Mem. Mot. to Dismiss at 10.

specificity"(citations omitted)).

Also unknown is what government body determines the tax rate of which the Plaintiffs'
complain or what body determines what services the Plaintiffs' receive.  If a body like the New
Mexico Legislature makes these decisions, then the Plaintiffs have failed to sufficiently allege
causation and redressability because they do not trace the legislative changes to the VFT investment
and because to undo those changes would require legislative involvement.  When dealing with a
large political body, it is difficult to trace increased taxes or diminished services to the loss of a
single investment, which represented a mere .5% of the total worth of the Fund.  See League of
United Latin Am. Citizens, N. M. (LULAC) v. Ferrera, No. 10-0946, 2011 WL 2433260, at *12
(D.N.M. May 31, 2011)(Browning, J.)("The endless number of diverse factors potentially
contributing to the outcome of state presidential primary elections, caucuses, and conventions
forecloses any reliable conclusion that voter support of a candidate is 'fairly traceable' to any
particular event."(citing Winpisinger v. Watson, 628 F.2d 133, 139 (D.C. Cir. 1980))).  Moreover,
if an outside body made the changes to tax rates and service levels, it is unclear that granting the
Plaintiffs' retrospective relief will alter either the tax rate or the amount of services.  See Daimler
Chrysler Corp. v. Cuno, 547 U.S. 332, 344 (2006); LULAC v. Ferrera, 2011 WL 2433260, at *14
(explaining that a judgment in favor of the plaintiff would not likely ameliorate his alleged injury
because of the involvement of third parties).

    **2.**    **The Plaintiffs' Allegations that They Face Increases in the Number of Years New Employees Must Work to Be Entitled to Full Retirement Benefits and Increased Contribution Levels are Insufficient to Establish an Injury in Fact Fairly Traceable to the Defendants.**

The Plaintiffs next assert that they are injured because new members face changed
requirements in the number of years that they must work before their pensions will vest and because

current members face a temporary increase in required employee contributions to the Fund.  In 2009, the New Mexico Legislature amended the ERA and increasing the number of years that new employees must work to be eligible for retirement and temporarily increasing employee Fund contributions by 1.5%.  See N.M.S.A. 1978, §§  22-11-23.1, -21(A)(5).  This cannot be an injury to the Fund, but rather is an injury that the Plaintiffs are asserting on behalf of themselves and of the class.  The named Plaintiffs are not affected by this increase in retirement eligibility, because the named Plaintiffs were members before July 1, 2010, when the legislation became effective.  See N.M.S.A. 1978, § 22-11-23.1; Am. Compl. ¶¶ 8, 9, at 3.  The eligibility changes only affect a small subset of the alleged 95,000 member class.[15]  See N.M.S.A. 1978, § 22-11-23.1.  The increases in contribution levels, however, affect the class as a whole because the changes increased the contribution requirements of all Fund members.  See N.M.S.A. 1978, § 22-11-21(A)(5).  Both alleged injuries suffer from a lack of causation and redressability, because the Plaintiffs do not trace these legislative decisions to the VFT investment and because any redress would necessitate action by the New Mexico Legislature.

While these allegations may establish an injury, the Plaintiffs have not made sufficient allegations to infer that this increases in years worked before receiving full benefits or contribution levels is fairly traceable to the Defendants' acts and that the asked-for award will redress this injury. There must be a "substantial likelihood that the defendant's conduct caused plaintiff's injury in fact."  Habecker v. Town of Estes Park, Colo., 518 F.3d 1217, 1217 (10th Cir. 2008).  The Plaintiffs'

---

[15] It is not clear that members joining after July 1, 2010 would have an injury-in-fact, because they do not have a vested property right in the Fund until they have met the years of service requirements and levels of employee contributions the New Mexico Legislature set.  See Pierce v. State, 121 N.M. 212, 225-26, 910 P.2d 288, 301-02 (1995).  The Court, however, does not have to decide that issue, because the Plaintiffs cannot establish causation or redressability.

Amended Complaint offers little to connect these legislative acts to the alleged conduct of the Defendants.  See Am. Compl. ¶ 140, at 44 ("By the wrongful conduct alleged herein, the [Defendants] breached their fiduciary duties . . . which has caused and is causing substantial damages to them, including . . . increased payroll contributions, and a looming increase in the number of years new employees must work to be entitled to full retirement benefits.").  The Plaintiffs make no allegations about when the Legislature began to consider these amendments or that the debate centered around the VFT investment.  If the Fund had only invested in the VFT, perhaps then the Court could draw the causal line between the Defendants alleged actions in causing the loss and the actions of the Legislature.  The Fund, however, is an $8.5 billion pool of assets, and this investment of forty-million dollars represents only .5% of the Fund's total capital.  For the Court to say that such a relatively small loss caused the Legislature to respond with increased retirement eligibility requirements and contribution increases, the Court would have to engage in impermissible speculation about the Legislature's motivations.  See LULAC v. Ferrera, 2011 WL 2433260, at *11-12 (citing Winpisinger v. Watson, 628 F.2d 133, 139 (D.C. Cir. 1980)).

The Plaintiffs' Amended Complaint also undermines their contention that there is a direct causal link between the VFT investment and the Legislature's actions.  See Am. Compl. ¶ 3, at 1-2.  The Plaintiffs assert only that the VFT investment loss "exacerbated" problems that have been ongoing in "recent years." Am. Compl. ¶ 3, at 1-2.  That members of the Public Employees' Retirement Fund ("PERF") are experiencing these same age-of-retirement eligibility and contribution increases further undercuts any causal connection that might reasonably be inferred, because the PERF did not invest in the VFT.  See Individual State Def.s' Mem. Mot. to Dismiss at 10; N.M.S.A. 1978, §§ 10-11-26.2 to -26.5.  An allegation that the Defendants acted fraudulently and breached fiduciary duties, that the VFT investment happened, that the VFT investment was lost,

and that the Legislature amended retirement eligibility and contribution provisions is not enough to fairly trace the alleged injury to the alleged wrong. A "conclusory allegation, representing no more than a speculative inference" as to why the Legislature changed retirement eligibility and contribution requirements "is not sufficient to demonstrate causation." LULAC v. Ferrera, 2011 WL 2433260, at *13.

The Plaintiffs also encounter the same redressibility issue that arose with the alleged injury relating to tax increases and service decreases: the Legislature enacted the amendments. See N.M.S.A. 1978, § 22-11-23.1. The Legislature passed amendments to the ERA, and the relief the Court could grant would not redress the Plaintiffs' alleged injury, because altering the retirement eligibility and contribution requirement provisions also requires the Legislature to act. See Arakaki v. Lingle, 477 F.3d 1048, 1063 (9th Cir. 2007)("[T]he Plaintiffs' alleged injury is speculative if redress ultimately depends on how the legislature responds to the court's judgment."(citing DaimlerChrysler Corp. v. Cuno, 547 U.S. at 343-44)). Because redressing the Plaintiffs' alleged injury of increased retirement age and contribution requirements requires a third party's actions, the increase in retirement eligibility and contribution requirements cannot establish standing.

**3.      The Plaintiffs' Allegations that They were Injured by the Loss of Principal, Lost Income, and Fees and Expenses Do Not Establish an Injury in Fact Fairly Traceable to the Defendants.**

The Plaintiffs allege that the loss of the forty-million dollar VFT investment, the lost income that the money could have generated elsewhere, and the fees and expenses associated with the transaction, injured them. The ERB Defendants argue that, without a threat to the Fund members' defined benefit, there is no "invasion of a legally protected interest," regardless of how "'risky' or 'leveraged' Plaintiffs allege the Vanderbilt Investment was." Individual State Def.s' Mem. Mot. to Dismiss at 8.

The Fund is a defined benefit plan.  See N.M.S.A. 1978, § 22-11-30 (for example, the ERA defines benefits under subsection (A): "Retirement benefits for a member retired pursuant to the Educational Retirement Act on or before June 30, 1967 shall be paid monthly and shall be one-twelfth of a sum equal to one and one-half percent of the first four thousand dollars ($4,000) of the member's average annual salary and one percent of the remainder of the member's average annual salary multiplied by the number of years of the member's total service credit.").  The Supreme Court, when analyzing a defined benefit plan under ERISA, has held that "no plan member has a claim to any particular asset that composes part of the plan's general asset pool."  Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 441 (1999). Although these cases deal with ERISA plans, the reasoning remains sound when applied to a defined benefit pension fund or trust because the cases involve beneficiaries attempting to sue on behalf of a defined benefit plan.  See Scanlon v. Eisenberg, No. 09-5026, 2010 WL 4065628, at *3 (N.D. Ill. Oct. 14, 2010)(applying the reasoning of ERISA-based Harley v. Minn. Mining & Mfg. Co., 284 F.3d at 905-08, to a case involving a trust and stating "the reasoning of the Court on the standing issue was the same as we believe to be applicable here.").  To establish an injury-in-fact when suing, ERISA beneficiaries must show that the losses caused by the fiduciary breach were so grievous that the "remaining pool of assets will be inadequate to pay for the plan's outstanding liabilities."  New Orleans Pensioner's Ass'n v. Bd. of Trs. of New Orleans Emp'rs Int'l Longshoreman's Ass'n AFL-CIO Pension Fund, No. 07-6349, 2008 WL 215654, at *4, (E.D. La. Jan. 24, 2008)(Feldman, J.)(holding that a plaintiff may be able to establish an injury-in-fact "by including well-pleaded allegations that imprudent or disloyal conduct created an appreciable risk that a fund will be unable to satisfy existing liabilities.").  Phrased another way, the plaintiff-beneficiary must show that the loss "threatened the financial integrity of the entire defined benefit plan."  Bendaoud v. Hodgson, 578 F.Supp. 2d 257, 264 (D.

-38-

Mass. 2008)(Gertner, J.)(citing Massachusetts Mutual Life Ins. Co. v. Russell, 473 U.S. at 142-43).

The United States Court Appeals for the Second Circuit, in Fin. Inst. Ret. Fund v. Office of Thrift Supervision, 964 F.2d 142 (2d Cir. 1992), appears to have reached a different result from the weight of authority. Compare Harley v. Minn. Mining & Mfg. Co., 284 F.3d at 905-08 and Loren v. Blue Cross & Blue Shield of Mich., 505 F.3d 598, 608 (6th Cir. 2007), with Fin. Inst. Ret. Fund v. Office of Thrift Supervision, 964 F.2d at 147. In that case, the Second Circuit disagreed with a district court's alternative holding that an ERISA plaintiff lacked standing because the potential risk of loss to plan assets was too remote and held that a violation of fiduciary duties was enough to "injure." Fin. Inst. Ret. Fund v. Office of Thrift Supervision, 964 F.2d at 149. The Second Circuit's opinion, while purporting to deal with Article III standing, focused more pointedly on statutory language and the "broad view of participant standing under ERISA," rather than on minimum constitutional requirements. Fin. Inst. Ret. Fund v. Office of Thrift Supervision, 964 F.2d at 149. In a later case, the Second Circuit seemed to recharacterize its opinion in Fin. Inst. Ret. Fund v. Office of Thrift Supervision as requiring a plaintiff to allege some injury or deprivation as a result of a breach of duty to establish an injury in fact; although the Second Circuit continued to maintain that plaintiffs have standing to sue where they are "*theoretically* injured by the funds' mismanagement of assets, some of which *could* be theirs." See Kendall v. Emps.' Ret. Plan of Avon, 561 F.3d 112, 121 (2d Cir. 2009)(emphasis added). Additionally, the Second Circuit decided Fin. Inst. Ret. Fund v. Office of Thrift Supervision in May 1992, one month before the Supreme Court clarified and more clearly articulated Article III standing requirements in Lujan v. Defenders of Wildlife, 504 U.S. 555. See Malkani v. Clark Consulting, Inc., 727 F.Supp.2d 444, 451 n.7 (D.Md. 2010)(distinguishing Fin. Inst. Ret. Fund. v. Office of Thrift Supervision on this basis and holding that there is no injury in fact where a plaintiff alleges that a plan will be underfunded, but

fails to alleged that the underfunding is imminent).  In any case, the Court declines to follow the Second Circuit's more liberal standing  requirements, because the Court believes that the Second Circuits position is not in line with the Supreme Court's and Tenth Circuit's requirements.

Courts outside of the Second Circuit use underfunding as the measure of whether plan beneficiaries have suffered an injury in fact, because it is only when the total amount of funding falls below the threshhold level necessary to pay beneficiaries that beneficiaries' benefits are endangered. If, after an investment loss, a Fund or plan is still operating at or above required funding levels to pay beneficiaries, then the investment loss did no constitutional harm to the beneficiaries because, whether the Fund experiences a surplus or not, a beneficiary will only ever receive the benefits the plan originally defined.  See Hughes Aircraft Co. v. Jacobson, 525 U.S. at 439-40.  The Plaintiffs do not allege, and cannot demonstrate, that the loss of principal, loss of income, or fees and expenses caused any particularized injury to *them*, which is necessary whether they bring the suit on behalf of themselves or the Fund, unless they can show that their interest in the fund, their set benefits, are threatened.  See New Orleans Pensioner's Ass'n v. Bd. of Trs. of New Orleans Emp'rs Int'l Longshoreman's Ass'n AFL-CIO Pension Fund, 2008 WL 215654, at *4.  Underfunding implicates that interest, and it is only when there are allegations that a substantial risk of underfunding exists that  plaintiffs can establish an injury in fact.  Generally, without an allegation that the Defendants' conduct caused underfunding, the increased costs and losses suffered by the Plaintiffs are too speculative to establish a "factual showing of perceptible harm."  Bear Lodge Multiple Use Ass'n v. Babbitt, 175 F.3d 814, 821 (10th Cir. 1999).  See Loren v. Blue Cross & Blue Shield of Mich., 505 F.3d at 608 (holding that participants' allegations that they incurred "greater costs than they would otherwise have incurred if BCBSM had not violated its fiduciary duties" was neither concrete nor particularized injury in fact).

-40-

The Plaintiffs make an allegation that "in recent years" the Fund has been underfunded.  Am. Compl. ¶ 3, at 1-2.  What is missing from this allegation, however, is an allegation that the Fund is currently underfunded or that the VFT investment caused underfunding.  The Amended Complaint asserts that the Fund has "in recent years" been underfunded, but fails to assert that the Fund is currently underfunded.   Whether the Fund is currently underfunded is essential information, especially given the steps that the Legislature has taken to increase the money in the Fund.  The Legislature has increased the contributions that members are paying into the Fund and prolonged the period of employment required before members are eligible for benefits.  See Am. Compl. ¶ 3, at 1-2.  The Plaintiffs suggest in their Amended Complaint that these measures were instituted to cover the Fund's prior "shortcomings"; if these measures covered the Fund's shortcomings, then the Fund would no longer be underfunded and the VFT investment would have caused the Plaintiffs no injury.  The Plaintiffs' must plead that the threat of underfunding is "actual and imminent" to have an injury-in-fact.  Malkani v. Clark Consulting Inc. 727 F.Supp.2d at 451 ("Malkani's argument that the Plan will become underfunded . . . also fails to allege an 'actual and imminent' injury, as Malkani did not claim that this potential underfunding is imminent.").  The Plaintiffs' allege that based on past shortfalls, there is a substantial risk that the Fund "will" be unable to satisfy it's obligations.  See Am. Compl. ¶ 10, at 3.  This allegation alone, however, does not satisfy the imminence standard that an injury be "certainly impending," because the Plaintiffs fail to allege that the Legislature's actions were insufficient to cover the Fund.  Lujan v. Defender's of Wildlife, 504 U.S. at 564 n.2.

The Plaintiffs' Amended Complaint also fails to sufficiently allege causation.  The Plaintiffs contend only that the VFT investment "exacerbated" problems that the Fund already faced; they do not allege that the VFT investment caused the Fund to be underfunded or the impact that the

investment loss had on those problems.  The Plaintiffs assert that there is a substantial risk that "due to such shortfalls the Fund will have insufficient assets to satisfy its obligations to its Beneficiaries," but connect this risk only to the shortfalls that the Fund already experienced and which the Legislature has apparently addressed.  Am. Compl. ¶ 10, at 3.  The forty-million dollar VFT investment represented only about .5% of the total value of the $8.5 billion fund.  See Am. Compl. ¶ 26, at 8.  To establish causation, the Plaintiffs' must link that .5% loss to an actual and imminent threat of underfunding.  See Habecker v. Town of Estes Park, Colo., 518 F.3d at 1225 ("If 'speculative inferences are necessary to connect [a plaintiff's] injury to the challenged action,' this [causal] burden has not been met.").  Where the cause of alleged underfunding is unclear and multi-faceted, the Plaintiffs must make some allegation that connects the VFT investment to the risk that their benefits will not be paid.  Stating that the VFT investment and the Defendants' actions "exacerbated" already existing problems is not sufficient to establish this causal connection.

The Plaintiffs' general allegations of a potential injury, which requires conjectural inferences by the Court, is too speculative to establish an injury in fact.  Not all investments will work out, and some investments may certainly cause underfunding, but the Plaintiffs must allege that connection. Because the Plaintiffs do not have an injury in fact fairly traceable to the VFT investment, they lack standing to bring their claims.

## B.   THE PLAINTIFFS DO NOT HAVE STANDING TO SUE FOR PROSPECTIVE RELIEF.

In their Prayer for Relief, the Plaintiffs' request various forms of injunctive relief.  See Am. Compl. at 60-61.  To seek prospective relief, a plaintiff must be "suffering a continuing injury or be under a real and immediate threat of being injured in the future."  Tandy v. City of Wichita, 380 F.3d 1277, 1283 (10th Cir. 2004).  "The threatened injury must be 'certainly impending' and not

-42-

merely speculative." Tandy v. City of Witchita, 380 F.3d at 1284 (citing Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. at 190). The Plaintiffs' alleged "continuing" injuries -- diminished services, tax increases, an increase in the number of years that employees must work to achieve benefits, increased contributions, loss of principal, fees, and expenses, and loss of income-- suffer from the same causation and redressability defects addressed above. See Am Compl. ¶¶ 3, 10, 144, 151, 154, 161, 165, 169, 173, 186, 193, at 1-3, 45-49, 54, 56; Response at 30. The Court will therefore focus on whether the Plaintiffs face a "real and immediate threat of being injured in the future." Tandy v. City of Wichita, 380 F.3d at 1283.

The Plaintiffs request injunctive relief to prohibit: (i) the wrongful conduct alleged in the Amended Complaint, including "pay to play" practices; (ii) to remove the ERB Defendants from the ERB; and (iii) to require the ERB to adopt standards for investment practices. See Am. Compl. at 60-61. The Plaintiffs appear to be alleging that they face a threat of repeated injury from pay-to-play schemes and breaches of fiduciary duties. None of the ERB Defendants are currently on the ERB, however. See Individual State Def.s' Reply at 15 n.13. To credit the Plaintiffs' allegations that they face the threat of repeated injury, the Court would have to assume that the *new* ERB Trustees would act in a manner inconsistent with their fiduciary duties and contrary to the Fund's interests. This allegation is speculative. See United Transp. Union v. Interstate Commerce Comm'n, 891 F.3d 908, 914 (D.C. 1989)("If this allegation is aimed at the likelihood that an officer or director will act *contrary* to the interests of one of the carriers on whose board he sits, it is not just speculative, it is rather far-fetched."). Past injury does not automatically establish that there is a risk of repeated injury. See Winness v. Yocom, 433 F.3d 727, 735 (10th Cir. 2006). Here, for the current ERB trustees to repeat the Defendants' alleged conduct, there would need to be another politically connected individual, who would use his connections to get before the ERB an

investment that would otherwise not be there, the ERB would have violate its fiduciary duties of investigating the investment, and the investment would have to result in a loss.  Such an situation depends on "a string of actions the occurrence of which is merely speculative."  <u>Fieger v. Mich. Supreme Court</u>, 553 F.3d 955, 967 (6th Cir. 2009)(explaining why an attorney's fear of future court sanctions was not a real and immediate threat of future injury sufficient to confer standing).  This scenario seems particularly unlikely given that, after the 2010 election, the Richardson administration ended, a new party came to power, and new people came on the scene.  While there is always the potential for corruption, it is speculative that the new people in the near future will use the same, recently exposed tactics.  Accordingly, the Plaintiffs fail to sufficiently allege either a continuing injury or a real and immediate threat of a repeated injury, and they therefore lack standing to bring this suit for injunctive relief.

### C. THE COURT WILL NOT ALLOW THE PLAINTIFFS TO AMEND BECAUSE IT WOULD BE FUTILE AND WILL AND REMAND TO STATE COURT FOR LACK OF STANDING.

Because the Plaintiffs have not sufficiently alleged an injury in fact fairly traceable to the Defendants' actions or that a judgment in their favor would likely ameliorate their alleged injuries, the Plaintiffs have failed to establish that they have Article III standing to assert their claims.  <u>See</u> <u>FW/PBS v. City of Dallas</u>, 493 U.S. 215, 231 (1990)(explaining that the plaintiff must "allege . . . facts essential to show jurisdiction.  If they fail to make the necessary allegations, they have no standing.").  Although the Plaintiffs offered to re-plead many of the alleged deficiencies in their Amended Complaint, the Plaintiffs did not offer any ways that they could address the jurisdictional flaws[16] and the Court does not believe that the Plaintiffs could reasonably offer any.  It appears, from

---

[16]In their Response, the Plaintiffs made several offers to re-plead facts and make new allegations, but do not offer to any new information that would cure a standing deficiency.  To

all indications, that amendment would be futile.

A district court is not required to solicit another amended complaint where a party has not offered to re-plead a deficiency in the complaint.  See Szymanski v. Benton, 289 F. App'x 315, 321 (10th Cir. 2008); United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 241-42 (1st Cir. 2004)( "Absent exceptional circumstances, a district court has not obligation to invite a plaintiff to amend his or her complaint when the plaintiff has not sought such amendment.") *abrogated on other grounds by* United States ex rel. Gagne v. City of Worcester, 565 F.3d 40 (1st Cir. 2009).  In fairness to the Plaintiffs, however, the Court, sua sponte, will determine whether the Plaintiffs could amend the Amended Complaint to cure the jurisdictional defects.  See Burch v. Don Jordan, No. 11-3018, 2011 WL 4402117, at *2 n.2 (10th Cir. Sept. 22, 2011)("The district court noted, however, that he did not seek leave to amend his complaint, and any attempt to do so would have been futile, given the absence of additional facts to support his claims.").

Under rule 15(a) of the Federal Rules of Civil Procedure, the court should freely grant leave to amend a pleading where justice so requires.  See Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."); In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D.

---

strengthen their claims of demand futility the Plaintiffs offer to include information from the deposition of ERB trustee Dr. Pauline Turner, to re-plead that Dr. Vora reports to Brown, and to plead additional information about Lewis showing that he has complemented Brown in the press. See Response at 13 n.21, n.23, 14 n.25.  The Plaintiffs assert that, if offered the chance to re-plead, they would plead direct claims against certain ERB Defendants under § 58-13C-509 of the 1986 N.M.S.A. and § 10b of the Exchange Act.  See Response at 27.  The Plaintiffs offer to amend the Amended Complaint, to state that Malott received a favorable loan from the Correra family.   See Response at 32, 46.  At the October 29, 2010, the Plaintiffs offered to re-plead their allegations of demand futility.  See Tr. 75:19-24 (Cuneo)("Now in terms of the issues dealing with the substance of the demand . . . I think that our Complaint adequately states futility of demand.  And if the Court is inclined not to agree with that, we'd like an opportunity to replead.").  During the hearing, the Court and the Plaintiffs engaged in a lengthy discussion of standing, and at no point did the Plaintiffs offer to re-plead jurisdictional facts or suggest that there was anything to add.  See Tr. 47:1-56:25 (Cuneo, Court).

571, 579-80 (D.N.M. 2010)(Browning, J.); Youell v. FNU Russell, No. 04-1396, 2007 WL 709041, at *1-2 (D.N.M. Feb.14, 2007)(Browning, J.). The Tenth Circuit "has determined that district courts should grant leave to amend when doing so would yield a meritorious claim." Burleson v. ENMR-Plateau Tel. Co-op., No. 05-0073, 2005 WL 3664299, at *2 (D.N.M. Sept. 23, 2005)(Browning, J.)(citing Curley v. Perry, 246 F.3d 1278, 1284 (10th Cir. 2001)). A court should deny leave to amend under rule 15(a), however, where "amendment would be futile." Jefferson Cnty. Sch. Dist. v. Moody's Investor's Serv., 175 F.3d 848, 859 (10th Cir. 1999). See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80. "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal." Bradley v. Val-Mejias, 379 F.3d 892, 901 (10th Cir. 2004)(citing Jefferson Cnty. Sch. Dist. v. Moody's Investor's Servs., 175 F.3d at 859).

A second amendment of the Plaintiffs' Complaint would be futile, because the Plaintiffs cannot make any allegations that would cure the redressability issues resulting from legislative involvement or make any allegations that would fairly trace any alleged underfunding to the VFT investment. See Brereton v. Bountiful City Corp., 434 F.3d 1213, 1219 (10th Cir. 2006)("Mr. Brereton's failure to show that his complaint could be amended to establish standing . . . justif[ies] the denial of leave to amend his complaint."). The Plaintiffs cannot overcome the defects in redressability related to their alleged increased tax, diminished service, increased contribution and increased retirement eligibility injuries, because these alleged injuries all require the involvement of a third party not before the Court -- the New Mexico Legislature. Because the Legislature enacted these changes, even if the Court awarded the Plaintiffs some relief, their injury would not be redressed absent the Legislature's independent action. See LULAC v. Ferrera, 2011 WL 2433260, at *14 (holding that the plaintiff could not amend his complaint, because he did not seek to amend and, did not offer any ways that he could address the fatal jurisdictional flaws in his case,

and because amendment would be futile).  Amendment to address underfunding causation would also be futile, because any allegation attempting to trace the Fund's alleged underfunding to the VFT investment would be speculative given that the VFT investment only amounted to .5% of the total worth of the $8.5 billion Fund, that the Plaintiffs alleged that the Fund has generally experienced underfunding in recent years, and that the economic climate rapidly deteriorated in this same time period.  The "endless number of diverse factors potentially contributing" to any underfunding the Fund might be experiencing -- if the Plaintiffs replead facts suggesting the Fund is underfunded -- "forecloses any reliable conclusion" that the Plaintiffs could allege additional information that their injury is traceable to the Defendants' conduct given the small percentage of the Fund's total value that the VFT investment represents.  Winpisinger v. Watson, 628 F.2d at 139.  The Plaintiffs cannot make their allegations of underfunding causation anything less than speculative or conjectural, because of the multi-faceted nature of the Fund, the economic climate in which the VFT investment took place, and the relatively modest percentage of the total portfolio that the VFT investment represents.  See Simon v. E. Ky. Welfare Rights Org., 426 U.S. at 42 ("[I]t does not follow from the allegation and its corollary that the denial of access to hospital services in fact results from petitioners' new Ruling . . . . [I]t is purely speculative whether the denials of service specified in the complaint fairly can be traced to petitioners[] . . .").  These considerations demonstrate that granting leave to amend would not yield a meritorious claim; accordingly, the Court will not allow the Plaintiffs to amend their Amended Complaint.  See Burleson v. ENMR-Plateau Tel. Co-op, 2005 WL 3664299, at *2.

The Court will also remand the proceeding to the New Mexico state courts.  The Tenth Circuit has held that, when lack of standing divests a district court of subject-matter jurisdiction over a case removed to federal court, the matter should be remanded to state court pursuant to 28 U.S.C.

§ 1447(c).  See Jepsen v. Texaco, Inc., 68 F.3d 483, 483 (10th Cir. 1995)("Lack of standing divests the court of subject matter jurisdiction, and therefore, upon determining that Mr. Jepsen lacked standing to bring his suit, the court should have remanded the matter to state court pursuant to § 1447(c).").  Section 1447(c) states: "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case *shall* be remanded."  28 U.S.C. § 1447(c) (emphasis added).  This remand leads to the unusual situation where the New Mexico courts will "have to rule on federal questions that the federal courts presently lack the power to address, but 'the state courts are not bound by the limitations of a case or controversy or other federal rules of justiciability even when they address issues of federal law.'"  City of Kansas, Mo. v. Yarco Co., Inc., 625 F.3d 1038, 1041 (8th Cir. 2010)(quoting ASARCO Inc. v. Kadish, 490 U.S. 605, 617 (1989)); Smith v. Wisconsin Dept. of Agric., Trade and Consumer Protection, 23 F.3d 1134, 1142 (7th Cir. 1994)("[S]ome consider it odd that a state court might have the authority to hear a federal constitutional claim in a setting where a federal court would not . . . ," but "§ 1447(c) says that a case removed to federal court 'shall be remanded' to the state court if it is discovered that the federal court lacks subject matter jurisdiction.").  It may be that the remand of federal claims will not make any difference, because the state may adopt the Court's standing analysis.  Moreover, if they do not like the state court's disposition of the federal claims, there is resort to the discretionary jurisdiction of the Supreme Court of the United States; hence, federal court review is not entirely foreclosed.  See ASARCO Inc. v. Kadish, 490 U.S. at 621 ("[O]ur prior decisions recogniz[e] that the state courts are not bound by Article III and yet have within their power and proper role to render binding judgments on issues of federal law, subject only to review by this Court.").  In any case, as a court of Congressionally and constitutionally limited jurisdiction, the Court has little discretion on the matter and must follow what Congress and the Constitution have determined.

-48-

Because the Court will remand all the Plaintiffs' claims on jurisdictional grounds, it need not address the substance of the Defendants' motions to dismiss the claims on other grounds. <u>See</u> <u>United States v. Lion</u>, 94 F. App'x 808, 809-10 (10th Cir. 2004)("Because we conclude that we lack jurisdiction over this appeal, we need not reach the merits of the district court's denial of Leon's motion to dismiss."); <u>Schwob v. Standard Ins. Co.</u>, 37 F. App'x 465, 469 (10th Cir. 2002)("We need not address the issues raised on appeal by plaintiff because we hold that the district court erred by failing to dismiss plaintiff's complaint sua sponte for lack of subject matter jurisdiction based on the doctrine of ripeness."). Accordingly, the Court will remand the case to state court for lack of Article III standing.

## II.    THE COURT NEED NOT DECIDE WHETHER THE FATA STATUTORILY BARS THIS SUIT.

The Vanderbilt Defendants contend that the first-to-file provision in the FATA operates to preclude this lawsuit as an impermissible copy-cat suit. The relevant provision states: "When a person brings an action pursuant to this section, no person other than the attorney general on behalf of the state may intervene or bring a related action based on the facts underlying the pending action." N.M.S.A. 1978, § 44-9-5E. In the federal system, the first-to-file rule has been construed as a "jurisdictional limit on the courts' power to hear certain duplicative qui tam suits." <u>Grynberg v.</u> <u>Koch Gateway Pipeline Co.</u>, 390 F.3d at 1278 (citing <u>United States ex rel. Lujan v. Hughes Aircraft</u> <u>Co.</u>, 243 F.3d 1181, 1183 (9th Cir. 2001) and <u>United States ex rel. Poteet v. Medtronic, Inc.</u>, 552 F.3d 503, 516 (6th Cir. 2009)).

It is undisputed that Foy initiated a FATA action before the Plaintiffs filed this case. It is also apparent that this action is based on many of the same underlying facts as the original <u>Foy</u>

Complaint.[17]  Compare Amended Complaint ¶¶ 53-87, at 15-27 with Foy Complaint ¶¶ 46-74, at 9-21, filed July 14, 2008 (Doc. 36, Ex. I).  Since the filing of the Foy complaint, the New Mexico Attorney General intervened in the Foy action.

That said, all of the conduct giving rise to the causes of action in Plaintiff's Amended Complaint occurred before the FATA's effective date of July 1, 2007.  See generally Amended Complaint ¶¶ 53-87, at 15-27.  Moreover, the New Mexico district court has already determined that, pursuant to the *ex post facto* clause of the United States Constitution, the FATA cannot apply retroactively to conduct occurring before July 1, 2007, because its remedies are punitive.  See Letter to the Court from Andrew Schultz ¶ 3, at 1 (Doc. 100).  Foy sought to take an interlocutory appeal of that decision, but the Court of Appeals of New Mexico denied the appeal.  See Tr. at 88:19-21.  Because the FATA did not exist at the time the acts forming the basis of the allegations in the Foy Complaint occurred, the state court action is proceeding only upon post-enactment conduct.

Because the Court does not have jurisdiction over the Plaintiffs' claims and is remanding the case to state court, the Court need not, and should not, decide whether the FATA applies only to post-enactment conduct.  The Court recognizes, however, that New Mexico follows the general rule that statutes apply prospectively unless the Legislature manifests a clear intent to the contrary.  See Andrew v. Schlumberger Tech. Co., 2011 WL 3934002, *5 (D.N.M. Aug. 24, 2011)(Browning, J.); Gallegos v. Pueblo of Tesuque, 132 N.M. 207, 220, 46 P.3d 668, 681 (2002).  The New Mexico Code provides that statutes operate prospectively unless the statute "expressly provides otherwise."

---

[17] The Foy plaintiffs amended their complaint to allege some post-enactment conduct, and the Foy action has not been dismissed in its entirety, but is proceeding in some fashion.  See Foy Docket Sheet, Notice of Filing Concerning Violations of Section 44-9-3(A)(9) After July 1, 2007, filed October 18, 2010; Order permitting Plaintiffs to Proceed on Remaining Claims, filed February 7, 2011.

N.M.S.A. 1978, § 12-2A-8.  A retrospective law affects acts, transactions, or occurrences that happened before the law came into effect and impairs vested rights, requires new obligations, imposes new duties, or affixes new disabilities to past transactions.  See Coleman v. United Eng'rs and Constructors, Inc., 118 N.M. 47, 52, 878 P.2d 996, 1001 (1994); Howell v. Heim, 118 N.M. 500, 506, 882 P.2d 541, 547 (1994).  Here, the FATA, if applied retroactively, would impose new duties on plaintiffs to file an action first or lose the ability to sue on related conduct, and would create a new cause of action against defendants and attach new liabilities to the conduct.  See Lopez v. Maez, 98 N.M. 625, 632, 651 P.2d 1269, 1276 (1982).  It is a limitation "on the right to institute such an action."  Wall v. Gillet, 61 N.M. 256, 257, 298 P.2d 939, 940 (1956).  There is no indication in the statute that the New Mexico Legislature wished the FATA to apply retroactively.  See N.M.S.A. 1978., §§ 44-9-1 to -14. Where the "'Legislature evidenced no intention that the . . . act should be retroactive.  [The Court] must . . . give it only prospective effect in accordance with the general rule.'"  Andrew v. Schlumberger Tech. Co., 2011 WL 3934002, at *7 (citing Wilson v. New Mexico Lumber & Timber Co., 42 N.M. 438, 81 P.2d 61, 64 (1938)).  Nevertheless, the Court need not apply the presumption against retroactivity or decide whether the FATA does not apply to the pre-enactment conduct alleged in this suit.

Further, even if the FATA were in play, the Court might not find that it precludes this suit, because where the duplicative portion of a qui tam action is dismissed, the pending suit may no longer be a "related action" barred by the FATA.  The FATA is analogous to the Federal Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA").  Federal courts analyzing the preclusive effect of a jurisdictionally deficient complaint under the FCA have held that, "if the first complaint is either jurisdictionally precluded . . . or legally incapable of serving as a complaint . . . then it does not properly qualify as a 'pending action' brought under the FCA."  United States ex rel. Poteet v.

Medtronic, Inc., 552 F.3d at 516 (internal citations omitted).  See Campbell v. Redding Med. Ctr.,
421 F.3d 817, 825 (9th Cir. 2005)("The first-to-file rule of § 3730(b)(5) bars only subsequent
complaints filed after a complaint that fulfills the jurisdictional prerequisites of § 3730(e)(4).").  It
follows that, where the relevant portion of a pending first-filed action is jurisdictionally barred or
legally insufficient, the claims in a subsequently filed suit may proceed, because they are no longer
duplicative.  Consequently, the Court might not be able to say that the Foy action, in its current
form, is a "related action" and, therefore, find that the first-to-file provision in the FATA precludes
this suit.

### III.    THE COURT NEED NOT DECIDE THE PLAINTIFFS' FOURTEENTH AMENDMENT CLAIM.

The ERB Defendants contend that the Plaintiffs have failed to state a claim for a violation
of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 in Count III of the Amended Complaint,
because the Plaintiffs fail to mention § 1983, did not specify what aspect of the Fourteenth
Amendment has been violated, and leave the Defendants to guess about basic facts of the claim.  See
Individual State Def.'s Reply at 23-25.  The Plaintiffs respond that federal courts construe references
to constitutional claims as arising under 42 U.S.C. § 1983 and that they have stated actionable
claims under that provision.  See Response at 29-31.  The Plaintiffs appear to be bringing a Takings-
Clause claim and a procedural due-process claim under 42 U.S.C. § 1983 in Count III; however, the
Court need not rule and should not decide that issue.

When analyzing a motion to dismiss, a court must view the allegations in the light most
favorable to the non-moving party and draw all reasonable inferences in the plaintiff's favor.  See
Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006).  The Court, viewing the Amended
Complaint in this light and with the clarification provided by the Plaintiffs' Response to the ERB

Defendants' Motion to Dismiss that the claim should be viewed as arising under § 1983, would be inclined to treat the Amended Complaint as attempting to raise a cause of action under 42 U.S.C. § 1983.  See Bragg v. Chavez, No. 07-0343, 2007 U.S. Dist. LEXIS 97084, (D.N.M. August 2, 2007)(Browning, J.)("Bragg's briefing gives the Court confidence that he is attempting to bring a claim under 42 U.S.C. § 1983 for a violation of his federally protected rights.").  The Plaintiffs' failure to refer explicitly to § 1983 should not provide a basis for dismissal.

In enacting 42 U.S.C. § 1983, Congress created a cause of a action for individuals who have been deprived of federally protected rights by person acting under the color of state law.  See Meade v. Grubbs, 841 F.2d 1512, 1526 (10th Cir. 1988).  Both parties agree that the ERB Defendants are state actors who operate under the color of state law.  See Response at 29; Individual State Def.s' Reply at 19-20. The Plaintiffs and the ERB Defendants disagree, however, as to whether the Plaintiffs have adequately stated a violation of their constitutional rights.  The Plaintiffs' Amended Complaint states that the ERB Defendants violated the Fourteenth Amendment, incorporating the Fifth Amendment.  See Am. Compl. ¶ 147, at 46.  The Amended Complaint elaborates no more than this statement and the ERB Defendants assert that this "bare bones pleading" cannot meet the standard enunciated in Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).  Individual State Def.s' Reply at 24.  Although the Amended Complaint is not clear, it appears to the Court that the Plaintiffs' are asserting a Takings-Clause deprivation-of-property claim and a procedural-due-process claim.  See Wallace v. City of N. Las Vegas, No. 10-01660, 2011 WL 2971241, at *3 (D. Nev. July 20, 2011)(explaining that "[t]he Complaint is vague, but Plaintiff appears to assert a claim of excessive force" before the court analyzed the claim under the Fourth Amendment standard for excessive force); Mandell v. Goord, No. 06-1478, 2009 WL 3122029, at *14 (N.D.N.Y. September 29, 2009) ("Although somewhat unclear, it appears that the plaintiff also seeks redress for alleged

-53-

violations of his Fourteenth Amendment right to due process of law . . . [t]o successfully state a

claim under 42 U.S.C. § 1983 for denial of procedural due process . . . ."). The express reference to

the Fifth Amendment in the Amended Complaint and the Plaintiffs' reference to Supreme Court of

New Mexico's statements about compensation for a deprivation of property rights in Pierce v. State,

121 N.M. 212, 228, 910 P.2d 288, 304 (1995), would lead the Court to analyze Count III under the

Fifth Amendment Takings Clause.  The Plaintiffs also appear to be asserting a violation of their right

to procedural due-process through their references to the Assoc. of State Prosecutors v. Milwaukee

County, 544 N.W.2d 888 (Wis. 1996), and Dadisman v. Moore, 384 S.E.2d 816 (W. Va. 1989), two

state due-process cases.  See Response at 30.  Because the Plaintiffs make few allegations related

to their claims, it may be that the Plaintiffs fail to state a claim for a Takings Clause violation or a

procedural due-process violation in Count III.

### A.   THE PLAINTIFFS MAY HAVE FAILED TO STATE A CLAIM UNDER THE TAKINGS CLAUSE.

The Fifth Amendment's Takings Clause prevents the Legislature and other government

actors from depriving private persons of vested property rights except for public use and upon

payment of just compensation.  See U.S. Const. Amend. V.  The threshold question in a Takings

Clause claim is whether the plaintiff has a cognizable property interest.   Additionally, the

government action must be authorized.  See Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 543

(2005); Sanders v. United States, 132 F. App'x. 378, 380 (Fed. Cir. 2005)(stating that a charge of

"theft or misappropriation of money is an issue of tortious or criminal conduct, whereas a Takings

claim arises only when the property is legally taken.").  The Takings Clause presupposes authorized

government action; if a government action is "found to be  impermissible," then "[n]o amount of

compensation can authorize such an act."  Lingle v. Chevron U.S.A. Inc., 544 U.S. at  543.

The Plaintiffs may be able to successfully establish a property interest in the Fund.  In Pierce v. State, the Supreme Court of New Mexico recognized that members of the ERB Fund have a vested property interest in the Fund.  121 N.M. at 223, 910 P.2d at 304.  The Supreme Court of New Mexico's holding in Pierce v. State may not be as broad as the Plaintiffs' claim, however, because it limited members' vested interests to their specific benefits and held that members have no interest in the res of the Fund.  121 N.M. at 223, 910 P.2d at 304.  The Plaintiffs do not clearly allege whether they are bringing these claims on behalf of the Fund or directly, on behalf of the class.  The absence of that kind of clarification may render the pleading deficient, because the Plaintiffs must provide the ERB Defendants with "fair notice of what the plaintiffs claim is and the grounds upon which it rests."  Green Country Food Mkt., Inc. v. Bottling Grp., LLC, 371 F.3d 1275 (10th Cir. 2004).

Furthermore, the nature of the Plaintiffs' allegations may preclude the Plaintiffs from stating a claim under the Takings Clause of the Fifth Amendment, because they argue that their property was not legally taken.  See Scott v. Phila. Hous. Auth., No. 10-4723, 2011 WL 1791095, at *6 (E.D. Pa. May 11, 2011); Adams v. United States, 20 Cl. Ct. 132, 139 (Cl. Ct. 1990)("[T]he Takings Clause only provides compensation for damages caused by Government acts in furtherance of a lawful public purpose.").  The Plaintiffs contend that Fund money was invested in the VFT for the unlawful purpose of satisfying political obligations through a "pay-to-play" scheme and to secure political contributions.  See Response at 37.  The Plaintiffs also argue the ERB Defendants' actions were inconsistent with statutory directives, and constituted mismanagement and waste.  See Response at 30.  Both of these allegations attempt to establish that the ERB Defendants were not authorized to make the investment in the VFT; thus, the Plaintiffs' may not be able to satisfy the Takings Clause's requirements.

Moreover, the ERB Defendants may not actually have "taken" property from the Plaintiffs in the manner that the Takings Clause requires. The ERB invested the money, and market forces determined whether the money would grow, diminish, or remain the same. See Adams v. United States, 20 Cl. Ct. at 138 ("The [CIA] investment house placed plaintiffs' investments in various market securities which produced no revenue. Under this alleged set of facts, the market, not the CIA, took plaintiffs' investments."). The ERB Defendants decisions may not qualify as a takings because the investment was not for the public use, as the Fifth Amendment requires, but made for the Plaintiffs' benefit. See U.S. Const. Amend. V ("[N]or shall private property be taken for *public use,* without just compensation.")(emphasis added). The United States Claims Court has found that the government does not "take" property when government lawyers "acting in a fiduciary capacity" make litigation decisions affecting the plaintiffs' property. Fort Mojave Indian Tribe v. United States, 23 Cl.Ct. 417, 427-28 (Cl.Ct. 1991)("The government lawyers were not acting in a sovereign capacity and taking plaintiffs' property for the benefit of others . . . . [T]hey were not forcing some people alone to bear public burdens . . . . [T]he independent guarantees of the fifth amendment are not remotely involved here."). Much like the Fort Mojave Indian Tribe v. United States case, the Plaintiffs allege that the ERB defendants breached their fiduciary duties and executed a "takings" by making poor decisions. Response at 30. The Plaintiffs may not be able to state a claim, because the ERB Defendants' decisions, "no matter how unsound, cannot be characterized as a fifth amendment taking of property for public use." Fort Mojave Indian Tribe v. United States, 23 Cl.Ct. at 427.

### B.   THE PLAINTIFFS MAY FAIL TO STATE A PROCEDURAL DUE-PROCESS CLAIM.

The Tenth Circuit employs a two-step test when evaluating whether the state has violated

a person's right to procedural due process: "(1) Did the individual possess a protected interest to which due process protection was applicable? (2) Was the individual afforded an appropriate level of process?" Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)(quoting Hennigh v. City of Shawnee, 155 F.3d 1249, 1253 (10th Cir. 1998)).  The Plaintiffs assert that the Supreme Court of New Mexico has recognized a protected property interest in the monies in the Fund and that the ERB Defendants violated due-process protections when they allocated funds in a manner inconsistent with statutory regulations.  See Response at 30.

The Plaintiffs may not have adequately pled a property interest protected by procedural due-process, because, individually, they have no interest in the res of the Fund, and because neither the Amended Complaint nor the Response clearly states whether this claim is brought on behalf of the Fund or on the part of the class.  See Pierce v. State,121 N.M. at 223, 910 P.2d at 304; Am. Compl. ¶¶ 145-148, at 45-46; Response at 29-30.

It is not every breach of state procedural requirements by a public agency that gives rise to a cause of action for violation of constitutional rights.  See Atencio v. Bd. of Educ. of Penasco Indep. School Dist. No. 4, 658 F.2d 774, 779 (10th Cir. 1981).  It is only when "the agency's disregard of its rules results in a procedure which in itself impinges upon due process rights that a federal court should intervene in the decisional processes of state institutions."  Atencio v. Bd. of Educ. of Penasco Indep. School Dist. No. 4, 658 F.2d at 779 (citing Bates v. Sponberg, 547 F.2d 325, 329-30 (6th Cir. 1976)).  The amount of process due varies with the facts of a particular case.  See Camuglia v. City of Albuquerque, 375 F.Supp. 2d 1299, 1308 (D.N.M. 2005)(Browning, J.)(citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)), aff'd, 448 F.3d 1214 (10th Cir. 2006).

The Plaintiffs' allegations may not rise to the level of a violation of procedural due process under the Fourteenth Amendment, because the Plaintiffs do not allege that the ERB Defendants

intentionally deprived the Plaintiffs of their property interest.  The Due Process Clause requires the government to follow "appropriate procedures when its agents *decide* to 'deprive any person of life, liberty, or property.'"  Daniels v. Williams, 474 U.S. 327, 331 (1986)(emphasis added).  The government can hardly be expected, however,  to provide more thorough procedures when it does not know that a deprivation will happen.  See Lauck v. Campbell Cnty., 627 F.3d 805, 812 (10th Cir. 2010)(commenting on procedural-due process and constructive discharge claims)("[T]he employer can hardly be expected to provide notice or hearing before the resignation; after all, the employer does not realize that the employee's employment is ending.").

Although the Plaintiffs allege that the Defendants failed to investigate the VFT investment and that they were subject to political influences, the Plaintiffs do not assert that the ERB Defendants intended to deprive the Plaintiffs or the Fund of any monies.  While the Plaintiffs posit that the risk of the VFT investment was so high as to make it clear that the Fund would lose its forty million-dollars, it was not certain that the ERB Defendants would lose the investment, and the Plaintiffs admit that there were some small returns before the market crashed.  See Am. Compl. at 32.  Furthermore, "in deciding whether a state has violated a person's constitutional right to procedural due process, [courts] should pay no attention to whether the state has complied with procedures mandated by state law."  Hulen v. Yates, 322 F.3d 1229, 1247 (10th Cir. 2003).  Once a property right is established, it is a matter of federal constitutional law whether the procedure afforded was accurate.  See Hulen v. Yates, 322 F.3d at 1247 (citing Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)).  The Plaintiffs make no allegations about what procedures were constitutionally due to them.  The Plaintiffs' only claims of a violation relate to a breach of state procedures and allegations of negligence.  See Reply at 30.  The Plaintiffs do not allege how allocating funds inconsistently with a statutory directive rises to an unconstitutional denial of

procedure; such an explanation is essential in a case like this one where it was the stock market, rather than the ERB Defendants, that ultimately deprived the Fund of its investment. Without pleadings that allege, as a matter of federal constitutional law, that procedures were deficient, the Plaintiffs' procedural due-process claim may not be plausible, and the Court may not be able to "draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. at 1949. Although "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation[s]." Ashcroft v. Iqbal, 129 S.Ct. at 1949.

Because the Plaintiffs may not allege a lack of procedures that rises to a constitutional deprivation, the Plaintiffs may have failed to state a procedural due-process violation.

## IV.   THE COURT WILL NOT DECIDE WHETHER THE PLAINTIFFS COULD BRING A DERIVATIVE SUIT FOR THEIR §10(b) AND RULE 10b-5 CLAIMS.

The Plaintiffs assert violations of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") rule 10b-5, 17 C.F.R. § 240.10b-5, derivatively on behalf of the Fund and not on behalf of the class. See Am. Compl. ¶ 203, at 58. It may be that rule 23.1 allows the Plaintiffs to sue derivatively on behalf of the Fund, but that the Plaintiffs fail to meet the rule's demand requirement. It may be that the Plaintiffs' allegations of demand futility insufficient and that their post-suit demand cannot satisfy rule 23.1.

### A.   THE FUND IS A TRUST.

The Vanderbilt Defendants assertion that the Plaintiffs may not sue on behalf of the Fund may misstate the nature of the Plaintiffs' claims. The Plaintiffs are not suing on behalf of the ERB, which the New Mexico courts have held is an arm of the state. Wirtz v. State Educ. Ret. Bd., 122 N.M. 292, 295, 923 P.2d 1177, 1180 (Ct. App. 1996). Instead the Plaintiffs sue on behalf of the

Fund, which is a trust.  See Response at 3.

The New Mexico Constitution provides that all funds and assets paid into a public employees retirement system or educational retirement system "shall be held by each respective system in a trust fund."  N.M. Const. Art. XX § 22(A).  Section 22(B) further provides that "the board of the educational retirement system shall be the trustees for [their system] and have sole and exclusive fiduciary duty and responsibility for administration and investment of the trust fund . . . ."  N.M. Const. Art. XX § 22(B).  These references in the New Mexico Constitution demonstrate an intent that the Fund should be treated as a trust and subject to trust principles.  Furthermore, the ERA, which creates the Fund, states that the ERB shall be "the trustee of the funds" and subjects the ERB to the Uniform Prudent Investor Act, which further clarifies the duties owed to the trust beneficiaries.  N.M.S.A. 1978, § 22-11-11; see also N.M.S.A. 1978, §§ 22-11-13, 45-7-602.  The New Mexico Constitution's and the ERA's references to the Fund as a "trust," the ERB as "trustees" and the ERB's "fiduciary duties" demonstrate to this Court that the Fund was intended as a trust.

That the Fund meets the definition of trust contained in the Restatement (Third) of Trusts § 2 further bolsters the Court's conclusion.  A trust is a "fiduciary relationship with respect to property, arising from a manifestation of intention to create that relationship and subjecting the person who holds title to the property to duties to deal with it for the benefit of . . . at least one of whom is not the sole trustee."  Restatement (Third) of Trusts § 2.  It follows that the Fund qualifies as a trust, because its trustees and beneficiaries stand in a fiduciary relationship under which the fiduciaries hold investment funds for the benefit of Fund members.  Defendants contend that because a member of the ERB, the State Treasurer, is the custodian of the Funds rather than the ERB as an organization  the Fund fails to meet this definition because it does not own or hold legal title.  See Individual State Def.s' Reply at 6 (citing N.M.S.A. 1978, § 22-11-11(B)).  The very same

provision that the ERB Defendants cite, however, goes on to say "and the board shall be the trustee of the funds."  N.M.S.A. 1978, § 22-11-11.  The State Treasurer is also a member of the ERB.  See Individual State Def.s' Reply at 16 ("Mr. Lewis actually holds his position by virtue of being elected state treasurer.").

Moreover, courts in New Mexico and other states have treated similar public pension funds as trusts.  See State ex rel. Pub. Emps' Ret. Assoc. v.  Longacre, 131 N.M. at 159, 33 P.3d at 909 (explaining that as "the trustee of the fund, and fiduciary to [Public Employees Retirement Act] members, the Board has a duty to collect overpayments for the trust) reversed on other grounds by State ex rel. Pub. Emps' Ret. Assoc. v. Longacre, 133 N.M. 20, 59 P.3d 500 (N.M. 2002); see also Ass'n of State Prosecutors v. Milwaukee Cnty., 199 Wis. 2d 549, 552, 544 N.W. 2d 888, 889 (Wis. 1996)(treating public pension fund as a trust); Hanson v. Utah State Ret. Bd., 652 P.2d 1332, 1338 (Utah 1982)(explaining that various state retirement funds "administered as a common trust fund"); La. State Emps.' Ret. Sys. v. State, 423 So. 3d 73, 75 (La. Ct. App. 1983)("These funds are in trust for the members of the systems.").

The Fund is a defined benefit retirement plan, such that the amount of the retirement benefit paid to a retiree is calculated by a formula based on the retiree's years of service and final average salary at retirement.  See N.M.S.A. 1978, § 22-11-23.  New Mexico, in requiring that the fund be managed as a trust fund and overseen by the ERB as its trustee, follows the customary practice of states operating such pension programs.  See Karen Eilers Lahey & T. Leigh Anenson, Public Pension Liability:  Why Reform is Necessary to Save the Retirement of State Employees, 21 Notre Dame J. L. Ethics & Pub. Pol'y 307, 310 (2007)("A defined benefit plan provides for employer, and sometimes employee, contributions to a trust fund administered by a trustee.  In the public sector, the trust fund manager is generally a politically appointed or member-elected retirement board that

makes investment decisions and determines funding levels and contribution obligations."(Citation

omitted)).

**B.   THE PLAINTIFFS MAY PURSUE THEIR 10b-5 CLAIMS DERIVATIVELY, BUT MAY FAIL TO SATISFY THE REQUIREMENTS OF RULE 23.1.**

In their Motion to Dismiss, the Vanderbilt Defendants focus almost exclusively on the state

causes of action.  While the Vanderbilt Defendants thoroughly articulate their position that  New

Mexico only authorizes derivative suits when the plaintiff is a shareholder of a corporation, they do

not assert the same is true for the Plaintiffs' federal claims.

Although it does not appear that the Tenth Circuit has established that rule 10b-5 actions may

be pursued derivatively, other circuits have.  See Frankel v. Slotkin, 984 F.2d 1328, 1333 (2d Cir.

1993)("The district court correctly indicated that for the plaintiff to maintain a derivative action for

damages under rule 10b-5 he must show damage to the corporation by fraud."); Ray v. Karris, 780

F.2d 636, 641 (7th Cir. 1985)("The right of a shareholder to sue derivatively under Rule 10b-5 on

behalf of the corporation was firmly established by this circuit . . . .").  Few courts have addressed

whether beneficiaries of a trust may assert a rule 10b-5 violation derivatively.  In Bolton v.

Gramlich, 540 F.Supp. 822  (S.D.N.Y. 1982),  the United States District Court for the Southern

District of New York, did not discuss the derivative nature of the plaintiff's action under rule 10b-5,

instead analyzing the sufficiency of the claims.  540 F.Supp. at 840 ("The Court therefore finds that

the plaintiffs have stated a derivative claim under § 10(b) and Rule 10b-5.").  In James v. Gerber

Prods. Co., 483 F.2d 944, 948 (6th Cir. 1973), the United States Court of Appeals for the Sixth

Circuit held that the broad purpose § 10(b) and rule 10b-5 to prohibit all fraudulent schemes in

connection with the purchase or sale of securities would not bar the derivative action of a trust

beneficiary.  See 483 F.2d at 948.  Of the handful of cases found relating to derivative rule 10b-5

suits brought by trust beneficiaries, the United States District Court for the District of Colorado, in Rippey v. Denver U.S. Nat'l Bank, 260 F.Supp. 704 (D. Colo. 1966), was the lone case to hold that the plaintiffs could not bring the suit.  See 260 F.Supp. at 704.  That court dismissed the suit for a failure to include all of the trust beneficiaries as necessary parties, because the class was not numerous enough to proceed under rule 23.1 of the Federal Rules of Civil Procedure, and because a trust is not a person as described in the Exchange Act, but the Exchange Act does not use the word "trust."  See Rippey v. Denver U.S. Nat'l Bank, 260 F.Supp. at 714.

Neither the Exchange Act nor rule 10b-5 require that a person defraud another person; rule 10b-5 states only that "it shall be unlawful for any person . . . (b) to make any untrue statement of a material fact or to omit to state a material fact."  17 C.F.R. § 240.10b-5.  Additionally, the motivating concern behind the statute is prevention of securities-related fraud.  Here, the Plaintiffs' allege that their beneficial interest in the Fund was threatened after the Defendants fraudulently enticed the ERB into investing in the VFT.  In any case, even if the Court were to find that the Exchange Act and rule 10b-5 permit the Plaintiffs to sue derivatively, they must still comply with the requirements of Federal Rule of Civil Procedure 23.1.  See Bolton v. Gramlich, 540 F.Supp. at 834 ("The Court therefore finds that the defendants have failed to show disqualification under Rule 23.1."); In re Cendant Corp., Derivative Action Litig., 232 F.Supp.2d 327, 332-33 (D.N.J. 2002)(Walls, J.)(applying rule 23.1 to settlement of derivative action, which involved 10b-5 claims, and noting the plaintiff's argument that this case involves "complexities unique to derivative lawsuits, such as: (a) futility of demand issues"); F.D.I.C. v. Kerr, 637 F.Supp. 828, 837 (W.D.N.C. 1986)("Derivative actions for 10b-5 violations may be brought by a shareholder on behalf of his corporation under Fed. R. Civ. P. 23.1.").

**1.    The Plaintiffs May Not Satisfy the Procedural Requirements of Rule 23.1 Because They Did Not Make Pre-Suit Demand on the ERB and May Not Sufficiently Allege Demand Futility.**

Rule 23.1 does not contain a substantive demand requirement.  See Kamen v. Kemper Fin. Servs., 500 U.S. at 96, 108.  The rule itself speaks only to the adequacy of the shareholder representative's pleadings.  See Fed. R. Civ. P. 23.1; Kamen v. Kemper Fin. Servs., 500 U.S. at 108-09.  Rule 23.1 requires that plaintiffs allege with particularity any effort by the plaintiff to obtain the desired action from the directors" and "the reasons for not obtaining the action or not making the effort."  Fed. R. Civ. P. 23.1.  Whether a plaintiff satisfies rule 23.1 is a matter of federal common law.  See Cadle v. Hicks, 272 F. App'x 676, 678 (10th Cir. 2008).  Federal courts look to the law of the state of incorporation or, in this case, the state of the trust as the source of federal common law in determining whether demand is met.  Cadle v. Hicks, 272 F. App'x at 678 (citing Kamen v. Kemper Fin. Servs., 500 U.S. at 96, 108); Grigs v. Jornayvaz, No.09-00629, 2010 WL 4932674, at *4 (D. Colo. Nov. 29, 2010).  The Supreme Court looks to state law to supply the contours of any demand requirement, because the presumption that state law should be incorporated into federal common law "is particularly strong where parties have entered into legal relationships with the expectation that their rights and obligations would be governed by state-law standards."  Kamen v. Kemper Fin. Servs., 500 U.S. at 98.  This rationale applies with the same force in the trust context, because it also involves parties entering into legal relationships who expect that their rights will be determined by state law.

New Mexico recognizes the general rule that a pre-suit demand or sufficiently pled facts showing futility is necessary to a shareholder derivative action.  See N.M.S.A. 1978, 53-11-47; White ex rel. Banes Co. Derivative Action v. Banes Co., 116 N.M. at 614, 866 P.2d at 342.  The Supreme Court of New Mexico has emphasized the importance of making pre-suit demand in a

shareholder derivative action and stated that "the demand requirement is crucial to the derivative action." White ex rel. Banes Co, Derivative Action v. Banes Co., 116 N.M. at 614, 616, 866 P.2d at 342, 344.  It is a necessary "condition precedent" to a corporate derivative action that a demand be made on the board or that adequate explanation of futility of such demand be provided.  Saylor v. Valles, 133 N.M. 432, 437, 63 P.3d 1152, 1157 (Ct. App. 2002)(declining to decide whether a plaintiff may bring a derivative action on behalf a nonprofit corporation, because, even if the plaintiffs could proceed, their failure to allege demand or demand futility rendered their complaint deficient).

The Plaintiffs admit that they did not make pre-suit demand and allege that demand was futile.  See Am. Compl. ¶ 118, at 38.  Rule 23.1 and federal common law again look to the state to supply the standard for excusing demand because of futility.  See Kamen v. Kemper Fin. Servs, 500 U.S. at 109 ("[A] court that is entertaining a derivative action under [a] statute must apply the demand futility exception as defined by the law of the State of incorporation.").  The New Mexico statute authorizing corporate derivative actions allows the suit to go forward when "the complaint alleges with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors and the reasons for his failure to obtain the action *or for not making the effort*." N.M.S.A. 1978, 53-11-47 (emphasis added).  The Supreme Court of New Mexico also recognizes this futility exception.  See Prager v. Prager, 80 N.M. 773, 776, 461 P.2d 906, 909 (1969).  In Prager v. Prager, the plaintiffs alleged that the defendants controlled the corporation, that the defendants acted fraudulently, that the defendants have refused to take action, and that demand would be futile; the Supreme Court of New Mexico agreed that demand would be futile.  See 80 N.M. at 777, 461 P.3d at 910.  The only case where the Supreme Court of New Mexico explained futility in more detail is from 1937.  See Porter v. Mesilla Valley Cotton Prods. Co., 42 N.M. 217, 76 P.2d 937

(1937).  There, the Supreme Court of New Mexico relied upon <u>Fletcher Cyclopedia of Corporations</u> and stated:

> A request or demand upon the directors or majority of the stockholders to bring suit or take other steps to obtain relief need not be made by a stockholder before suing in his own behalf, if the circumstances clearly show that it would be a mere useless form.  No such request or demand is necessary, therefore, as a general rule, where the wrong or ultra vires act complained of was done or is threatened by a majority of the stockholders, or by the defendant directors with the consent or approval of a majority of the stockholders, or by defendant officers who own a majority of the stock or who otherwise have control and are hostile or adverse in interest to plaintiff's demands.

<u>Porter v. Mesilla Valley Cotton Prods. Co.</u>, 42 N.M. at 220, 76 P.2d at 917 (citing 6 <u>Fletcher Cyclopedia of Corporations</u> §4070).  The Supreme Court of New Mexico also pointed to the Supreme Court's decision in <u>Hawes v. Contra Costa Water Co.</u>, 104 U.S. 450, 461 (1882).

The Plaintiffs allege that demand would have been futile, because the ERB trustees are "hostile or adverse in interest" to their demands.  Am. Compl. ¶ 119, at 38. The Plaintiffs assert that the alleged political corruption and wrongful conduct by a majority of the ERB trustees, who controlled both the ERB and the Fund, establishes the futility of demand.  The Defendants respond that the Plaintiffs have made no allegations against three of the ERB trustees on the ERB at the time the Amended Complaint was filed and that the allegations against the remaining four members are inadequate.  <u>See</u> Independent State Def.s' Mem. Mot. to Dismiss at 14-15; Vanderbilt Def.s' Reply at 6-7.

The Court would look at the ERB as it existed in June 2010, when the Plaintiffs filed their Amended Complaint, to determine futility, because the Plaintiffs must show that futility existed "before suing in [their] own behalf."  <u>Porter v. Mesilla Valley Cotton Prods. Co.</u>, 42 N.M. at 220, 76 P.2d at 917.  This rule is also the general rule that other states follow.  <u>See</u> <u>In re Pfizer, Inc. Derivative Sec. Litig.</u>, 307 F. App'x 590, 592 (2d Cir. 2009)(following Delaware law and analyzing

futility at the time the complaint was filed); <u>Staehr v. W. Capital Res., Inc.</u>, No. 10-1806, 2011 WL 2633894, at *5 (D. Minn. July 6, 2011)(Ericksen, J.)(relying on Delaware law to inform Minnesota law on demand futility because derivative actions are uncommon in Minnesota). The Plaintiffs and Defendants also both look to the ERB as it existed at the time the Amended Complaint was filed. <u>See</u> Response at 12; Vanderbilt Def.s' Reply at 6.

The ERB is made up of seven members; to show futility, the Plaintiffs may need to plead sufficient facts to show that at least four ERB trustees were incapable of an independent judgment at the time the Amended Complaint was filed. <u>See</u> Vanderbilt Def.'s Reply at 6. The Plaintiffs allege that Malott was involved in corrupt practices and pay-to-play schemes. <u>See</u> Am. Compl. ¶ 119, at 38. Assuming the Plaintiffs' allegations as true, as required at the dismissal stage of litigation, the Plaintiffs may have alleged sufficient facts to show that Malott would be hostile to their demands, because Malott would be unlikely to expose his allegedly corrupt actions. Garcia is also accused of wrongdoing in this suit, and the Plaintiffs may have alleged sufficient facts to show that she would be hostile to the Plaintiffs suit. Am. Compl. ¶ 119, at 38. Malott's and Garcia's alleged hostility to the suit results not only because of the conduct the Plaintiffs have alleged, but also because they would likely be defendants in any resulting suit by the ERB. The Plaintiffs assert that New Mexico State Treasurer James B. Lewis would also be adverse to their complaints, because he is an executive official, he is a senior Democratic Party official in New Mexico, Governor Richardson appointed him to the "Governor's Task Force on Ethics Reform" and he has said complementary things about former New Mexico State Treasurer, and a defendant in this case, Douglas M. Brown. <u>See</u> Response at 13-14. That the New Mexico State Treasurer should have a myriad of political connections is unsurprising. Involvement in politics does not, however, automatically impinge on his ability to be impartial and does not *clearly show* that Lewis would be

unable to look at the Plaintiffs' allegations with an unbiased eye.  Allegations that Dr. Gautam Vora would be unable to independently judge the Plaintiffs' complaints because he is beholden to Brown and Richardson are similarly slim, and they may not support a finding of futility.

On November 22, 2010, however, the Plaintiffs made a post-suit, written demand on the ERB, asking that it "substitute itself as plaintiff in the Action, and prosecute the claims that the fund has brought on the Fund's behalf against the Vanderbilt Defendants and the Trustee Defendants." Letter from Shane C. Youtz to the Court ¶ 7, at 2 (dated November 24, 2010), filed November 24, 2010 (Doc. 84, Ex. A).  On July 25, 2011, the Court was notified for the first time, that on January 14, 2011, the ERB voted to reject the Plaintiffs' demand.  <u>See</u> Letter to the Court from Shane Youtz (dated July 1, 2011), filed August 9, 2011 (Doc. 99); Letter from Joseph Goldberg to the Court ¶ 1, at 1 (dated July 20, 2011), filed July 25, 2011 (Doc. 96, Ex. B)(containing the January 14, 2011 Minutes of the New Mexico Education Retirement Board Regular Meeting).

Although the New Mexico courts have not addressed whether post-suit demand is sufficient to satisfy the demand requirement, it may be that post-suit demand is insufficient to satisfy the demand rule.  The demand requirement is intended to give boards of directors, corporate managers, and perhaps, boards of trustees the opportunity to evaluate claims of wrongdoing *before* a lawsuit is initiated.  <u>See</u> <u>Porter v. Mesilla Valley Cotton Prods. Co.</u>, 42 N.M. at 220 ("*Before* the shareholder is permitted in his own name, to institute and conduct a litigation which usually belongs to the corporation, he should show, to the satisfaction of the court, that he has exhausted all means with his reach to obtain, within the corporation itself, the redress of his grievances . . . ."(citing <u>Hawes v. Contra Costa Water Co.</u>, 104 U.S. at 461)).  Arguably, to hold that demands which satisfy rule 23.1 "may be made on the directors *after* a derivative suit has been initiated would be to reduce the demand requirement of the rule to a meaningless formality." <u>In re Section 16(b) Litig.</u>, 602 F.Supp.

2d 1202, 1214 (W.D. Wash. 2009)(citing In re Kaufman Mut. Funds Actions, 479 F.2d 257, 263 (1st

Cir. 1973)), aff'd in part and rev'd in part by Simmonds v. Credit Suisse Sec. (USA) LLC, 638 F.3d

1072 (9th Cir. 2011).  The United States Court of Appeals for the Third Circuit has also held that

post-suit demand  is impermissible, because post-suit demand usurps the boards "opportunity to

decide in the first place whether and in what manner action should be taken."  Weiss v. Temp. Inv.

Fund, 692 F.2d 928, 943 (3d Cir. 1982) vacated on other grounds by Weiss v. Temp. Inv. Fund, 465

U.S. 1001 (1984).  Given this weight of authority and the purpose of the demand requirement,

Supreme Court of New Mexico might hold that the demand requirement is not met by post-suit

demand.

## V.   THE COURT NEED NOT DECIDE WHETHER SOVEREIGN IMMUNITY PRECLUDES TORT CLAIMS AGAINST THE ERB DEFENDANTS.

The Plaintiffs assert, in Count I of their Amended Complaint, that the ERB Defendants

breached their fiduciary duty to the Plaintiffs through their actions leading up to, and culminating

in, their votes in favor of the VFT investment on May 12, 2006.  The Plaintiffs contend that the

"ERB's consideration of the Vanderbilt Investment was knowingly inadequate and intentionally

rushed."  Am. Compl. ¶ 88, at 1-2.  The Plaintiffs further contend that, when voting in favor of the

VFT investment, "the four Trustee Defendants acted to further political goals, repay favors, and/or

accede to political pressures, but, in any event, abdicated their constitutional, statutory, and fiduciary

responsibilities, and failed to follow the Board's own procedures."  Am. Compl. ¶ 89, at 1-4.  The

Plaintiffs allege that even if the forty-million dollars was not transferred from the Fund to the VFT

investment for political purposes, "it was a wholly reckless and inappropriate investment of the

fiduciary assets of the Fund."  Am. Compl. ¶ 94, at 1-4.

In Count III of the Amended Complaint, the Plaintiffs allege that the ERB Defendants have

violated their state constitutional rights by impairing a vested property right, and assert violations of Article II §§ 18, 20 and Article XX § 22(D) of the New Mexico Constitution.  See Am. Compl. ¶¶ 145-48, at 45-46.  The Plaintiffs state that, pursuant to the ERA, "employees who have worked for five years of qualified state employment have vested property rights in their retirement plan benefits."  Am. Compl. ¶ 146, at 45.

The ERB Defendants assert immunity from the breach of fiduciary duty and state constitutional claims pursuant to New Mexico's Tort Claims Act, N.M.S.A. 1978, §§ 41-4-1 to -30. ("NMTCA").  See Individual State Def.s' Mem. Mot. to Dismiss at 15, 20.  The ERB Defendants contend that, for purposes of the NMTCA, the ERB is a New Mexico governmental entity, and as contemplated by the statute, the ERB Defendants are public employees.  See Individual State Def.s' Mem. Mot. to Dismiss at 16.  The ERB Defendants assert that they were acting squarely within the scope of their duties as government actors when making the investment decision, and they note the absence of any waiver of immunity in the NMTCA's text for a breach of fiduciary duty.  See Individual State Def.s' Mem. Mot. to Dismiss at 16.  The ERB Defendants assert that the NMTCA precludes the Plaintiffs' state constitutional claim, because sovereign immunity was not waived.  See Individual State Def.s' Mem. Mot. to Dismiss at 21.  Additionally, given that a waiver of immunity in the NMTCA must be clear and unambiguous, the ERB Defendants contend that they enjoy sovereign immunity from the breach-of-fiduciary-duty claim.  See Individual State Def.s' Mem. Mot. to Dismiss at 16.

In response, the Plaintiffs reiterate that they assert their claim for breach of fiduciary duty on the Fund's behalf, and not directly on its members' behalf.  Relying in part on a case from the Supreme Court of Texas, the Plaintiffs contend that immunity is nonexistent when a government affirmatively files suit seeking money damages against public employees.  See Response at 23

(citing City of Galveston v. State, 217 S.W.3d 466, 471 (Tex. 2007)). The Plaintiffs also liken their claim to that a successor board of a county pension plan recently brought against former board members, and conclude that "this case is no different." Response at 23-24 (citing Luzerne Cnty. Ret. Bd. v. Makowski, 627 F.Supp. 2d 506 (M.D. Pa. 2007)). The Plaintiffs also assert that, in other states, failures to follow statutory directives when allocating pension funds can constitute an impairment of property rights and that they have adequately stated a claim under the New Mexico Constitution. See Response at 29-30.

The Plaintiffs also attempt to circumvent the NMTCA's provisions by asserting that the ERB Defendants are not "public employees" as the NMTCA uses that term. Response at 24-27. The Plaintiffs note that the ERB trustees are not among those that the NMTCA enumerates in its non-exhaustive list of persons enjoying immunity, and contend that the ERB Defendants also do not fall in any of the more general categories included in the NMTCA's definition of public employees. See Response at 24.

### A.   THE NMTCA CONTROLS WHEN AND FOR WHAT A PUBLIC EMPLOYEE CAN BE SUED.

With the NMTCA's adoption, the State of New Mexico consented to suits against its entities and employees acting within the scope of their duties, and enumerates specific torts that it will allow. The NMTCA provides that "[a] governmental entity and any public employee while acting within the scope of duty are granted immunity from liability for any tort except as waived [herein]." N.M.S.A. 1978, § 41-4-4A. Additionally, "absent a waiver of immunity under the Tort Claims act, a person may not sue the state for damages for violation of a state constitutional right." Ford v. N.M. Dep't of Pub. Safety, 119 N.M. 405, 412, 891 P.2d 546, 553 (Ct. App. 1994). The NMTCA defines the term "governmental entity" as "the state or any local public body." N.M.S.A. 1978, §

41-4-3.  "State" and "local public body" are, in turn, "the State of New Mexico or any of its instrumentalities or institutions," N.M.S.A. 1978, § 41-4-3H, and "all political subdivisions of the state and their agencies, instrumentalities and institutions," N.M.S.A. 1978, § 41-4-3C.  The NMTCA defines a "public employee" as "an officer, employee or servant of a governmental entity . . . , [and] persons acting on behalf of or in service of a governmental entity in any official capacity, whether with or without compensation."  N.M.S.A. 1978, § 41-4-3F(4).

### B.   A BREACH OF FIDUCIARY DUTY SOUNDS IN TORT, AND THE NMTCA CONTAINS NO WAIVER FOR BREACH OF FIDUCIARY DUTY.

A breach of fiduciary duty claim sounds in tort.  See Klein v.  Grynberg, 44 F.3d 1497, 1503 n. 3 (10th Cir. 1995); Eckhardt v. Charter Hosp. of Albuquerque, Inc., 124 N.M. 549, 554, 953 P.2d 722, 727 (Ct. App. 1997).  Section 41-4-4A cloaks governmental entities and public employees with immunity for any tort, except as waived in other sections of the NMTCA.  See N.M.S.A. 1978, § 41-4-4A; Bierner v. City of Truth or Consequences, 136 N.M. 197, 199, 96 P.2d 322, 324 (Ct. App. 2004).  Excluding the waivers of immunity for certain intentional torts alleged against law enforcement officers, and not in play here, the NMTCA waivers of immunity apply to the "negligence of public employees while acting within the scope of their duties."  N.M.S.A. 1978, §§ 41-4-5 to -12.

There are eight areas for which the NMTCA waives immunity.  They are enumerated as follows:  N.M.S.A. 1978, § 41-4-5 (waiver of immunity for negligence of public employees acting within scope of employment in operation or maintenance of any motor vehicle, aircraft or watercraft); N.M.S.A. 1978, § 41-4-6 (for negligence in operation or maintenance of buildings, public parks, machines, equipment and furnishings); N.M.S.A. 1978, § 41-4-7 (for negligence in operation of airports); N.M.S.A. 1978, § 41-4-8 (for negligence in operation of certain public

utilities); N.M.S.A. 1978, § 41-4-9 (for negligence in operation of medical facilities); N.M.S.A. 1978, § 41-4-10 (for negligence by health care providers); N.M.S.A. 1978 § 41-4-11 (for negligence in construction or maintenance of highways and streets); and N.M.S.A. 1978 § 41-4-12 (for deprivation of rights by law enforcement officers, not limited to negligence).  Breach of fiduciary duty is not among the tort claims for which the New Mexico Legislature chose to waive governmental immunity through the NMTCA.

### C.   THE COURT NEED NOT DECIDE WHETHER THE ERB DEFENDANTS ARE PUBLIC EMPLOYEES ACTING WITHIN THE SCOPE OF DUTY AS ERB MEMBERS.

Given its ruling on constitutional standing, the Court need not, and should not, decide whether the ERB Defendants are public employees acting within the scope of their employment. The Fund is, however, a state-created retirement plan, the management of which is vested in the ERB.  N.M.S.A. 1978, § 22-11-6.  The Court of Appeals of New Mexico considers the ERB to be an arm-of-the-state.  See Wirtz v. State Educ.  Ret. Bd., 122 N.M. 292, 923 P.2d 1177 (Ct. App. 1996).  Additionally, a court in this district has determined that the ERB is an arm-of-the-state and, thus, not subject to diversity jurisdiction.  See N.M. ex rel. Nat'l Educ. Ass'n of N.M. v. Austin Capital Mgmt. Ltd., 671 F.Supp. 2d 1248, 1252 (D.N.M. 2009)(Black, J.)(holding that "there is no question that both the SIC and the ERB are arms of the State rather than independent political subdivisions").  Indeed, state pension boards and administrations have been found to be "arms of the state" by virtually every court considering that question.[18]

---

[18]See Burrell v. Teacher's Ret. Sys. of Ala., 353 F. App'x 182, 183 (11th Cir. 2009) (Teacher's Retirement System of Alabama); Ernst v. Rising, 427 F.3d 351, 359-61 (6th Cir. 2005) (Michigan's retirement system for state-court judges and state officials); McGinty v. New York, 251 F.3d 84, 96 (2d Cir. 2001) (New York State and Local Employees Retirement System); Fitzpatrick v. Bitzer, 519 F.2d 559, 561 (2d Cir. 1975), aff'd in part, rev'd in part on other grounds, 427 U.S. 445 (1976) (Connecticut's State Employees' Retirement System); W. Va. Inv. Mgmt. Bd. v.

Because the ERB may be an arm of the state, the ERB trustees may be "officer[s] . . . of a governmental entity" pursuant to N.M.S.A. 1978, § 41-4-3F.  At least some might also, pursuant to N.M.S.A. 1978, § 41-4-3F(1), fit in the category of "elected or appointed officials."  The ERB trustees consist of the Secretary of Public Education, the State Treasurer, one member whom the New Mexico Association of educational retirees elect, one member whom the National Education Association of New Mexico elect, and two members that the Governor appoints.  See N.M.S.A. 1978, §22-11-3B.  It would appear that every trustee on the ERB is either elected or appointed, and might qualify for immunity under the NMTCA as "elected or appointed officials."  The ERB trustees might also qualify for sovereign immunity under the NMTCA as "persons acting on behalf of or in service of a governmental entity in any official capacity whether with or without compensation" pursuant to § 41-4-3(F)(3).  The ERA establishes that the ERB trustees are not salaried, but are, instead, paid per diem and mileage as set forth in the Per Diem and Mileage Act, N.M.S.A. 1978, § 22-11-5(D), which was enacted "to establish rates for reimbursement for travel for public officers and employees."  N.M.S.A. 1978, § 10-8-2.  The ERB trustees are managers of the Fund, and, accordingly, may either be "elected or appointed officials" pursuant to § 41-4-3F(1) or "persons acting on behalf of or in service of a governmental entity in any official capacity" pursuant to § 41-4-3F.

The NMTCA defines "scope of duties" as "performing any duties that a public employee is

Residential Accredited Loans, Inc., No.10-00461, 2010 WL 3418314, at *5 (S.D. W. Va. Aug. 26, 2010) (West Virginia Investment Management Board); Mo. State Emps' Ret. Sys. v. Credit Suisse, N.Y. Branch, No. 09-4224, 2010 WL 318652, at *6 (W.D. Mo. Jan. 21, 2010) (Missouri State Employees' Retirement System); Cal. Pub. Emps.' Ret. Sys. v. Moody's Corp., Nos. C 09-03628, 09-03629, 2009 WL 3809816, at *2-*8 (N.D. Cal. Nov. 10, 2009) (California Public Employees Retirement System); JMB Grp. Trust IV v. Penn. Mun. Ret. Sys., 986 F.Supp. 534, 538 (N.D. Ill. 1997) (Pennsylvania Municipal Retirement System).

requested, required or authorized to perform by the governmental entity, regardless of the time and

place of performance."  N.M.S.A. 1978 § 41-4-3(G).  Notably, the NMTCA "clearly contemplates

including employees who abuse their officially authorized duties, even to the extent of some tortious

and criminal activity."  Celaya v. Hall, 135 N.M. 115, 121, 85 P.3d 239, 245 (2004).

The allegations in the Plaintiffs' Amended Complaint may themselves suggest that the ERB

Defendants were acting within the scope of their duties as Fund managers.  See Am. Compl. ¶¶ 26-

32, at 8-9.  The Plaintiffs' allegations against the ERB Defendants concern how the Vanderbilt

Financial presentation came before the ERB, the ERB's consideration and investigation of the VFT

investment, and the ERB's knowledge and motivations when voting on the VFT investment.  See

Am. Compl. ¶¶ 49-83, at 14-25.  It may be that these assertions conclusively demonstrate that the

ERB Defendants were acting within the scope of their duties as defined by the NMTCA, which

would bar the Plaintiffs' claims of breach of fiduciary duty and violations of the state constitution.

### C.    THE COURT NEED NOT DECIDE WHETHER NMTCA IMMUNITY BARS PLAINTIFFS' BREACH OF FIDUCIARY DUTY OR STATE CONSTITUTIONAL CLAIMS IF ASSERTED DERIVATIVELY, ON THE FUND'S BEHALF.

The Plaintiffs assert that NMTCA immunity does not exist, because their tort claims are

brought on behalf of the Fund.  In support of their position, the Plaintiffs rely on cases which suggest

that sovereign immunity does not bar suits by a governmental entity bringing claims against a

present or former public employee who breached a fiduciary obligation to that entity.  See Response

at 23 (citing City of Galveston v. Texas, 217 S.W.3d 466, 471 (Tex. 2007)).

Sovereign immunity is concerned primarily with protecting government defendants from

suit.  See Harlow v. Fitzgerald, 457 U.S. 800, 816 (1982).  This rationale is also the motivating

concern behind the NMTCA.  The New Mexico Legislature attempted to balance immunizing

governmental entities and public employees from the heavy burdens of lawsuits, while recognizing the "inherently unfair and inequitable result which occurs in the strict application of . . . sovereign immunity." N.M.S.A. 1978, § 41-4-2.  Accordingly, the Legislature carved out limited exceptions, in recognition of these competing interests.  Nothing in the NMTCA indicates that tort claims brought by governmental entities do not fall within the purview of the NMTCA's grant of immunity to public officials, and the Plaintiffs offer no authority supporting a different conclusion. The Plaintiffs may be mistaken in asserting that  the NMTCA delineates immunity provisions -- or waivers thereof -- based on the identity or status of the plaintiff.  See Response at 23.

In City of Galveston v. Texas,  the State of Texas, acting through its attorney general, brought suit against one of its cities, alleging negligent installation and maintenance of a water line located under a state highway.  See City of Galveston v.  Texas, 217 S.W.3d at 471.  The Supreme Court of Texas held that, absent a clear and unambiguous consent from the legislature, the city enjoyed sovereign immunity from suit.  In reasoning its way to this conclusion, the Galveston court recognized the rule in Texas that a governmental entity leaves itself open to a counter-claim when it affirmatively files suit.  See City of Galveston v. Texas, 217 S.W.3d at 471.

Although the analysis is different, the effect of waiving immunity and declaring it nonexistent appears to be the same.  Because the Court is not permitted to find a waiver under the NMTCA absent clear and unambiguous legislative intent, the Court likewise may not be prepared to declare immunity nonexistent based on the identity of the Plaintiffs, absent some clear and unambiguous indication that the Legislature intended such a result.  The Court may not be able to read language into the NMTCA to abrogate sovereign immunity, which might act to bar the Plaintiffs' breach of fiduciary duty and state constitution claims.

**IT IS ORDERED** that: (i) the Individual State Defendants' Motion to Dismiss Plaintiffs'

Claims is granted in part and (ii) the Court will remand the case to New Mexico state court for lack

of subject-matter jurisdiction.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Gordon H. Rowe, III
The Rowe Law Firm
Albuquerque, New Mexico

*-- and --*

Richard D. Greenfield
Marguerite R. Goodman
Greenfield & Goodman, LLC
New York, New York

*-- and --*

Jonathon Cueno
Michael G. Lenett
Matthew E. Miller
Brendan S. Thompson
Cueno, Gilbert & LaDuca, LLP
Washington, D.C.

       *Attorneys for the Plaintiffs*

Andrew G. Schultz
Rodey, Dickason, Sloan, Akin
   & Robb, P.A.
Albuquerque, New Mexico

*-- and --*

Peter L. Simmons
Fried, Frank, Harris, Shiver
  & Jacobson, LLP
New York, New York

> *Attorneys for Defendants Vanderbilt Capital Advisors, LLC,*
>   *Pioneer Investment Management U.S.A., Inc., Osbert M. Hood,*
>   *Stephen C. Bernhardt, Kurt W. Florian, Jr., Anthony J. Koenig, Jr.,*
>   *Mark E. Bradley, Ron D. Kessinger, Robert P. Nault, and James R. Stern*

William C. Madison
Rebecca S. Kenny
Madison Harbour & Mroz, P.A.
Albuquerque, New Mexico

*-- and --*

Peter A. Silverman
Joseph A. Donado
Figilulo & Silverman, P.C.
Chicago, Illinois

> *Attorneys for Defendant Patrick Livney*

Nicholas A. Foley
Douglas J. Buncher
John D. Gaither
Neligan Foley LLP
Dallas, Texas

> *Attorneys for Defendant Aldus Equity*

Michael Comeau
Grey W. Handy
Comeau, Maldegen, Templeman & Indall, LLP
Santa Fe, New Mexico

*-- and --*

Roberta Braceras
Jennifer Chunias
Goodwin Procter LLP
Boston, Massachusetts

> *Attorneys for Defendant New England*
> *Pension Consultants, Inc.*

Henry F. Narvaez
Martin R. Esquivel
Bryan C. Garcia
Denise Michelle Chanez
Narvaez Law Firm, P.A.
Albuquerque, New Mexico

> *Attorneys for Defendant Bruce Malott*

Stephen S. Hamilton
Montgomery & Andrews, P.A.
Santa Fe, New Mexico

> *Attorney for Defendant Gary Bland*

Ellen S. Casey
Jaclyn M. McLean
Hinkle, Hensley, Shanor & Martin, LLP
Santa Fe, New Mexico

> *Attorneys for Defendant Veronica Garcia*

Richard J. Shane
Riley & Shane, P.A.
Albuquerque, New Mexico

> *Attorneys for Defendant Douglas M. Brown*

Paul Shechtman
Stillman, Friedman & Schechtman
New York, New York

> *Attorneys for Defendant Saul Meyer*

William Arland, III
The Arland Law Firm
Santa Fe, New Mexico

*-- and --*

Joseph Goldberg
Mary (Molly) Schmidt-Nowara
Freedman Boyd Hollander Goldberg Ives
 & Duncan, P.A.
Albuquerque, New Mexico

*Attorneys for Nominal Defendant The
 Educational Retirement Fund*